# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MTB BRIDGEPORT-NY OPERATING LLC, *et al.*,[1] | Case No. 11-12707 (___) |
| Debtors. | |

## DECLARATION OF LEE W. SHUBERT IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Lee W. Shubert, declare as follows:

1.     I am the managing member of MTB Bridgeport-NY Operating LLC ("MTB Operating") and MTB Bridgeport-NY Licensee LLC ("MTB Licensee" and together with MTB Operating, the "Debtors" or the "Company"), debtors and debtors-in-possession in the above-referenced chapter 11 cases (the "Chapter 11 Cases"). I have been employed in such capacity since May 11, 2011, and am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.     I submit this declaration (the "Declaration") to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 Cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), filed on the date hereof (the "Petition Date") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "First Day Pleadings"). I am familiar with the contents of each of the First Day Pleadings (including the exhibits thereto) and I believe each of the First Day

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) MTB Bridgeport-NY Operating LLC (0459); and (ii) MTB Bridgeport-NY Licensee LLC (4381).

Pleadings is (a) necessary to enable the Debtors to enter and operate in Chapter 11 with minimum disruption and loss of productivity or value and (b) is in the best interests of the Debtors' estates, creditors and stakeholders.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Company's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4. This Declaration is intended to provide a summary overview of the Debtors' business and the Chapter 11 Cases. Part I of this Declaration provides a description of the Debtors' businesses, corporate history and organizational structure, capital structure, the sale process, regulations imposed by the FCC and Communications Act (defined below), and the circumstances giving rise to the commencement of the Chapter 11 Cases. Part II of this Declaration summarizes the First Day Pleadings and the relief they seek, which the Debtors believe is crucial to the uninterrupted operation of the Debtors business and successful sale of the Debtors' assets for the highest possible price to maximize value for all parties-in-interest.

## PART I

## ORGANIZATIONAL STRUCTURE AND CORPORATE HISTORY

A. **General Business**

5. The Debtors currently operate television station WSAH (DTV Channel 42), Bridgeport, Connecticut (FCC Facility ID No. 70493) (the "Television Station"). The

Company's main studio facilities and transmitter are located in Seymour, CT. MTB Operating contracts for the programming that the Debtors broadcast on the Television Station.

6.      The Television Station is an affiliate of Retro Television Network ("RTN") which, on a barter basis, provides nostalgic/vintage television programming (network and syndicated) for twelve hours each broadcast day. RTN's programming includes such titles as Adam 12, Emergency, Highway to Heaven, I Spy, Naked City, Peter Gunn, Starsky & Hutch, The Rifleman, and other similar programming. RTN's programming is scheduled on the Television Station between noon and midnight. For the balance of each day (midnight until noon), the Television Station broadcasts paid programming which is comprised principally of so-called infomercials, per-inquiry and direct response television advertisements.

## B.    History

7.      In November 2006, Arthur Liu established MTB Equity, LLC, a non-debtor affiliate, to hold the membership interests in Multicultural Television Broadcasting, LLC ("Multicultural"), another non-bankrupt debtor affiliate, that at one time owned and operated five (5) television stations.[2] The aforementioned television stations were structured as ten different Delaware limited liability companies so that each television station's assets were held by one FCC license holding company and one operating company. Among these ten companies are the Debtors, MTB Operating, which holds all of the assets (other than the FCC licenses) of television station WSAH (DTV Channel 42), Bridgeport, Connecticut (FCC Facility ID No. 70493) ("WSAH"), and MTB Licensee, which holds the FCC licenses for WSAH.

---

[2] Multicultural's subsidiary operating and licensing companies included: (i) MTB San Francisco Operating LLC (KCNS); (ii) MTB San Francisco Licensee LLC; (iii) MTB Raleigh Operating LLC (WRAY-TV); (iv) MTB Raleigh Licensee LLC; (v) MTB Boston Operating LLC (WMFP); (vi) MTB Boston Licensee LLC; (vii) MTB Cleveland Operating LLC (WOAC); (viii) MTB Cleveland Licensee LLC; (ix) MTB Bridgeport-NY Operating LLC (WSAH); and (x) MTB Bridgeport-NY Licensee LLC (collectively, the "Subsidiaries").

8.     Effective May 11, 2011, Titan Broadcast Management LLC, a Delaware limited liability company ("Titan") became the manager of WSAH in compliance with section 4(k) of the Management Services Agreement dated November 16, 2009 between Multicultural Capital Trust and Titan Broadcast Management LLC.   Titan is the 100% owner of 5 Star Spectrum, LLC, a Delaware limited liability company ("5 Star") which owns non-voting membership interest representing 33.3% ownership position in NRJ TV LLC ("NRJ").   NRJ is the assignee and successor-in-interest to the lenders under the Prepetition First Lien Credit Documents (defined below).  Effective May 26, 2011, NRJ completed the acquisition of 100% of the Prepetition First Lien Credit Documents and the interests related thereto, acquiring such interests from Canpartners Investments IV, LLC, Citicorp USA, Inc., Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund Ltd., Fortress Credit Funding III LP, and Fortress Credit Funding IV LP.

## 1.     First Lien Credit Agreement

9.     On December 20, 2006, Multicultural and its Subsidiaries, including, Debtor MTB Operating (the "Borrowers"), with the licensee subsidiaries, including, Debtor MTB Licensee, as guarantors, and Wells Fargo Foothill, Inc., as administrative agent (in such capacity, the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders"), entered into that certain First Lien Credit Agreement, as amended on January 16, 2007, and October 16, 2007 (as may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), that certain Security Agreement, and that certain Guaranty[3] (collectively, with certain agreements, documents, and

---

[3]    Pursuant to (i) that certain General Continuing Guaranty, dated as of December 20, 2006, certain of Multicultural's subsidiaries, other than those that compose Borrowers (such subsidiaries, each, "Guarantor" and collectively, jointly and severally, "Guarantors") guaranteed the Obligations (as defined in the Prepetition First Lien Credit Agreement) (the "First Lien Guaranty"); and (ii) that certain General Continuing Guaranty, dated as of

instruments in respect thereof, the "<u>Prepetition First Lien Credit Documents</u>"), which provided for certain financial accommodations (the "<u>Prepetition First Lien Obligations</u>").

10.     As of August 22, 2011, the Borrowers were indebted to the First Lien Lenders under the Prepetition First Lien Obligations for: (i) advances under a revolver the amount of $5,265,153.33 plus accrued and unpaid interest, fees costs and expenses; (ii) a Term A-1 Loan in the amount of $37,718,919.46 plus accrued and unpaid interest, fees costs and expenses; and (iii) a Term A-2 Loan in the amount of $30,869,758.42 including accrued and unpaid interest, fees costs and expenses (collectively, the "<u>First Lien Obligations</u>").

11.     The Prepetition First Lien Obligations were collateralized by substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets (the "<u>Collateral</u>").  In May, 2011, the First Lien Lenders assigned their remaining interests in the First Lien Obligations to NRJ.  On or about September 28, 2010, Drawbridge Special Opportunity Fund L.P. replaced Wells Fargo Foothill, Inc. as the First Lien Agent for the First Lien Obligations (the "<u>Successor First Lien Agent</u>").

**2.     Second Lien Credit Agreement**

12.     On December 20, 2006, Multicultural and its operating subsidiaries, including, Debtor MTB Operating, as borrowers, with the licensee subsidiaries, including, Debtor MTB Licensee, LLC as guarantors, and Wells Fargo Foothill, Inc., as administrative agent (in such capacity, the "<u>Second Lien Agent</u>"), and the lenders from time to time party thereto (the "<u>Second Lien Lenders</u>"), entered into that certain Second Lien Credit Agreement, as amended on January 16, 2007, and October 16, 2007 (as may be further amended, restated,

---

December 20, 2006, Guarantors guaranteed the Obligations (as defined in the Prepetition Second Lien Credit Agreement) (the "<u>Second Lien Guaranty</u>").

supplemented or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement"), that certain Security Agreement, and that certain Guaranty (collectively, with certain agreements, documents, and instruments in respect thereof, the "Prepetition Second Lien Credit Documents"), which provided for certain financial accommodations (the "Prepetition Second Lien Obligations"). The Prepetition Second Lien Obligations were collateralized by a second priority lien on substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets (the "Prepetition Second Lien Collateral").

13.     As of August 22, 2011, the Borrowers were indebted to the Second Lien Lenders under the Prepetition Second Lien Obligations in the amount of $46,319,171.95 plus accrued and unpaid interest, fees costs and expenses (collectively, the "Second Lien Obligations"). The Second Lien Obligations are secured by valid, enforceable and perfected second-priority liens upon and security interests in the Collateral.

14.     On or about January 16, 2007, Pacific Media Capital, LLC replaced Wells Fargo Foothill, Inc. as the assignee and successor-in-interest to the agent and lenders under the Prepetition Second Lien Credit Documents.

15.     On February 6, 2008, Bernard National Loan Investors and Fortress Value Recover Fund I LLC replaced Pacific Media Capital, LLC as the assignee and successor-in-interest to the agent and lenders under the Prepetition Second Lien Credit Documents (the "Prepetition Second Lien Lender").

**3.     The Intercreditor Agreement**

16.     On December 20, 2006, Wells Fargo Foothill, Inc., as agent under the Prepetition First Lien Credit Agreement, and Wells Fargo Foothill, Inc., as agent under the

Prepetition Second Lien Credit Agreement, entered into that certain Intercreditor Agreement (the "Intercreditor Agreement"), pursuant to which the liens securing the Prepetition Second Lien Obligations are contractually subordinated to the liens securing the Prepetition First Lien Obligations. Among other things, the Intercreditor Agreement governs these parties' rights on various issues including priority, enforcement and distributions, including with respect to actions taken in these Chapter 11 Cases.

17. Pursuant to the Intercreditor Agreement, among other things, the Second Lien Lenders: [4]

- agreed to fully subordinate any and all Liens on Collateral securing any Second Lien Obligations existing or thereafter created to all Liens with respect to Collateral securing any First Lien Obligations (Intercreditor Agreement § 2.1(b));

- waived any right to "directly or indirectly, contest, or support any other person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity, or enforceability of a Lien held by or on behalf of any" First Lien Lenders in the Collateral (id. at § 2.2);

- subject to the limitations set forth in the Intercreditor Agreement until the Discharge of the First Lien Obligations has occurred, agreed to a standstill to exercise any rights or remedies with respect to any Collateral (id. at § 3.1(a));

- until the Discharge of the First Lien Obligations has occurred, granted the First Lien Agent and First Lien Lenders the exclusive right to Exercise any Secured Creditor Remedies[5] with respect to the Collateral without any consultation with or the consent of the Second Lien Agent or any Second Lien Lender (id. at § 3.2);

---

[4] The summary of the Intercreditor Agreement contained in this Declaration is qualified in its entirety by the terms of the Intercreditor Agreement. To the extent of any inconsistency, the terms of the Intercreditor Agreement shall govern. Any capitalized term used in this section of the Declaration not otherwise defined herein, shall have the meanings ascribed to them in the Intercreditor Agreement.

[5] "Exercise any Secured Creditor Remedies" or "Exercise of Secured Creditor Remedies" means (a) the taking of any action to enforce any Lien in respect of the Collateral, including the institution of any foreclosure proceedings, the noticing of any public or private sale or other disposition pursuant to Article 9 of the UCC or any diligently pursued in good faith attempt to vacate or obtain relief from a stay or other injunction restricting any other action described in this definition, (b) the exercise of any right or remedy provided to a secured creditor under the First Lien Loan Documents or the Second Lien Loan Documents (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of any Grantor or the taking of any action or the exercise of any right or remedy in respect of the setoff or recoupment against the Collateral or proceeds of Collateral), under applicable law, at equity, in an Insolvency Proceeding or otherwise, including the acceptance of

- subject to Sections 3.1(a), 3.3, and 6.5(b) of the Intercreditor Agreement, agreed to not take any action that would restrain, hinder, limit, delay, or otherwise interfere with any Exercise of Secured Creditor Remedies by First Lien Agent or any First Lien Lender, including any Disposition of the Collateral, whether by foreclosure or otherwise (id. at § 3.5(i)); and

- subject to Section 3.7 of the Intercreditor Agreement, waived any and all rights as a junior lien creditor or otherwise to object to the manner in which First Lien Agent or First Lien Lenders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the Collateral, regardless of whether any action or failure to act by or on behalf of First Lien Agent or First Lien Lenders is adverse to the interest of Second Lien Lenders (id. at § 3.5(ii)).

18.    Additionally, subject to the limitations set forth in section 6.2 of the Intercreditor Agreement, with respect to any debtor-in-possession financing or cash collateral arrangements to which the First Lien Lenders consent (or do not object), the Second Lien Lenders are deemed to consent (and will not object) in connection with such use of cash collateral or DIP financing (Id. at § 6.2).

19.    Finally, the Second Lien Agent agreed that it would consent, and would not object or oppose a motion to Dispose of any Collateral free and clear of the Liens or other claims in favor of the Second Lien Agent under section 363 of the Bankruptcy Code if the requisite First Lien Lenders have consented to such Disposition and such motion does not

---

Collateral in full or partial satisfaction of a Lien, (c) the sale, assignment, transfer, lease, license, or other Disposition of all or any portion of the Collateral, by private or public sale or any other means, (d) the solicitation of bids from third parties to conduct the liquidation of all or a material portion of Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, (e) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third parties for the purposes of valuing, marketing, or Disposing of, all or a material portion of the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, (f) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any capital stock composing a portion of the Collateral) whether under the First Lien Loan Documents, the Second Lien Loan Documents, under applicable law of any jurisdiction, in equity, in an Insolvency Proceeding, or otherwise, (h) the pursuit of Default Dispositions relative to all or a material portion of the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the Disposition of such Collateral within a commercially reasonable time, or (i) the commencement of, or the joinder with any creditor in commencing, any Insolvency Proceeding against any Grantor or any assets of any Grantor.

impair, subject to the priorities set forth in the Intercreditor Agreement, the rights of the Second

Lien Lenders under section 363(k) of the Bankruptcy Code (Id. at § 6.3).

### 4.    The Forbearance Agreements

20.    Beginning on or around November 2007 and continuing through the fall of

2008, several unwaived "Events of Default" occurred and continued to occur under the

Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement.

21.    On May 12, 2008 a Notice of Acceleration was sent from the First Lien

Agent to Borrowers (the "Notice of Acceleration") pursuant to which the Borrowers were

notified that (a) the commitment of the Lenders to make advances or extend credit, if any, under

the Prepetition First Lien Credit Agreement was terminated, and (b) the entire unpaid balance of

all outstanding First Lien Obligations, together with all accrued and unpaid interest thereon and

all fees and other amounts due under the Prepetition First Lien Credit Agreement and the other

loan documents, were immediately due and payable.

22.    On October 30, 2008, the Borrowers entered into that certain First Lien

Forbearance Agreement with the Lenders (as amended, the "First Lien Forbearance Agreement")

and that certain Second Lien Forbearance Agreement with the Second Lien Lenders (as

amended, the "Second Lien Forbearance Agreement" and together with the First Lien

Forbearance Agreement, the "Forbearance Agreements").    Pursuant to the Forbearance

Agreements, Multicultural immediately transferred four (4) television stations to that certain

Multicultural Capital Trust (the "Trust"). The primary role of the Trust is to sell the assets of the

Borrowers for the benefit of the First Lien Lenders and Second Lien Lenders.  The remaining

Television Station owned and operated by the Debtors that is the subject of these Chapter 11

Cases was transferred to the Trust in May, 2011.

## 5. The Multicultural Capital Trust

23. On October 30, 2008, pursuant to the Forbearance Agreements, MTB Equity, Multicultural, Lee W. Shubert LC, a Maryland limited liability company (the "Trustee"), the First Lien Lenders, the First Lien Agent, the Second Lien Lenders and the Successor Second Lien Agent entered into that certain Irrevocable Trust Agreement forming the Trust.

24. Pursuant to the Forbearance Agreements, Multicultural was required to transfer to the Trust all of Multicultural's right, title and interest in and to all of its equity interests in the Subsidiaries that operated the five television stations (collectively, the "Stations").

25. The Trust was established for the purpose of, among other things: (i) selling the membership interests in, or assets of, the Subsidiaries; (ii) applying any sale proceeds first to the payment of the First Lien Obligations and then to the Second Lien Obligations and then distributing any remaining sale proceeds to Multicultural; and (iii) otherwise holding, protecting and conserving the Trust assets until such time as the Trust is terminated pursuant to Article VI thereof.

26. Pursuant to the terms of the Forbearance Agreements, the Trust was placed in control of the operating Subsidiaries, which in turn, control the license Subsidiaries of the Stations.

27. On January 5, 2010, the Trust sold the assets of MTB Raleigh Operating LLC and MTB Raleigh License LLC, the licensee of television station WRAY-TV, to a third-party. On June 25, 2009, the Trust sold the assets of MTB Cleveland Operating LLC and MTB Cleveland License LLC, the licensee of television station WOAC (presently known by the call-sign WRLM) to the same third party purchaser as WRAY-TV. The buyer of the two television

stations is not related to NRJ, and both sales were in consideration of cash used to pay down the First Lien Obligations. On May 13, 2011, the Trust sold television station KCNS and television station WMFP to affiliates of NRJ in consideration for cash used to pay down First Lien Obligations.

28.    As of May 11, 2011, the Trust owns the equity interests directly in Debtor MTB Operating, and indirectly in Debtor MTB Licensee, which owns the assets of the Television Station. The Trust continues to own the shell companies that formerly owned the other television stations that were sold and intends to dissolve these entities.

**C.    Current Organizational Structure**

29.    MTB Operating owns all of the equity of MTB Licensee and the Trust owns all the equity of MTB Operating. Lee W. Shubert, via Lee W. Shubert, LC, Trustee, is the Managing Member of both MTB Operating and MTB Licensee.

**D.    Events Leading to the Chapter 11 Filing and Proposed Sale**

30.    The Debtors commenced these Chapter 11 Cases in order to permit them to conduct a sale of their business as a going concern under section 363(b) of the Bankruptcy Code. To that end, on July 25, 2011, MTB Operating entered into that certain Exclusive Brokerage Agreement (the "Brokerage Agreement") with Kalil & Co., Inc. ("Kalil" or the "Broker") to market for sale substantially all of the assets used or useful in connection with the Television Station (the "Assets").

31.    Kalil is a media brokerage firm that has provided radio and television brokerage services for over 40 years to the broadcast industry. For the last decade, Kalil has consistently been rated the top television broadcast brokerage firm in the country, based on

numbers of deals and dollar volume as compiled by SNL Kagan, which provides the data to the industry.

32.     Kalil has been involved with the ongoing sales of the MultiCultural Television stations set forth above over the past three years. While not technically engaged to sell the Assets (WSAH-TV) by the Trustee until July 25, 2011, Kalil has fielded numerous requests from prospective buyers for information on the Television Station regarding a potential sale. Contemporaneously with the Chapter 11 filing, the Debtors have submitted an application to formally retain Kalil to continue to market the assets. Subject to this Court's approval, Kalil will continue to market the Assets during these Chapter 11 Cases.

33.     As more fully set forth below, the Debtors have filed a motion requesting, among other things: (i) the approval of certain bidding procedures in connection with the sale of the Debtors' Assets; (ii) the scheduling of an auction and hearing to consider approval of the sale; and (iii) authorizing the sale of the Assets.

E.     **Regulations**

34.     The ownership, operation and sale of television broadcast stations are subject to the jurisdiction of the Federal Communications Commission (the "FCC"), which acts under authority derived from the Communications Act of 1934, as amended (the "Communications Act"). Both the entry into Chapter 11 and the emergence from Chapter 11 require consent of the FCC. Under the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments and transfers of control, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated. The FCC treats the entry into bankruptcy as an

involuntary assignment or transfer, and the emergence from bankruptcy by a licensee or its parent company as a "voluntary" transfer of control or assignment of FCC licenses when control will be transferred to a "permanent" holder, rather than to some other court-appointed interim holder. The restructuring will not be implemented until the FCC has granted applications seeking approval of the new control structure.

35.     Following the filing of its voluntary petitions under Chapter 11, the Debtors will file applications seeking the FCC's consent to the pro forma assignment of its FCC license from the Debtors to the Debtors as "debtors-in-possession" under Chapter 11 (the "Short Form Application"). The Debtors will then be required to file applications with the FCC (the "Long Form Application") to obtain approval of the transfer of control of the Debtors upon conclusion of the sale process described herein. The Short Form Application can be approved by the FCC on a more expedited basis than the Long Form Application and is not subject to formal petitions to deny.

36.     The FCC will allow the application for transfer out of bankruptcy to a "permanent" holder to be filed once the Bankruptcy Court has authorized the transaction. Generally, three to seven days after submission of the application for a voluntary transfer of control, the FCC issues public notice that it has accepted the application for filing. Interested parties then have 30 days from the date of the public notice to file petitions to deny the application. To the extent petitions to deny are filed in this situation, they typically focus on the qualifications of the restructured company and/or the purchaser and their reportable owners, officers and directors to hold or control FCC broadcast licenses.

37.     If petitions to deny are filed against the transfer applications, the applicants will have an opportunity to file an opposition, with the petitioner then having an

opportunity to file a reply. The FCC then will consider the applications and the filings made by the parties to the proceeding. Oppositions to the application for FCC consent to transfer FCC licenses can delay the process.

38. If no oppositions are filed against the applications and the FCC finds the applications to be in compliance with its rules and policies, the FCC may grant the applications shortly after the close of the public notice period. In some instances, the FCC may request that the applicants supply additional information through amendments to the applications. There is no time limit on how long the FCC may consider transfer applications before acting on them, but the FCC has a declared goal of processing all transfer applications within 180 days, and most applications are granted much more quickly. In a bankruptcy context, however, the FCC will not grant the applications until the Bankruptcy Court has authorized the transaction.

39. Once the FCC has granted a transfer application, it will issue a public notice of the grant. Interested parties opposed to the grant may file for reconsideration for a period of 30 days following public notice of the grant. If the grant is made by the FCC's staff under delegated authority, the FCC may reconsider the action on its own motion for a period of 40 days following issuance of public notice of the grant. After the lapse of 40 days, assuming no protest or reconsideration, the FCC consent to the grant becomes final and unappealable. Parties are free to close upon the grant of FCC consent even if petitions for reconsideration are filed, but the consummation will be subject to any further order that the FCC might issue upon reconsideration. Although highly unusual, the FCC may rescind a grant of consent upon reconsideration if it finds that doing so would serve the public interest, convenience and necessity.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS[6]

**A.    Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases**

40.    The joint administration of the Debtors' Chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties-in-interest.  The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect all of the Debtors.  Joint administration will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these cases.  Joint administration will also enable parties in interest in each of the above-captioned Chapter 11 cases to be apprised of the various matters before the Court in all of these cases.

41.    The entry of an order of joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays.  Moreover, the relief requested by this Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

42.    For these reasons, I believe that joint administration of these cases by the Court is in the best interests of the Debtors' estates.

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

**B.      Motion For an Order (A) Authorizing Debtor to Maintain Existing Cash Management System, Bank Accounts and Business Forms; and (B) Providing for Other Related Relief.**

43.      The Debtors manage their finances through the maintenance of single bank account for the depositing receipts, paying vendors, funding payroll and paying any other accounts payable (the "Cash Management System").   Specifically, the Debtors maintain a business checking account (account number xxxxxx7797) (the "Bank Account") at Wachovia Bank – Columbia Mall Financial Center ("Wachovia Bank").   The Bank Account is essential to the Debtors' ongoing business operations and even a temporary delay in establishing a new account would be detrimental for reasons set forth herein.   The balances in the Bank Account will not exceed the current limits of governmental insurance.

44.      The Debtors' Cash Management System, while admittedly simple, allows the Debtors to ensure cash availability to efficiently manage its business operations.   Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into these Chapter 11 cases.   The Debtors are seeking authority to maintain and leave open their existing Bank Account so the Trustee can focus on operating the business and overseeing the sale process and not be distracted by the administrative issues of opening a new account and obtaining new checks and other business forms.   The Debtors have instructed or are in the process of instructing Wachovia Bank to place a hold on and not pay any checks drawn and outstanding on the Bank Account issued prior to the Petition Date unless and until this Court enters an order authorizing the payment of these checks.   In an effort to manage this process efficiently, to distinguish between prepetition date and postpetition date checks, the Debtors left a "gap" in their check numbers such that check numbers preceding this gap will be readily identifiable as checks issued prepetition.   The Debtors will not pay, and Wachovia Bank will be instructed not to pay, any prepetition debts other than those specifically authorized by this Court.

45.     I believe that the Bank Account and related Cash Management System mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close the Bank Account and reestablish a new account would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using the existing Bank Account is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were not honored.

46.     Likewise, the commencement of these cases will already place a strain on the Debtors' relationships with their employees, customers and vendors, all of whom are vital to the Debtors' continued operations and successful reorganization. Requiring the Debtors to open a new Bank Account and to dishonor and reissue checks and drafts would not only cause delay, confusion and disruption in the Debtors' operations, it would also jeopardize Debtors' vital relationships with these parties in interests.

47.     The Debtors have filed, among other motions: (a) a motion seeking authority to pay certain outstanding employee obligations; and (b) a motion to enable them to satisfy their prepetition obligations relating to sales, use and similar taxes. Accordingly, unless this Motion is granted, the Debtors undoubtedly would be unable to satisfy certain checks and be forced to reissue checks to the detriment of their business and without any benefit to the estates.

48.     Consequently, I believe that maintenance of the existing Bank Account and Cash Management System is in the best interests of all creditors, other parties-in-interest, and the Debtors' estates.

49.     Additionally, in the ordinary course of business, the Debtors use a variety of business forms. To minimize expenses to their estates and avoid confusion, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, letterhead and invoices), as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession. With such authorization, the Debtors will be able to avoid the expense, delay, and confusion of ordering entirely new business forms.

50.     The cost to the Debtors and their estates in obtaining new checks and other business forms would be significant and the Debtors have already taken other measures to ensure that the policies underlying the U.S. Trustee's operating guidelines are protected by generally alerting parties-in-interest to the Debtors' chapter 11 filings. Accordingly, I believe that the requested relief is necessary to preserve the Debtors' estates.

51.     The Debtors also engage in certain intercompany transfers and transactions (the "Intercompany Transactions"). The Televisions Station's Annual Regulatory Fee for WSAH due to the Federal Communication Commission (the "Annual Regulatory Fee") will be due on September 14, 2011 primarily for the pre-petition period. Although the Debtors intend to seek a waiver of the Annual Regulatory Fee, absent such waiver, the Debtors will need to make an intercompany transfer to cover the amount of this fee.

52.     For these reasons, I believe that authorizing the Debtors to maintain the existing Cash Management System, Bank Accounts, and Business Forms, and to continue to engage in Intercompany Transactions, is in the best interest of the Debtors, their estates and creditors.

**C. Motion for Order Authorizing the Payment of Prepetition Sales and Use Taxes.**

53.    I understand that, to the extent the Debtors have collected sales and use taxes from their customers, such funds may constitute so-called "trust fund" taxes (the "Trust Fund Taxes") that were required to be collected from third parties and must be held in trust by the Debtors for payment to the Taxing Authorities.

54.    In addition, I understand that many state and local Taxing Authorities impose personal liability on the officers and directors of entities responsible for collecting Trust Fund Taxes to the extent that any such taxes are collected but not remitted. Thus, if any Trust Fund Taxes remain unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal prosecution on account of any such nonpayment during the pendency of these cases. Such lawsuits or proceedings obviously would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' efforts to: (a) stabilize the Debtors' postpetition business operations; and (b) develop and implement a successful Chapter 11 strategy.

55.    Moreover, I believe that some of the Taxing Authorities may seek to have the Debtors audited if the Trust Fund Taxes are not paid promptly. I believe such audits would further divert attention and resources from the reorganization process.

56.    I submit that the payment of the Trust Fund Taxes is necessary to preserve the assets of the Debtors' estates and to maintain their ongoing operations.

57.    For these reasons, I believe that authorizing the Debtors to pay the prepetition sales, use and other taxes is in the best interests of the Debtors, and their estates and creditors.

**D.** **Motion of the Debtors for an Order Under Sections 105(a) and 507(a) of the Bankruptcy Code Authorizing Payment of Certain Prepetition Employee Obligations and Honoring of Prepetition Employee Policies and Benefits**

58.     The Debtors have two employees, and prior to the Petition Date and in the ordinary course of their businesses, the Debtors provided them with salaries, vacation time, and other compensation and benefits as further described herein (the "Employee Obligations").

**A.**     **Employee Compensation**

59.     The Debtors' employees are paid biweekly on a salary basis. Automatic Data Processing, Inc. ("ADP") processes the Debtors' payroll based upon data transmitted to it from the Debtors' corporate headquarters. ADP tallies the amounts necessary to fund payroll (including payroll taxes) and automatically deducts from the Debtors' Bank the amount necessary to fund all payroll and related tax liabilities. Upon approval of the payroll distribution by the Debtors, ADP directly deposits net payroll amounts to the employees' bank accounts.

60.     The employees' last pay day was August 19, 2011 for the period August 8, 2011 through and including August 21, 2011. As of the Petition Date, the employees are owed approximately $3,000 for work performed prior to the Petition Date. None of the Debtors' employees are owed more than $11,725.00 in accrued and unpaid wages or salary. All of the outstanding wages and salary were earned within 180 days of the Petition Date.

61.     As of the Petition Date, the Debtors do not believe any money is owed to government agencies with respect to the above prepetition wages and salary for payroll-related withholding obligations and taxes (including income tax withholding, Medicare, social security, unemployment taxes, and the like) (the "Withholding Obligations").

**B.**     **Personal Time Off and Sick Leave**

62.     The Employees are also eligible for paid time off to be used for vacation or sickness ("PTO"). PTO is awarded based on length of full-time service with the Debtors as

follows: full-time employees earn ten (10) days of PTO per year during the first five (5) years of full-time employment with the Debtors, and fifteen (15) days of PTO per year after five (5) years of full-time employment with the Debtors. PTO does not carry over if it is not used during a calendar year. Unused PTO will be paid only if the employment is terminated within the year.

63.     Additionally, full time employees receive ten (10) days of sick leave for each year, which are to be used for sickness only ("Sick Leave").

64.     As of the Petition Date, the Debtors' Employees collectively have accumulated approximately $9,000 in PTO and Sick Leave. The Debtors intend to honor accrued PTO and Sick Leave days in the ordinary course of business. None of the Debtors' Employees shall receive an aggregate amount in excess of the statutory cap of $11,725.00 under section 507(a)(4) of the Bankruptcy Code on account of PTO, Sick Leave, wages and salary.

## C.     Business Reimbursement

65.     The Debtors reimburse certain of their personnel for business and travel expenses. These expenses typically result from work related travel and expenses and from use of personal equipment for work purposes, such as cell phones. Employees sometimes pay these expenses out of pocket and subsequently seek reimbursement from the Debtors.

66.     As of the Petition Date, the Debtors estimate that $1,000 in reimbursable business and travel expenses have been incurred but have not yet been submitted for reimbursement or paid. Failure to reimburse these expenses would impose an undue burden on the affected employees, who incurred those expenses with the expectation that the Debtors would reimburse them.

67.     The Debtors employ only two individuals. These employees may suffer extreme hardship if the Employee Obligations are not honored and may be unable to pay their

basic living expenses, causing serious harm to the employees' families. Moreover, it is reasonable for the Debtors to be concerned that if their employees are not paid their outstanding wages, morale will suffer and the Debtors' only two employees may decide to leave at this critical time.

68.    I do not believe that the postpetition payment of Employee Obligations will create any significant, ongoing burden on the Debtors' estates. I believe the Debtors will have sufficient cash on hand to pay all Employee Obligations.

69.    For the foregoing reasons, I submit that granting the relief requested in the motion is appropriate and in the best interest of the Debtors' estates.

**E.    Motion For Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment.**

70.    In connection with the operation of their businesses and the management of their facilities, the Debtors utilize electricity, satellite television, telephone, and similar utility products and services (collectively, the "Utility Services") provided by approximately four different utility companies (each a "Utility Provider" and collectively, the "Utility Providers") covering a number of utility accounts.

71.    Prior to the Petition Date, the Utility Providers provided Utility Services to the Debtors. Ordinarily, the Debtors pay each of the Utility Providers upon receipt of a monthly invoice for the Utility Services. The Debtors have a very good payment history with the Utility Providers. To the best of my knowledge, the Debtors have not had significant defaults or arrearages with respect to undisputed invoices for the Utility Providers. Uninterrupted Utility Services are essential to the Debtors ongoing operations, and, therefore, to the success of the Debtors' Chapter 11 cases. Should any Utility Provider refuse or discontinue service, even for a

brief period, the Debtors' business operations could be disrupted. The impact of such disruption on the Debtors' business operations would be extremely harmful and would jeopardize the success of the Debtors' Chapter 11 cases. Therefore, it is essential that the Utility Services continue uninterrupted.

72.     The Debtors expect that revenues from operations and funds from their debtor-in-possession financing will be sufficient to pay all postpetition obligations for Utility Services, and intend to continue to pay all such obligations in a timely manner in the ordinary course of business. As an additional measure, the Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, calculated from an historical average over the twelve months, or approximately $26,000, into an account maintained by the Debtors (the "Utility Deposit Account") to provide adequate assurance of payment for future services to the Utility Providers. The Debtors submit that the Utility Deposit Account together with the Debtors ability to pay for future Utility Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers. If any Utility Provider believes additional assurance ("Additional Adequate Assurance") is required, the Debtors propose that such Utility Provider be required to request such Additional Adequate Assurance pursuant to the procedures set forth in this Motion.

73.     If the Utility Providers are permitted to alter, refuse or terminate utility services, even for a brief period, a substantial disruption of the Debtors' operations will occur, and the Debtors' businesses will be harmed, possibly severely. I believe such a disruption could have a devastating impact on the Debtors' business operations and revenues, and ultimately affect the Debtors' ability to maximize the value of their estates. In contrast, the Utility

Providers will not be prejudiced by the continuation of its services and will be paid all postpetition charges. It is therefore critical that Utility Providers continue to provide uninterrupted utility services to the Debtors.

74. Without the Additional Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Providers in an unorganized manner at a critical period in their chapter 11 cases when their efforts should be focused on stabilizing their operations and maximizing value for all of their stakeholders. The orderly process contemplated by the Additional Adequate Assurance Procedures is necessary for a smooth transition by the Debtors into chapter 11 and will aid in their restructuring efforts. Moreover, the Additional Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. This will protect the Debtors and their stakeholders from any attempt by a Utility Provider to delay a request for adequate assurance in an attempt to force the Debtors to accede to its request to avoid cessation of essential services.

75. I submit that the Proposed Adequate Assurance constitutes sufficient adequate assurance to the Utility Providers. For the foregoing reasons, I submit that granting the relief requested in the motion is appropriate and in the best interests of the Debtors' estates.

**F.      Motion for an Order Authorizing Debtors to Continue Insurance Programs and Granting Related Relief.**

76. In connection with the operation of the Debtors' businesses and the management of their properties, the Debtors maintain numerous insurance policies providing coverage for, among other things, property insurance, general liability insurance, professional liability insurance, director and officers' liability, excess indemnity insurance, trustee and fiduciary liability and employee benefits, administration insurance, workers' compensation and umbrella coverage (collectively, the "Insurance Policies"). The Insurance Policies are issued in

the name of the Debtors, either as the sole insured or collectively with affiliates of the Debtors, as co-insureds, under the policies.

77. The Insurance Policies are maintained through Hartford Casualty Insurance Company, Hartford Fire Insurance Company, Hiscox Insurance Company, The Cincinnati Insurance Company and Hartford Underwriters Insurance Company (collectively, the "Insurance Carriers"). I believe the Insurance Policies are essential to the ongoing operation of the Debtors' business.

78. The Debtors pay premiums to the Insurance Carriers based upon a fixed rate established and billed by each Insurance Carrier. The premiums for most of the Insurance Policies are determined annually and are paid by the Debtor: (a) directly to the Insurance Carrier at policy inception or (b) indirectly through insurance brokers.

79. As of the Petition Date, the Debtors owe approximately $15,000 on all prepetition deductible and claim expense reimbursements and all premium payments due and payable with respect to the Insurance Policies.

80. The Debtors must continue, in full force and effect, their Insurance Policies, which provide a comprehensive range of coverage for the Debtors' business and properties. If the Insurance Policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others. Moreover, from an administrative standpoint, it would be extremely difficult for the Debtors to secure replacement insurance coverage in the postpetition period if the Insurance Policies are allowed to lapse.

81. Finally, the Debtors may need to renew or replace certain of their Insurance Policies in the upcoming months. If the Debtors do not honor their obligations under

the Insurance Policies, certain of the Insurance Carriers may be reluctant to continue doing business with the Debtors. In the current insurance market, any reduction in the number of available Insurance Carriers may result in an increase in the Debtors' future insurance premiums.

82.     For the foregoing reasons, I submit that granting the relief requested in the motion is appropriate and in the best interests of the Debtors' estates.

**G.      Motion of the Debtors for an Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors in the Ordinary Course of Business.**

83.     The operation of the Television Station and the uninterrupted broadcast of programming require certain licensing and broadcast services from outside vendors. In order to continue to broadcast during these cases, the Debtors need authority to pay these obligations as they come due to the parties that are essential to the Debtors' continued operations (the "Critical Vendors"). Many of these Critical Vendors are not easily replaced, and may refuse to provide critical services in the event they are not paid. Further, some of the Critical Vendors are providing services without a formal agreement. I believe these payments are necessary in order to allow the Debtors to continue to operate their business without interruption during these cases.

84.     For the foregoing reasons, I submit that granting the relief requested in the motion is appropriate and in the best interests of the Debtors' estates.

**H.      Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses for Professionals.**

85.     Simultaneously with the filing of this Declaration, the Debtors filed an application to retain Landis Rath & Cobb LLP as their counsel.

86.     The Debtors anticipate that, as these cases progress, they may need to retain other professionals in connection with their ongoing business and reorganization efforts. In addition, a statutory committee of unsecured creditors (the "Committee") may be appointed in

these cases. If appointed, the Committee will likely retain counsel, and possibly other professionals, to assist it in fulfilling its obligations in these cases.

87. The proposed compensation procedures outlined in the interim compensation motion (the "Compensation Procedures") should enable professionals to be paid partial amounts owed to them while ensuring appropriate oversight, and otherwise not unduly burdening the Court, the United States Trustee and the respective Professionals. Accordingly, I submit that approving the Compensation Procedures is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

I. **Motion of Debtors and Debtors in Possession for Interim and Final Orders (I) Authorizing Post-Petition Secured Financing Pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; (III) Providing Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code; (V) Providing Related Relief and (VI) Scheduling A Final Hearing**

88. Through the DIP Financing Motion, the Debtors request entry of the Interim Order and the Final Order authorizing their obtaining post-petition financing and their use of cash collateral through the proposed debtor-in-possession financing facility (the "DIP Facility"). The Debtors have filed contemporaneously herewith a motion for an order scheduling a hearing to approve, among other things, the sale of substantially all of the Debtors' assets (the "Sale Motion"). As set forth in the Sale Motion and this Declaration, the Debtors do not have sufficient working capital, or other assets that are not subject to the First Lien Lenders liens to continue their business operations without the need for additional financing. As further set forth in the DIP Financing Motion and the Sale Motion, NRJ will serve as the proposed stalking horse as the Debtors seek to sell substantially all of their assets pursuant to an orderly sale process approved by this Court (the "Sale").

89.     The Debtors' decision to enter into the proposed DIP Facility is the culmination of an intense, several month-long process targeted at procuring the best available financing under the circumstances.  Because the Debtors' had no other viable financing alternative, and the Prepetition First Lien Lender is unwilling to agree to the use of Cash Collateral alone, if the Debtors rejected the DIP Facility, they would not be able to continue operating their business.

90.     Entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of the estates assets and is in the best interest of the Debtors' creditors and all parties-in-interest.  Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment.  Given the Debtors' significantly constrained liquidity position, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these Chapter 11 Cases and the general uncertainty in the marketplace that will accompany this process.

91.     Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their business in an orderly manner, maintain business relationships and assure the continuity of operations with, and ability to make payment to, vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs — each of which is vital to preserving and maintaining the value of these estates for the benefits of all stakeholders.

92.     Consequently, the Debtors seek entry of an interim and final order authorizing the Debtors to obtain a $650,000 secured postpetition financing (the "DIP Financing") from NRJ (the "DIP Lender") on a superpriority basis.  The DIP Liens shall prime and be senior in all respects to any existing liens or claims, subject only to (i) the Carve-Out, and

(ii) liens on property of a Debtor that are in existence on the Petition Date but only to the extent a lien on such property (x) is valid, binding, perfected, enforceable and not avoidable, and (y) the lien on such property on the Petition Date was senior in priority to the Prepetition First Lien Lender's Liens. Further, the DIP Facility will prime the existing Prepetition Secured Obligations, which is consistent with the terms of the Intercreditor Agreement. Subject to the approval of this Court, the Debtors proposed to enter into the DIP Facility and to use Cash Collateral, as such term is defined in section 363 of the Bankruptcy Code, in order to provide the Debtors with sufficient liquidity to fund operations during the Chapter 11 Cases.

93. The DIP Facility will mature on the earliest of (a) March 31, 2012; (b) the earlier of (i) the date upon which the Interim Order expires or (ii) thirty-five (35) days after the entry of the Interim Order, in either case, if a Final Order approving the DIP Facility has not been entered prior to the expiration of such period; (c) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the 30th day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrower; (e) the date of indefeasible prepayment in full by Borrowers of all obligations hereunder in accordance with the terms hereof; or (f) upon acceleration of the obligations hereunder.

94. In an effort to ensure the Debtors could not obtain financing on better terms than the proposed DIP Financing, prior to the Petition Date, I reached out to four alternative lenders, none of whom could provide debtor-in-possession financing on terms better than those offered by NRJ. My efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis. The DIP Facility was the best and only available financing

that satisfied the Debtors' needs.  Indeed, discussions with other potential lenders were stalled because of diligence requirements, unfavorable terms, and time constraints.  Accordingly, the Debtors submit that the terms of the DIP Credit Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

95.     The Debtors negotiated the terms of the proposed DIP Facility in good faith and ay arm's length and the Debtors believe the terms of the DIP Facility are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment.

96.     The Debtors ability to continue operating is critical to preserving the Debtors' going concern value and ensuring that the value of the Debtors' assets are maximized for the benefit of the Debtors' estates and creditors.  The Debtors, their employees and estates will suffer irreparable harm if the DIP Facility is not approved and if the Debtors do not obtain the working capital they need to operate in Chapter 11 and to consummate a sale of their businesses as a going concern.

**J.      Motion of the Debtors for Entry of Orders:  (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief**

97.     On the date hereof, the Debtors filed the above-reference motion (the "Sale Motion").  The Debtors commenced these Chapter 11 Cases in order to permit them to conduct a sale of their business as a going concern under section 363(b) of the Bankruptcy Code.  To that end, the Debtors have retained Kalil as their advisor to explore possible sale transactions with interested buyers (subject to approval by this Court).  In connection with Kalil's efforts, the

Debtors' have established procedures (subject to approval by this Court) for the submission and consideration of bids, so that these procedures may promptly be communicated to interested parties.

98.     The Debtors have determined that it is in the best interests of their estates to proceed with NRJ as the Stalking Horse Bidder pursuant to the Agreement since, among other reasons, NRJ's bid will provide a floor for other bidders during the sale process on terms that are fair and reasonable.

### 1. Proposed Sale to NRJ

99.     Prior to the commencement of these Chapter 11 Cases, the Debtors and NRJ entered into the Agreement, subject to higher and better offers and the approval of this Court. The Sale Motion contains a summary of material provisions of the Agreement. I believe that this summary accurately reflects the Agreement.

100.     The Debtors believe that a sale of substantially all their assets is in the best interests of their estates and all parties-in-interest. Upon approval of the Bid Procedures, the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse Bidder, in an effort to achieve maximum value for the benefit of all of their constituents.

101.     The Debtors submit that sound business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures. Absent a sale of their assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as they are due, and the value of the Acquired Assets will continue to decline absent a prompt sale. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

## 2. The Proposed Bid Procedures are Reasonable and Appropriate

102. The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale, in order to generate and retain potential purchasers' interests in the Acquired Assets. In addition, because the Debtors have little to no liquidity, the Debtors have no choice but to sell their assets in an expedited manner to preserve and maximize the value of their estates. Accordingly, the Bid Procedures were developed consistently with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest or best offer for the Acquired Assets. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close the transaction.

103. The value of the Acquired Assets may decline substantially if the Sale process is not completed on an expedited basis. The Debtors' key customers and vendors may terminate their relationships with the Debtors, and potential bidders may lose confidence in the certainty of the Sale process and decide to stop pursuing the purchase of the Acquired Assets. As such, it is imperative to move forward with the Auction and the Sale promptly.

104. I believe that the Bid Procedures and related notices are reasonable and appropriate, and will benefit the Debtors, and their estates and creditors.

## 3. The Proposed Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases are Reasonable and Appropriate

105. To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements, to the Stalking Horse Bidder, or as applicable, to the Successful Bidder.

106. Section 365(a) of the Bankruptcy Code provides a debtor-in-possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor." Courts will approve the assumption of an executor contract or unexpired lease under section 365(a) of the Bankruptcy Code upon finding that the debtors have exercised their sound business judgment in determining to assume and assign the Assigned Agreements.

107. The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these Cases.

108. I submit that the Cure Procedures and related notices for effectuating the assumption and assignment of the Assigned Agreements as set forth in the Motion are appropriate and should be approved.

Pursuant to 28 U.S.C. § 1746, I I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of August, 2011.

Lee W. Shubert