# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MTB BRIDGEPORT-NY OPERATING LLC, *et al.*,[1] | Case No. 11-12707 (   ) (Joint Administration Requested) |
| Debtors. | |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION
FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
POST-PETITION SECURED FINANCING PURSUANT TO
SECTIONS 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1),
364(E) AND 503(B) OF THE BANKRUPTCY CODE; (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING
ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES PURSUANT TO SECTIONS 361, 362 AND 363 OF
THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC
STAY PURSUANT TO SECTION 362(D) OF THE BANKRUPTCY CODE;
(V) PROVIDING RELATED RELIEF AND (VI) SCHEDULING A FINAL HEARING**

MTB Bridgeport-NY Operating LLC ("MTB Operating"), and MTB Bridgeport-NY Licensee LLC ("MTB Licensee"), the debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move (the "DIP Financing Motion") the Court for the entry an Interim Order substantially in the form of the proposed order annexed hereto as **Exhibit A** (the "Interim Order") and a Final Order (the "Final Order," and together with the Interim Order, the "DIP Orders") authorizing the Debtors, pursuant to title 11 of the United States Code (the "Bankruptcy Code"), including sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) thereof, and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including Rules 2002, 4001, and 9014, to: (i) obtain postpetition financing (the "DIP Facility")

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are MTB Bridgeport-NY Operating LLC (0459) and are MTB Bridgeport-NY Licensee LLC (4381).

and enter into a senior secured priming and superpriority debtor-in-possession credit agreement, substantially in the form annexed hereto as **Exhibit B** (together with all schedules and exhibits thereto, the "DIP Credit Agreement," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Documents"),[2] by and among the Debtors as Borrowers and NRJ TV LLC ("DIP Lender") as lender, all in respect of the obligations set forth in the DIP Credit Documents and herein (the "DIP Obligations"); (ii) grant mortgages, security interests, liens and superpriority claims for the benefit of the DIP Lender in respect of the DIP Obligations as provided herein and in the DIP Credit Documents; (iii) use Cash Collateral (defined below); (iv) provide Adequate Protection (defined below) to the Prepetition Secured Parties (defined below); (v) modify the automatic stay pursuant to section 362 of the Bankruptcy Code; (vi) fund postpetition allowed fees and expenses of Retained Professionals (defined below) and the Carve-Out (defined below); (vii) pending a final hearing on the Motion (the "Final Hearing"), obtain an emergency postpetition loan of $650,000 under the DIP Credit Agreement (the "Interim DIP Facility"), (viii) in accordance with Bankruptcy Rule 4001(c)(2), request that this Court schedule the Final Hearing and approve notice with respect thereto; and (ix) grant related relief. In support of the Motion, the Debtors submit the *Declaration of Lee W. Shubert in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Declaration"). In further support of the Motion, the Debtors submit as follows:

## Preliminary Statement

1.      The Debtors have secured a $650,000 debtor-in-possession credit facility (the "DIP Facility"), which will ensure that they have access to the funds necessary to maintain the stability of their business operations. The use of Cash Collateral alone would be insufficient to

---

[2] Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the DIP Credit Agreement and DIP Credit Documents.

meet the Debtors' postpetition liquidity needs and provide the necessary assurances to customers, suppliers and regulatory authorities, all of which are necessary to maintain the value of the Debtors' business.

2.    To continue operating in the ordinary course during the bankruptcy proceeding, the Debtors need to access liquidity. The Debtors will obtain this liquidity from the use of Cash Collateral and the DIP Facility. As discussed below and in the Declaration, the Debtors' decision to proceed with the DIP Facility comes after a search for other available and better financing alternatives. The DIP Facility is the best available source of financing and provides the Debtors with the liquidity they need to operate during these cases. The DIP Facility was negotiated at arm's length on terms that are reasonable. Thus, to ensure the Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, the Court should approve the DIP Facility.

### Status of the Case and Jurisdiction

3.    On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these cases (the "<u>Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these cases.

6.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

7.     The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 503(b) of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002, 4001 and 9014 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

### Background

8.     MTB Equity, LLC, a non-debtor affiliate, was established to hold the membership interests in Multicultural Television Broadcasting, LLC, another non-debtor affiliate, that at one time owned and operated five (5) television stations.  The aforementioned television stations were structured as ten different Delaware limited liability companies so that each television station's assets were held by one FCC license holding company and one operating company. Among these ten companies are the Debtors, MTB Bridgeport-NY Operating LLC, which holds all of the assets (other than the FCC licenses) of television station WSAH (DTV Channel 42), Bridgeport, Connecticut (FCC Facility ID No. 70493) ("WSAH"), and MTB Bridgeport-NY Licensee LLC, which holds the FCC licenses for WSAH.

9.     WSAH is an affiliate of Retro Television Network ("RTN") which, on a barter basis, provides nostalgic/vintage television programming (network and syndicated) for twelve hours each broadcast day.  RTN's programming includes such titles as Adam 12, Emergency, Highway to Heaven, I Spy, Naked City, Peter Gunn, Starsky & Hutch, The Rifleman, and other similar programming.  RTN's programming is scheduled on the Television Station between noon and midnight.  For the balance of each day (midnight until noon), the Television Station broadcasts paid programming which is comprised principally of so-called infomercials, per-inquiry and direct response television advertisements.

10.    Effective May 11, 2011, Titan Broadcast Management LLC, a Delaware limited liability company ("Titan") became the manager of the WSAH in compliance with section 4(k) of the Management Services Agreement dated November 16, 2009 between Multicultural Capital Trust and Titan Broadcast Management LLC.    Titan is the 100% owner of 5 Star Spectrum, LLC, a Delaware limited liability company ("5 Star") which owns non-voting membership interest representing 33.3% ownership position in the DIP Lender.    The DIP Lender is the assignee and successor-in-interest to the lenders under the Debtors' prepetition senior secured credit facility.    Effective May 26, 2011, the DIP Lender completed the acquisition of 100% of the senior debt interests of the Debtors.    The DIP Lender acquired the senior debt interests from Canpartners Investments IV, LLC, Citicorp USA, Inc., Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund Ltd., Fortress Credit Funding III LP, and Fortress Credit Funding IV LP.

11.    In October 2008, pursuant to certain agreements with their secured creditors, Multicultural Television Broadcasting, LLC transferred its interests in the eight non-debtor operating and license holding entities to the Multicultural Capital Trust (the "Trust").    The Trust was created pursuant to that certain Irrevocable Trust Agreement, for the purpose of the sale of each of the aforementioned television stations.    In May 2011, Multicultural Television Broadcasting, LLC transferred its membership interests in the Debtors to the Trust for the purpose of the sale of substantially all of the Debtors' assets.

12.    The Trust has since sold substantially all, if not all, of the assets of the eight non-debtor entities, which are now shell companies.    Two of the non-debtor television stations were sold, via the sale of assets of the respective operating and license holding companies, to affiliates of NRJ TV LLC.    NRJ TV LLC was not, at that time, a secured creditor of any of the Debtors or their non-debtor affiliates.    The Trust sold the other two non-debtor television stations, via the

sale of assets of the respective operating and license holding companies, to unrelated third parties.

13.     The outstanding secured indebtedness totals approximately $120 million dollars comprised of approximately $74 million owed to senior secured debt held by NRJ TV LLC and approximately $46 million of second lien subordinated debt held by Bernard National Loan Investors and Fortress Value Recovery Fund I LLC. Subject to higher and better offers, NRJ TV LLC intends to credit bid a portion of its secured debt and assign its credit bid to a third party designee which will acquire WSAH via the acquisition of substantially all, if not all, of the Debtors' assets. Material consideration of the DIP Lender to enter into the DIP Facility is the right to credit bid the DIP Obligations, DIP Liens and DIP Superpriority Claims and the Prepetition First Lien Obligations, the Prepetition First Lien Collateral, the Adequate Protection Liens and 507(b) Claims (each defined below) with respect to any bulk or piecemeal sale of all or any portion of the Debtors' assets.

14.     The Debtors acknowledge and agree that NRJ TV LLC has the right to credit bid under Section 363(k) of the Bankruptcy Code and otherwise waive their rights to object to NRJ TV LLC's right to credit bid.

### The Debtors' Outstanding Prepetition Indebtedness

**A.     Prepetition First Lien Obligations**

15.     On or about December 20, 2006, Multicultural Television Broadcasting LLC and its operating subsidiaries, including, Debtor MTB Bridgeport-NY Operating, LLC, as borrowers, with the licensee subsidiaries, including, Debtor MTB Bridgeport-NY Licensee, LLC as guarantors, and Wells Fargo Foothill, Inc., as administrative agent, and the lenders from time to time party thereto, entered into that certain First Lien Credit Agreement, as amended on January 16, 2007, and October 16, 2007 (as may be further amended, restated, supplemented or

otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), that certain Security Agreement, and that certain Guaranty (collectively, with certain agreements, documents, and instruments in respect thereof, the "Prepetition First Lien Credit Documents"), which provided for certain financial accommodations (the "Prepetition First Lien Obligations"). The Prepetition First Lien Obligations were collateralized by substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets (the "Prepetition First Lien Collateral").

16.     NRJ TV LLC is the assignee and successor-in-interest to the agent and lenders under the Prepetition First Lien Credit Documents (the "Prepetition First Lien Lender").

17.     As of August 22, 2011, the outstanding balance of the Prepetition First Lien Obligations was approximately $73,853,833.21, plus accrued and unpaid interest, fees, costs and expenses. In addition, the Prepetition First Lien Lender has made additional advances after May 1, 2011 of $233,000.

**B.     Prepetition Second Lien Obligations**

18.     On or about December 20, 2006, Multicultural Television Broadcasting LLC and its operating subsidiaries, including, Debtor MTB Bridgeport-NY Operating, LLC, as borrowers, with the licensee subsidiaries, including, Debtor MTB Bridgeport-NY Licensee, LLC as guarantors, and Wells Fargo Foothill, Inc., as administrative agent, and the lenders from time to time party thereto, entered into that certain Second Lien Credit Agreement, as amended on January 16, 2007, and October 16, 2007 (as may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement"), that certain Security Agreement, and that certain Guaranty (collectively, with certain agreements, documents, and instruments in respect thereof, the "Prepetition Second Lien Credit Documents"), which provided for certain financial accommodations (the "Prepetition Second

Lien Obligations"). The Prepetition Second Lien Obligations were collateralized by a second priority lien on substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets (the "Prepetition Second Lien Collateral").

19.     As of August 22, 2011, the outstanding balance of the Prepetition Second Lien Obligations was approximately $46,319,171.95, plus accrued and unpaid interest, fees, costs and expenses.

20.     Bernard National Loan Investors and Fortress Value Recovery Fund I LLC are the assignee and successor-in-interest to the agent and lenders under the Prepetition Second Lien Credit Documents (the "Prepetition Second Lien Lender").

E.     **The Intercreditor Agreement**

21.     On December 20, 2006, Wells Fargo Foothill, Inc., as agent under the Prepetition First Lien Credit Agreement, and Wells Fargo Foothill, Inc., as agent under the Prepetition Second Lien Credit Agreement, entered into that certain Intercreditor Agreement (the "Intercreditor Agreement"), pursuant to which the liens securing the Prepetition Second Lien Obligations are contractually subordinated to the liens securing the Prepetition First Lien Obligations. Among other things, the Intercreditor Agreement governs these parties' rights on various issues including priority, enforcement and distributions, including with respect to actions taken in these Chapter 11 Cases.

22.     In particular, the Intercreditor Agreement provides that if the Prepetition First Lien Lender consents to the use of cash collateral, the Prepetition Second Lien Lender shall also consent to the use of cash collateral. *See* Intercreditor Agreement, Section 6.2. Section 6.2 further provides that, if the Prepetition First Lien Lender provides post-petition financing, the Prepetition Second Lien Lender "shall not, directly or indirectly, provide, offer to provide, or

support any DIP Financing secured by a Lien senior to or *pari passu* with the Liens securing the [Prepetition First Lien Obligations]." Additionally, Section 6.5 of the Intercreditor Agreement prohibits the Prepetition Second Lien Lender from contesting any request by the Prepetition First Lien Lender for adequate protection in the form of replacement liens and/or administrative claims as long as the Prepetition Second Lien Lender also receives such replacement liens and/or administrative claims; provided further, that such replacement liens and/or administrative claims granted to the Prepetition Second Lien Lender are subordinate to those of the Prepetition First Lien Lender.

23. A more detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Cases, is fully set forth in the Declaration, filed contemporaneously herewith and incorporated herein by reference.

## Concise Statement Pursuant to Bankruptcy Rule 4001(c)

24. Pursuant to Bankruptcy Rule 4001(c), the Debtors submit this concise statement of the material terms of the DIP Facility, as specified in the DIP Credit Agreement and the Interim Order.[3]

| Provision | Summary Description |
|---|---|
| **Amount of Borrowing** | $650,000 |
| **Interest Rate and Margins** | 8%.<br>Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days and interest shall be payable monthly.<br>During the continuance of an Event of Default, DIP Loans, interest, fees and other amounts due under the DIP Facility will bear interest at a rate that is 500 basis points per annum greater than the rate otherwise applicable to the DIP Loans at such time. |

---

[3] This concise statement is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the Interim Order, as applicable. To the extent of any inconsistency between this concise statement and the provisions of the DIP Credit Agreement and the Interim Order, the Interim Order shall govern.

| Provision | Summary Description |
|---|---|
| Maturity | The Maturity Date is the earliest of: (a) seven (7) months from the Petition Date; (b) the earlier of (i) the date upon which the Interim Order expires or (ii) thirty-five (35) days after the entry of the Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period; (c) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the 30th day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrower; (e) the date of indefeasible prepayment in full by Borrower of all obligations hereunder in accordance with the terms hereof; or (f) upon acceleration of the obligations hereunder. |
| Events of Default | Events of default include:<br><br>(a) default in the payment when due of any principal or interest; (b) any representation, warranty or statement made or deemed made by either Debtor proves to be untrue in any material respect on the date as of which made or deemed made; (c) default in the performance or observation of certain covenants; (d) post-petition defaults under other Indebtedness; (e) any of the Security Documents shall cease to be in full force and effect; (f) the Intercreditor Agreement or any provision thereof shall cease to be in full force; (g) taking of any action in the Chapter 11 Cases that is not permitted under the DIP Credit Agreement; (h) the filing by either Debtor or the confirmation of any plan that does not include repayment of obligations under the DIP Credit Agreement; (i) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any Credit Document or the Interim Order or the Final Order; (j) the Final Order is not entered within thirty-five (35) days of the entry of the Interim Order; (k) a Chapter 11 plan of reorganization has not been confirmed, or a sale of substantially all of the Debtors' assets has not been approved, within six (6) months of the Petition Date; (l) the payment of, or application by either Debtor for authority to pay, any pre-petition claim without the DIP Lender's prior written consent other than as provided in any "first day order;" (m) the appointment of an interim or permanent trustee in the Chapter 11 Cases; (n) the dismissal or conversion of the Chapter 11 Cases; (o) the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the obligations owing under the DIP Credit Agreement; (p) the failure of the Debtors to perform any of their obligations under the Interim Order or the Final Order; (q) the challenge by the Debtors to the validity, extent, perfection or priority of any liens granted under the Prepetition First Lien Credit Documents; (r) unauthorized use of DIP Collateral or Cash Collateral; (s) entry of an order in any of the |

| Provision | Summary Description |
|---|---|
| | Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the DIP Lender or the filing of a motion by the Debtors requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the DIP Lender's claim; (t) the appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of either Debtor; or (u) the entry of an order precluding the DIP Lender/Prepetition First Lien Lender to have the right to or be permitted to "credit bid" the DIP Obligations, DIP Liens and DIP Superpriority Claims and the Prepetition First Lien Obligations, the Prepetition First Lien Collateral, the Adequate Protection Liens and 507(b) Claims with respect to any bulk or piecemeal sale of all or any portion of the Debtors' assets or to assign its credit bid. |
| **Priority of DIP Liens**<br><br>Interim Order at ¶ 9(b)-(d) | The granting of valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon (collectively, the "DIP Liens") on all assets of the Debtors and their Estates, including, subject to entry of the Final DIP Order, any proceeds of, or property and interests recovered in respect of, claims or causes of action of the estates, including those arising under sections 544, 545, 547, 548, and 549 of the United States Bankruptcy Code (collectively, the "DIP Collateral"). |
| **Priority of DIP Liens**<br><br>Interim Order at ¶ 9(b)-(d) | Except as set forth in the Interim Order, the DIP Liens shall prime and be senior in all respects to any existing liens or claims, subject only to (i) the Carve-Out, and (ii) liens on property of a Debtor that are in existence on the Petition Date but only to the extent a lien on such property (x) is valid, binding, perfected, enforceable and not avoidable, and (y) the lien on such property on the Petition Date was senior in priority to the Prepetition First Lien Lender's Liens. |
| **Superpriority Administrative Claims**<br><br>Interim Order at ¶ 9(a) | Pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility shall be entitled to allowed superpriority expense claim status in the Chapter 11 Cases (the "DIP Superpriority Claims") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 330, 331, 364(d), 503(b), 506, 507(a), 507(b), 726 or any other provision of the Bankruptcy Code, subject and subordinate to the Carve-Out. |

| Provision | Summary Description |
|---|---|
| **Effect on Existing Liens**<br><br>Interim Order at ¶¶ 9(b) | The DIP Facility will prime the existing Prepetition Secured Obligations. The priming of the Prepetition First Lien Obligations is consensual. The priming of the Prepetition Second Lien Obligations is consistent with the terms of the Intercreditor Agreement. |
| **Carve-Out**<br><br>Interim Order at ¶ 11. | In addition to any collateral in which the DIP Lender is receiving a lien pursuant to section 364(c)(3) of the Bankruptcy Code as set forth above, the DIP Liens shall be subject and subordinate to payment of, and only of: (a) the Professional Fees incurred, pursuant to the Budget, prior to the earliest of (i) the date on which the DIP Lender provides written notice (the "Carve-Out Trigger Notice") to the Debtors that either (x) an Event of Default (as defined in the DIP Credit Agreement) has occurred or (y) the DIP Facility has terminated; or (ii) the maturity date of the DIP Facility; (b) the sum of $25,000 for payment of costs and expenses of all Professional Fees incurred after delivery of the Carve-Out Trigger Notice; and (c) the unpaid fees of the United States Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code (collectively, the "Carve-Out"). The Carve-Out shall be fully reserved by the DIP Lender. |

### Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(1)

25. The DIP Credit Agreement includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i). As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Chapter 11 Cases and should be approved.

a. **Local Rule 4001-2(a)(i)(B) — _Validity, Perfection and Amount of Prepetition Obligations,_** Interim Order at ¶ 14. As part of the Interim Order, subject to and without prejudice to the rights of any Committee or other party-in-interest, the Debtors agree and stipulate as follows:

(1) Prepetition Credit Documents. Prior to the Petition Date, the Debtors entered into (i) the Prepetition First Lien Credit Documents with the Prepetition First Lien Lender, and (ii) the Prepetition Second Lien Credit Documents with the Prepetition Second Lien Lender, each of whom were granted the Prepetition Liens in the Prepetition Collateral in respect of the Prepetition Secured Obligations.

(2) Prepetition Secured Obligations. (a) Pursuant to the Prepetition

First Lien Credit Documents, as of the Petition Date, the Debtors were indebted and liable to the Prepetition First Lien Lender, without defense, counterclaim or offset of any kind, in the aggregate principal amount of at least $73,853,833.21 in respect of the Prepetition First Lien Obligations, plus accrued but unpaid interest, costs, fees and expenses; (b) pursuant to the Prepetition Second Lien Credit Documents, as of the Petition Date, the Debtors were indebted and liable to the Prepetition Second Lien Lender, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $46,319,171.95 in respect of the Prepetition Second Lien Obligations, plus accrued but unpaid interest, costs, fees and expenses; and (c) the Prepetition Secured Obligations constitute the legal, valid and binding obligations of the Debtors that are party thereto, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code) and no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, disgorgement, recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(3)     <u>Prepetition Liens</u>.  The Prepetition Liens are (i) valid, binding, perfected, enforceable, liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (iii) subject only to (A) after giving effect to this Interim Order, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and (B) Prior Permitted Senior Liens.

(4)     <u>Releases and Waivers</u>.  The Debtors do not have, and hereby forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses or setoff/recoupment rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, whether known or unknown, against each of the (i) Prepetition First Lien Lender and any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time; and (ii) Prepetition Second Lien Lender and any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time.

(5)     <u>Default</u>.  The Debtors are in default with respect to their Prepetition Secured Obligations and an Event of Default has occurred under the Prepetition Credit Documents.

b.     **Local Rule 4001-2(a)(i)(B) — *Committee Challenge Period*,** Interim Order at ¶ 15. The Interim Order provides that any statutory committee or another party-in-interest with standing and requisite authority, must timely commence the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules challenging the Prepetition Lien and Claim Matters by no later than 60 days from the date of appointment of any Committee or, in the event that no Committee is appointed in these Chapter 11 Cases, upon conclusion of the date that is 90 days from the Petition Date.

c. **Local Rule 4001-2(a)(i)(C) — *Waiver of Section 506(c) Claims*,** Interim Order at ¶ 12. The Interim Order does not waive, without notice, the Debtors' rights under section 506(c) of the Bankruptcy Code. The parties will seek entry of a final order providing that the Debtors waive their rights to a 506(c) surcharge on the Prepetition Collateral or the Secured Parties.

d. **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*,** Interim Order at ¶ 9(b). Subject to entry of the Final Order, fully perfected and unavoidable first-priority senior priming security interests in and liens upon proceeds of avoidance actions under \ sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code.

e. **Local Rule 4001-2(a)(i)(F) — *Treatment of Committee Professionals*,** Interim Order at ¶ 11. The Committee's professional fees are included in the Carve-Out. As discussed above, each of the DIP Liens and DIP Claims are subject and subordinate to the Carve-Out.

## Relief Requested

26.     By this motion, the Debtors request entry of the Interim Order and Final Order authorizing the Debtors to enter into the $650,000 DIP Facility.

27.     More specifically, the Debtors seek authority to:

a. permit the Debtors, pursuant to and upon the entry of an Interim Order in form and substance acceptable to DIP Lender, to borrow funds under the DIP Facility in accordance with the DIP Budget (as defined below) on an interim basis;

b. permit the Debtors, pursuant to and upon entry of a Final Order in form and substance acceptable to DIP Lender, to borrower up to a maximum aggregate amount of $650,000 dollars under the DIP Facility in accordance with the DIP Budget (as defined below);

c. grant first priority priming liens under, as applicable, section 364(d) of the Bankruptcy Code on all assets of the Debtors that are subject to liens granted under the Prepetition First Lien Credit Documents, and including, subject to entry of the Final DIP Order, any proceeds of, or property and interests recovered in respect of, claims or causes of action of the estates, including those arising under sections 544, 545, 547, 548, and 549 of the United States Bankruptcy Code excluding any specified assets (other than those assets that are subject to liens granted pursuant to the Prepetition First Lien Credit Documents) that are subject to a valid and perfected lien, not otherwise subject to avoidance, in favor of a third party which lien existed as of the date the Chapter 11 Cases commenced (the "Prior Permitted Senior Liens"); provided, however, DIP Lender shall be granted a junior lien in such assets pursuant to section 364(c)(3) of the Bankruptcy Code. Any property of the estates that is not unencumbered by a Prior Permitted Senior Lien as of the Petition Date, shall become subject to a lien in favor of the DIP Lender pursuant to section 364(c)(2) of the Bankruptcy Code, subject and

subordinate to the Carve-Out (as defined below). All of the foregoing liens to be granted pursuant to section 364 of the Bankruptcy Code shall be referred to collectively as the "DIP Liens" and all collateral subject to such DIP Liens, the "DIP Collateral";

d.    grant pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility shall be entitled to allowed superpriority administrative expense claim status in the Chapter 11 Cases (the "DIP Superpriority Claim") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 330, 331, 364(d), 503(b), 506, 507(a), 507(b), 726 or any other provision of the Bankruptcy Code, subject and subordinate to the Carve-Out (as defined below);

e.    use "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) (the "Cash Collateral") subject to the consent of the DIP Lender;

f.    grant adequate protection to the Prepetition First Lien Lender and the Prepetition Second Lien Lender in the form of replacement liens (collectively the "Adequate Protection Obligations");

g.    modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Interim Order and the Final Order;

h.    waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

i.    pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

## The Debtors' Liquidity Needs

28.    The Prepetition First Lien Lender has a lien on substantially all of the Debtors' cash, and is not willing to consent to the use of cash collateral outside of the terms of the DIP Facility. Accordingly, an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their business and provide the appropriate comfort to suppliers, customers and employees. The Debtors are unable to obtain the required funds (i) in the forms of (w) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (x) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (y) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code or (z) debt secured

only as described in section 364(c)(2) or (3) of the Bankruptcy Code or (ii) on terms more favorable than those offered by the DIP Lender under the DIP Budget, the DIP Credit Agreement and this Interim Order. The Debtors' need is immediate because (a) the Prepetition First Lien Lender will not consent to the use of cash collateral alone; (b) it provides comfort to vendors that might otherwise discontinue service with the Debtors; and (c) it assures customers of continued operations.

29. The Debtors have requested that, pursuant to the terms of the DIP Credit Agreement, the DIP Lender make loans and advances and provide other financial accommodations to the Debtors. The ability of the Debtors to continue their business and operate under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing. The DIP Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, pursuant to the terms and conditions of the DIP Credit Agreement. Accordingly, the relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtors' business, the management and preservation of their assets and properties, the satisfaction of all regulatory requirements, and is in the best interests of the Debtors, their estates and creditors.

30. The terms of the DIP Facility have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors. The DIP Lender is extending financing to the Debtors in good faith and the DIP Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

31. The Debtors have determined that (i) the DIP Budget is reasonable and will allow the Debtors to operate in the Chapter 11 Cases without the accrual of unpaid allowed administrative expenses; and (ii) the DIP Budget includes all reasonable, necessary, and

foreseeable expenses to be incurred for the period set forth in the DIP Budget. The DIP Budget shall be subject to a ten percent (10%) cumulative variance of both revenue and expenditures, with the exception of expenditures made for the payment of professional fees.

32.     It is in the best interests of the Debtors' estates that they be allowed to finance their operations under the terms and conditions set forth herein. The relief requested by this Motion is necessary to avoid harm to the Debtors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of the Interim Order. The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

### The Debtors' Efforts to Obtain Postpetition Financing

33.     Prior to the Petition Date, the Debtors explored other potential sources of financing.

34.     The Debtors entered into the DIP Facility with the Debtors' existing first-priority secured creditor as the Debtors concluded that it represented the best available source of financing.

35.     The Debtors also are unable to obtain the required funds in the forms of (i) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (ii) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (iii) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code or (iv) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code. Efforts to find alternative sources of financing were hindered by the fact that virtually all the Debtors' assets are subject to the senior security interests in favor of their pre-petition lenders and that it would be

difficult and costly for the Debtors to undertake to prime the pre-petition lenders' liens at this early stage of the cases.

## Development of the DIP Budget

36.     A 13-week budget with respect to the DIP Facility is attached hereto as **Exhibit C** (as amended, supplemented, extended or otherwise modified from time to time, the "DIP Budget"). To best assess the Debtors' funding needs during these Chapter 11 Cases, the Debtors have analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization. In undertaking this analysis, the Debtors and their advisors have considered the Debtors' near-term projected financial performance.

37.     As part of the Debtors' financial review and analysis, the Debtors developed a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various "First-Day" pleadings.

38.     Utilizing this cash flow forecast to project their cash needs during these Chapter 11 Cases, the Debtors believe that approximately $650,000 in liquidity availability is necessary for operations during these Chapter 11 Cases. The proposed DIP Facility will provide the Debtors with immediate access of funds pursuant to the DIP Budget. The immediate availability of the Interim DIP Facility is necessary to provide assurance of payment and "business as usual" continued operations to trade vendors. Without such assurances, trade vendors may very well refuse to provide goods and services to the Debtors and/or require cumbersome credit terms, which could negatively affect the Debtors' bankruptcy estates as a whole. Additionally, the

Prepetition First Lien Lender has a lien on substantially all, if not all, of the Debtors' cash and is not willing to consent to the use of cash collateral alone.

**Supporting Authority**

**A.  Financing Under Section 364 of the Bankruptcy Code**

39.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets. *See 11 U.S.C. § 364(c);*[4] *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

40.     Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if

---

[4]     Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt — (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

41.     Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements.   Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, focusing on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

42.     More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business, (b) is in the best interests of the debtors' creditors and estates, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender. *See, e.g., East West Resort Dev. V, L.P., L.L.P.,* Case No. 10-10452 (BLS) (Bankr. D. Del. Mar. 11, 2010); *Aleris International, Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009); *In re LandSource Communities Dev. LLC, et al*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 21, 2008 as amended May 22, 2009).

43.     The Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**i.      Entry into the DIP Facility is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment**

44.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Intl AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *Ames Dep't Stores,* 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *Barbara K Enters.,* 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Bray v. Shenandoah Fed Say & Loan Ass'n (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir, 1986); *In re Ames Dep't Stores, Inc* , 115 B.R, 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981)*; In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

45.     Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor-in-possession is afforded discretion to act with regard to business decision-making. *See In re Simasko Prod. Co.,* 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to

act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

46.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

47.     The Debtors' decision to enter into the proposed DIP Facility satisfies this standard. This decision is the culmination of a process targeted at procuring the best available financing under the circumstances. Because the Debtors' had no other viable financing alternative, and the Prepetition First Lien Lender is unwilling to agree to the use of Cash Collateral alone, if the Debtors rejected the DIP Facility, they would not be able to continue operating their business, resulting in a destruction of value.

48.     Entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties-in-interest. Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment. Given the Debtors' significantly constrained liquidity position, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these Chapter 11 Cases and the general uncertainty in the marketplace that will accompany this process.

49.     Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their business in an orderly manner, maintain

business relationships and assure the continuity of operations with, and ability to make payment to, vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs — each of which is vital to preserving and maintaining the value of these estates for the benefits of all stakeholders.

### ii. The Terms of the DIP Facility are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment

50.     It is well recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *See, e.g., In re Snowshoe Co. Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable).   Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989); *see also In re Garland Corp.,* 6 B.R. 456, 461 (Bankr 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames,* 115 B.R. at 3739 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

51.     Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and 364(b) of the Bankruptcy Code. *See Snowshoe,* 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992),

52.     The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis. As discussed above and in the Declaration, the DIP Facility was the only available financing that satisfied the Debtors' needs. Indeed, discussions with other potential lenders were stalled because of diligence requirements, unfavorable terms, and time constraints. Decl. at ¶ 94. Accordingly, the Debtors submit that the terms of the DIP Credit Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

53.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization). Here, despite the unavailability of alternative postpetition financing, the Debtors conducted hard-fought negotiations to ensure that the terms of the DIP Facility were appropriate under the circumstances, with the end result being that the terms of the DIP Facility are comparable, and in many instances, more favorable than debtor-in-possession financings approved over the past few months.

### a. The Scope of the Carve-Out is Appropriate

54.     The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames,* 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames,* 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and a committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### b. The Payment of Attorney Fees to the DIP Lender is Appropriate

55.     The payment of professional fees and expenses of the DIP Lender is reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.,* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

### B. The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code

56.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under

section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

57.     The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors, the DIP Lender, and all of the DIP Facility Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party in connection with the DIP Facility other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 363(e).

**C.     The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate**

58.     As discussed above, the DIP Facility contemplates providing the DIP Lender with priming liens on the liens granted to the Secured Parties pursuant to section 364(d) of the Bankruptcy Code. Accordingly, the Debtors are required to show that the interests of the Secured Lenders are "adequately protected." 11 U.S.C. § 364(d). Additionally, pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use Cash Collateral of the Secured Parties subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

59.     What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims. *See In re Columbia Gas Sys., Inc.,* 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello,* 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

60.     Consistent with the purpose of adequate protection of preserving the value of the protected entity's interest in the property, appreciation or increases in the value of the property may be sufficient to provide adequate protection. *See Matter of Pursuit Athletic Footwear, Inc.*, 193 B.R. 713 (Bankr. D. Del. 1996); *In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987); *In re LHD Realty Corp.*, 20 B.R. 717 (Bankr. S.D. Ind. 1982); *In re Rogers Development Corp.*, 2 B.R. 679 (Bankr. E.D. Va. 1980); *Matter of Pleasant Valley, Inc.*, 6 B.R. 13 (Bankr. D. Nev. 1980). Further, Courts have relied on conservative and carefully prepared financial projections to demonstrate that the value of the collateral is increasing in value in reference to adequate protection. *See Matter of Athletic Pursuit Athletic Footwear, Inc.* Accordingly, the Adequate Protection Obligations proposed herein and in the DIP Orders are fair and reasonable and are sufficient to satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code. *See* 11 U.S.C. §§ 363(c), 364(d).

61.     Since the DIP Liens will be senior to Prepetition First Lien Obligations, the Debtors believe that the Prepetition Second Lien Lender has consented to the proposed DIP Facility and the priming of its liens. *See* Intercreditor Agreement, Section 6.2. As such, the Prepetition Second Lien Lender cannot contest or otherwise object to (i) the use of Cash Collateral; (ii) the Interim DIP Facility (or the DIP Facility as and when it becomes final);

(iii) the grant of Adequate Protection to the Prepetition First Lien Lender; and/or (iv) the absence of any adequate protection payments to the Prepetition Second Lien Lender. *See* Intercreditor Agreement, Section 6.2 and 6.5.

62.     While the Prepetition First Lien Lender's receipt of the Adequate Protection Liens allows the Prepetition Second Lien Lender to request adequate protection liens, so long as such liens are subordinate as contemplated in the Intercreditor Agreement, the Debtors propose to grant exactly such relief. Accordingly, the Prepetition Second Lien Lender has received all the adequate protection to which it is entitled under the Intercreditor Agreement.

**D.     Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.**

63.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

64.     In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dept Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores,* at 36.

65.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail herein and in the Declaration, the Debtors

have an immediate need to obtain access to liquidity to, among other things, provide comfort to their employees, customers and suppliers as well as to continue to operate their business, maintain key business relationships, make payroll and satisfy other working capital and operational needs. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties-in-interest.

66.     Without approval of the DIP Facility, considering the Prepetition First Lien Lender's unwillingness to consent to cash collateral use, trade vendors might discontinue the provision of goods and services, which would disrupt operations and frustrate the Debtors' reorganization efforts. Additionally, absent access to liquidity under the DIP Facility, the Debtors face the potential inability to satisfy their payroll and other direct operating expenses necessary to run their business in the ordinary course. Thus, availability of sufficient working capital and liquidity is vital to the preservation and maintenance of the value of the Debtors' estates.

67.     The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this District. *See, e.g., In re Taylor-Wharton Intl LLC,* Case No. 09-14089 (Bankr. D. Del. Nov. 20, 2009); *In re Lazy Days' R.V. Center Inc.,* Case No. 09-13911 (Bankr. D. Del. Nov. 6, 2009); *In re Source Interlink Cos.,* Case No. 09-11424 (Bankr. D. Del. May 28, 2009); *In re Abitibi-Bowater Inc.,* Case No. 09-11296 (Bankr. D. Del. Apr. 20, 2009); *In re EZ Lube, LLC,* Case No. 08-13256 (Bankr. D. Del. Jan 14, 2009).

**E.      Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

68.     The Interim Order proposes that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lender, in its sole discretion, to file the Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar

instruments or otherwise confirm perfection of such liens, security interests and mortgages. The Interim Order also proposes that, upon five business days' prior notice to the Court, U.S. Trustee, counsel for the Debtors, and counsel for any Committee, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lender to exercise remedies following a default under the DIP Facility. Interim Order, ¶ 20.

69. Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed DIP Orders.

## Request For Final Hearing

70. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 30 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

71. To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

## Notice

72. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to NRJ TV LLC; (c) creditors holding the twenty (20) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (d) the Office of the United States Attorney General for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange

Commission; (g) the Federal Communication Commission; and (h) the Prepetition Second Lien Lender. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules of the United States Bankruptcy Court for the District of Delaware. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

73.      No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Declaration, the Debtors respectfully request entry of the DIP Orders, (a) authorizing the Debtors to (i) enter into and perform under the DIP Credit Agreement and (ii) use Cash Collateral, (b) granting the Adequate Protection Obligations, (c) setting a date for a hearing to consider entry of the Final Order no later than 30 days following the Petition Date and (d) granting such other and further relief as may be appropriate.


Dated: August 26, 2011                   **LANDIS RATH & COBB LLP**
         Wilmington, Delaware

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:     (302) 467-4400
Facsimile:     (302) 467-4450
Email: chipman@lrclaw.com
           olivere@lrclaw.com
           ellis@lrclaw.com

*Proposed Counsel to Debtors and Debtors-in-Possession*