## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MTB BRIDGEPORT-NY OPERATING LLC, *et al.*,[1] | Case No. 11-12707 (   )<br>(Joint Administration Requested) |
| Debtors. | |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move the Court (the "Motion"), pursuant to Sections 105(a), 363, 365, and 503(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (collectively, the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of two orders: (a) one, substantially in the form attached hereto as **Exhibit "A"** (the "Bid Procedures Order"), (i) approving the bid procedures (the "Bid Procedures") substantially in the form attached hereto as **Exhibit "B"**, including the bid protections as set forth in the asset purchase agreement (the "Agreement") between the Debtors, as sellers, and NRJ TV LLC ("NRJ" or the "Stalking Horse Bidder"), with respect to the proposed sale (the "Sale") of

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are MTB Bridgeport-NY Operating LLC (0459) and MTB Bridgeport-NY Licensee LLC (4381).

substantially all of the assets (as discussed in greater detail below, the "Acquired Assets"), (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "Auction"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "Assumed and Assigned Agreements"); and (v) granting related relief; and (b) a second order, substantially in the form attached hereto as **Exhibit "C"** (the "Sale Order"), (i) authorizing and approving the Agreement; (ii) authorizing the sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, a copy of which is attached hereto as **Exhibit "D"**, with such liens, claims, encumbrances, and interests to attach to the proceeds received by the Debtors from the Sale (the "Sale Proceeds") less the amount of cash necessary to fund (a) any professional fee carve-out approved by the Court as part of any debtor-in-possession financing approved by the Court in these cases (the "Cases"), and (b) such other wind-up costs as may be approved by the Court; (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements (as defined herein), and (iv) granting related relief. In support of this Motion, the Debtors respectfully state to the Court as follows:

## I.
## STATUS OF THE CASE AND JURISDICTION

1. On the date hereof (the "Petition Date"), the Debtors commenced these Cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2. The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these Cases.

4. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief sought herein are Section 105(a), 363, 365, and 503(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014 1015(b), and Local Rule 6004-1.

## II.
## BACKGROUND

**A.      Overview of the Debtors and Their Operations.**

6. MTB Equity, LLC, a non-debtor affiliate, was established to hold the membership interests in Multicultural Television Broadcasting, LLC, another non-debtor affiliate, that at one time owned and operated five (5) television stations. The aforementioned television stations were structured as ten (10) different Delaware limited liability companies so that each television station's assets were held by one FCC license holding company and one operating company. Among these ten companies are the Debtors, MTB Bridgeport-NY Operating LLC, which holds all of the assets (other than the FCC license) of television station WSAH (DTV Channel 42), Bridgeport, Connecticut (FCC Facility ID No. 70493) ("WSAH"), and MTB Bridgeport-NY Licensee LLC, which holds the FCC licenses for WSAH.

7. In October 2008, pursuant to the certain agreements with their secured creditors, Multicultural Television Broadcasting, LLC transferred its interests in the eight non-debtor operating and license holding entities to the Multicultural Capital Trust (the "Trust"). The Trust was created pursuant to that certain Irrevocable Trust Agreement, for the purpose of the sale of each of the aforementioned television stations. In May 2011, Multicultural Television Broadcasting, LLC transferred its membership interests in the Debtors to the Trust for the purpose of the sale of substantially all of the Debtors' assets.

8.    The Trust has since sold substantially all, if not all, of the assets of the eight non-debtor entities, which are now shell companies. Two of the non-debtor television stations were sold, via the sale of assets of the respective operating and license holding companies, to affiliates of NRJ. NRJ was not, at that time, a secured creditor of any of the Debtors or their non-debtor affiliates. The Trust sold the other two non-debtor television stations, via the sale of assets of the respective operating and license holding companies, to unrelated third parties.

9.    On or about December 20, 2006, Multicultural Television Broadcasting LLC and its operating subsidiaries, including, Debtor MTB Bridgeport-NY Operating, LLC, as borrowers, with the licensee subsidiaries, including, Debtor MTB Bridgeport-NY Licensee, LLC as guarantors, and Wells Fargo Foothill, Inc., as administrative agent, and the lenders from time to time party thereto, entered into that certain (a) *First Lien Credit Agreement,* as amended on January 16, 2007, and October 16, 2007, (b) *Security Agreement,* and (c) *Guaranty,* all as may be further amended, restated, supplemented, or otherwise modified from time to time, and together with certain agreements, documents, and instruments in respect thereof (collectively, the "Prepetition First Lien Credit Documents"), which provided for certain financial accommodations (the "Prepetition First Lien Obligations"). The Prepetition First Lien Obligations were collateralized by substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets. As of August 22, 2011, the outstanding balance of the Prepetition First Lien Obligations was approximately $73,853,833.21, plus accrued and unpaid interest, fees, costs and expenses. NRJ is the assignee and successor-in-interest to the lenders under the Prepetition First Lien Credit Documents.

10.    Effective May 11, 2011, Titan Broadcast Management LLC, a Delaware limited liability company ("Titan") became the manager of WSAH in compliance with section 4(k) of

the Management Services Agreement dated November 16, 2009 between the Trust and Titan. Titan is the 100% owner of 5 Star Spectrum, LLC, a Delaware limited liability company ("5 Star") which owns non-voting membership interest representing 33.3% ownership position in NRJ. NRJ is the assignee and successor-in-interest to the lenders under the Debtors' Prepetition First Lien Credit Documents. Effective May 26, 2011, NRJ completed the acquisition of 100% of the lenders' interests in the Prepetition First Lien Credit Documents, acquiring such interests from Canpartners Investments IV, LLC, Citicorp USA, Inc., Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund Ltd., Fortress Credit Funding III LP, and Fortress Credit Funding IV LP.

11.     On or about December 20, 2006, Multicultural Television Broadcasting LLC and its operating subsidiaries, including, Debtor MTB Bridgeport-NY Operating, LLC, as borrowers, with the licensee subsidiaries, including, Debtor MTB Bridgeport-NY Licensee, LLC as guarantors, and Wells Fargo Foothill, Inc., as administrative agent, and the lenders from time to time party thereto, entered into that certain *Second Lien Credit Agreement*, as amended on January 16, 2007, and October 16, 2007, that certain *Security Agreement*, and that certain *Guaranty* (collectively, as may be further amended, restated, supplemented, or otherwise modified from time to time, and together with certain agreements, documents, and instruments in respect thereof, the "Prepetition Second Lien Credit Documents"), which provided for certain financial accommodations (the "Prepetition Second Lien Obligations"). The Prepetition Second Lien Obligations were collateralized by a second priority lien on substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of the Debtors' assets. As of August 22, 2011, the outstanding balance of the Prepetition Second Lien Obligations was approximately $46,319,171.95, plus accrued and unpaid interest, fees, costs and expenses. Bernard National Loan Investors is the assignee and

successor-in-interest to the agent and lender, along with Fortress Value Recovery Fund I LLC as successor-in-interest to the lender, under the Prepetition Second Lien Credit Documents (collectively, the "Prepetition Second Lien Lender").

12.     WSAH is in default under the Prepetition First Lien Credit Documents and the Prepetition Second Lien Credit Documents and is operating at a net loss of approximately $50,000 per month.

13.     NRJ, whom the Debtor has also requested authority to obtain post-petition financing from (the "NRJ DIP Loan"), intends to credit bid a portion of the Prepetition First Lien Obligations it is owed by the Debtors and the NRJ DIP Loan to acquire WSAH via the acquisition of substantially all, if not all, of the Debtors' assets.  The Debtors acknowledge and agree that NRJ has the right to credit bid both the Prepetition First Lien Obligations and the NRJ DIP Loan owed to NRJ and otherwise waives its right to object.

14.     A more detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Cases, is fully set forth in the *Declaration of Lee W. Shubert in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed on the Petition Date and incorporated herein by reference.

## III.
## THE PROPOSED SALE AND RELATED PROCEDURES

### A.     The Proposed Sale.

15.     After substantial analysis, the Debtors believe that it is in the best interests of the Debtors and their estates to enter into the Agreement to sell their assets, subject to higher and better offers.

16.   The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement:[2]

a.   Purchase Price.  The aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price"), shall be: (a) the credit bid amount of Twelve Million Dollars ($12,000,000), plus (b) the assumption of Assumed Liabilities, including payment of all Cure Amounts in accordance with the terms of the Sale Order.

b.   Acquired Assets.[3]  Substantially all of the Sellers' assets, including, all direct or indirect, right, title, and interests of the Sellers in and to all the tangible and intangible assets, properties, rents, claims, and contracts of the Sellers, to the extent transferable, excluding the Excluded Assets as defined in the Agreement.

c.   Assumed Liabilities.  The Buyer will assume and pay, perform, or discharge when due or otherwise, certain specified liabilities of the Sellers set forth in the Agreement, including Cure Amounts.

d.   Excluded Assets.  The Acquired Assets are the only assets transferred to, or otherwise acquired by, the Buyer under the Agreement.  The Acquired Assets do not include (i) any right, title, or interest of any Person other than the Sellers in any property or asset, (ii) all Avoidance Actions arising from or in connection with the Sellers' Cases, and (iii) the properties and assets of Sellers listed or described in Section 1.1 of the Agreement.

e.   Excluded Liabilities.  The Sellers shall retain all liabilities and obligations that are not Assumed Liabilities, as described in Section 1.1 of the Agreement.

f.   Business Records.  Pursuant to Section 1.1 of the Agreement, the Sellers' Business Records are an Acquired Asset.  Under Section 3.2 of the Agreement, the Buyer agrees to make such records available to Seller.

g.   Due Diligence or Financing Condition.  There are no due diligence or financing conditions.

h.   Closing and Other Deadlines.  The Closing shall occur on or before the second Business Day following the satisfaction or waiver by the appropriate Party of all the conditions contained in Articles VII and VIII of the Agreement.

---

[2] Capitalized terms in the below sub-paragraphs, otherwise not defined in this Motion, have the meanings ascribed to them in the Agreement and Bid Procedures.

[3] The Sale does not include the transfer of "personally identifiable information," as defined in Section 101(41 A) of the Bankruptcy Code.

i.  No Good Faith Deposit. Because the Buyer is credit bidding less than the full amount owed to it pursuant to the Prepetition First Lien Obligations and the NRJ DIP Loan, no Good Faith Deposit has been made by or is otherwise required of the Buyer.

j.  Termination. The rights of the Buyer and the Sellers to terminate the Agreement are set forth in Section 10.1 of the Agreement.

k.  Successor Liability. The Agreement provides that the Sale Order shall contain a determination that the Buyer is not a successor to any Seller or otherwise liable for any Seller's Liabilities (other than the Assumed Liabilities) and permanently enjoins all Persons from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, Action, or Lien against the Buyer or the Acquired Assets

l.  No Stay. Relief from the fourteen-day stay of Bankruptcy Rule 6004(h) is requested herein.

m.  Non-Solicitation. Section 6.12 of the Agreement provides limitations of the Sellers' ability to solicit the Acquired Assets outside of the Bid Procedures.

17.  The Debtors believe that the Sale is in the best interests of their estates and all parties-in-interest. Upon approval of the Bid Procedures, the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse Bidder, in an effort to achieve maximum value for the benefit of all of their constituents.

**B.  Proposed Bid Procedures.**

18.  The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale, in order to generate and retain potential purchasers' interests in the Acquired Assets. In addition, because the Debtors have little to no liquidity, the Debtors have no choice but to sell their assets in an expedited manner to preserve and maximize the value of their estates. Accordingly, the Bid Procedures (as summarized below) were developed consistently with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest or best offer for the Acquired Assets while affording appropriate protection for the Stalking Horse Bidder. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that

promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close the transaction.

19.     The Debtors seek to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Agreement attached hereto as **Exhibit "D"**, for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the Sale Proceeds. The Debtors have drafted the Agreement for the proposed bidders to model their Bid. The key provisions of the Agreement are summarized above, but are qualified in their entirety by reference to the actual Agreement, which terms may change pursuant to negotiation with the Successful Bidder at the Sale Hearing.

20.     Attached to this Motion as **Exhibit "B"** are the proposed Bid Procedures. Pursuant to Local Rule 6004-1: (a) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (b) the Auction will be conducted openly, but only the Debtors, the Stalking Horse Bidder, any representative of any Official Committee of Unsecured Creditors appointed in the Cases (the "Committee"), and any Qualified Bidder who has timely submitted a Qualified Bid, together with professional advisors to each of the foregoing, may attend the Auction, and (c) bidding at the Auction will be transcribed. The Bid Procedures are typical for asset sales of this size and nature, require a deposit, include provisions for consultation with the Committee, and require that a bidder be a "Qualified Bidder" as defined in the Bid Procedures.

21.     The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures:[4]

        a.     <u>Participation Requirements.</u>

---

[4] Capitalized terms not defined in the below sub-paragraphs shall have the meanings ascribed to them in the Bid Procedures attached hereto as **Exhibit "B"**, or the Agreement, as applicable.

i.   Confidentiality Agreement.   An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a "Confidentiality Agreement"); and

ii.  Proof of Financial Ability to Perform.   The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion.

b.   Qualified Bid. [5]

i.   Modified Agreement.   A Bid must include fully executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated Transaction. A Bid shall include a black-lined copy of the Agreement (the "Modified Agreement") to show all changes requested by the Bidder.

ii.  Acquired Assets.   Each Bid must be for all of the Acquired Assets or such portion of the Acquired Assets as the Qualified Bidder wishes to purchase; provided, however, that the aggregate purchase price in any Bid(s) for less than all of the Acquired Assets must equal or exceed the Minimum Initial Bid (defined below).

iii. Contingencies.   A Bid may not be conditioned on obtaining internal approval, obtaining financing, or on the outcome or review of due diligence after the Auction.

iv.  Authorization to Bid.   Each Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified Agreement.

v.   Good Faith Deposit.   Each Bid must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the highest proposed purchase price offered by the Qualified Bidder in its Qualified Bid (the "Good Faith Deposit").

vi.  No Fees Payable to Qualified Bidder.   A Bid shall not request or entitle the Qualified Bidder, other than the Stalking Horse Bidder, to any termination fee, expense reimbursement, or similar type of payment.

---

[5] The Stalking Horse Bidder shall be deemed a Qualified Bidder and its credit-bid is a Qualified Bid.

      vii.    <u>Financing Sources</u>. A Bid must contain evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for all such financing sources.

      viii.   <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid shall have an initial minimum bid requirement equal to the Stalking Horse Bidder's initial Purchase Price, in cash (or cash equivalents), plus Two Hundred Fifty Thousand Dollars ($250,000) (the "<u>Minimum Initial Bid</u>").

      ix.    <u>Other Evidence</u>. Each Bid must contain evidence satisfactory to the Debtors (based on availability of financing, experience, and other considerations) that the bidder will be able to timely consummate the Transaction if selected as the Successful Bidder.

c.    <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse Bidder, shall be _____ __, 2011, at 12:00 p.m. (Prevailing Eastern Time) (the "<u>Bid Deadline</u>"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

d.    <u>Auction</u>. Only in the event that the Debtors receive at least one (1) Qualified Bid by the Bid Deadline, other than from the Stalking Horse Bidder, the Debtors shall conduct the Auction of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets (the "<u>Baseline Bid</u>"). No later than _____ __, 2011, at 4:00 p.m. (Prevailing Eastern Time), the Debtors will notify all Qualified Bidders of (i) the Baseline Bid, and (ii) the time and place of the Auction. The Auction shall commence at 10:00 a.m. (Prevailing Eastern time) on _____ __, 2011, at the offices of Landis Rath & Cobb LLP, 919 N. Market Street, Suite 1800, Wilmington, Delaware, 19899.

e.    <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before _____ __, 2011.

f.    <u>Modifications</u>. The Bid Procedures may not be modified except upon order of the Bankruptcy Court or the express written consent of the Debtors, the Committee, and the Stalking Horse Bidder.

22.    The Debtors, with the consent of the Stalking Horse Bidder, expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the consent of the Stalking Horse Bidder, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set

forth herein or the date for the Auction; (d) cancel or extend the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

23. The Stalking Horse Bidder is a Qualified Bidder, and its bid is a Qualified Bid.

24. The Stalking Horse Bidder shall be authorized to assign its credit bid to any third party designated by the Stalking Horse Bidder.

**C.** **Notice of Auction.**

25. The Debtors seek to have the Auction scheduled for a date no later than _____ __, 2011. The value of the Acquired Assets may decline substantially if the Sale process is not completed on an expedited basis. The Debtors' key customers and vendors may terminate their relationships with the Debtors, and potential bidders may lose confidence in the certainty of the Sale process and decide to stop pursuing the purchase of the Acquired Assets. As such, it is imperative to move forward with the Auction and the Sale promptly.

26. Not later than three business days after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as **Exhibit "E"** (the "Sale Notice"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Stalking Horse Bidder; (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (f) counsel to the Committee; (g) all Attorneys General for the states in which the Debtors conduct business; (h) the Federal Communications

Commission; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

27.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware, 19801; and (d) be served so as to be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Stalking Horse Bidder; (iv) the Office of the United States Trustee; and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1(b) (collectively, the "Notice Parties").

28.     Not later than three (3) business days after entry of the Bid Procedures Order, the Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal* or *The New York Times*.

**E.      Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Assumed and Assigned Agreements.**

29.     To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements, to the Stalking Horse Bidder, or as applicable, to the Successful Bidder.

30.     The Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "Cure Amounts"), and (b) the deadline for objections to the assumption and/or assignment of Contracts and Leases to be assumed and/or assigned in connection with the Sale (collectively, the "Cure Procedures").

31.     The Debtors shall prepare and distribute to non-Debtor parties to the Assumed and Assigned Agreements a notice, substantially in the form annexed hereto as **Exhibit "F"** (a "Cure Notice"), listing (a) the Assumed and Assigned Agreement(s), and (b) the Cure

Amount(s), if any, no later than ten (10) business days after the Auction, to be assigned to the Successful Bidder.

32.    To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed and Assigned Agreements, the Debtors propose the following deadlines and procedures:

a.    The non-Debtor parties to the Assumed and Assigned Agreements shall have until _____, 2011 (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assumed and Assigned Agreements in connection with the Sale; provided, however, if the Debtors amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties to the added contract or lease or to the reduced Cure Amount contract or lease shall have until seven (7) days after such amendment to submit a Contract Objection (the "Amended Contract Objection Deadline").

b.    Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assumed and Assigned Agreement in connection with the Sale, shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed and Assigned Agreements(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m., on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Successful Bidder, of such consensual resolution, the Debtors shall promptly provide the Successful Bidder notice and opportunity to object to such proposed resolution, (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter, or (c) the Successful Bidder may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

33.     Unless an objection to the assumption and assignment of an Assumed and Assigned Agreement is filed and served before the Contract Objection Deadline, or the Amended Contract Objection Deadline, as applicable, all counterparties to the Assumed and Assigned Agreements shall be (a) forever enjoined and barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors, their estates, the Stalking Horse Bidder, or the Successful Bidder shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices, (b) deemed to have consented to the Cure Amount, and (c) forever barred and estopped from asserting or claiming against the Debtors and the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements, or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

## IV.
## RELIEF REQUESTED

34.     By this Motion, the Debtors seek the entry of two orders of this Court:  (a) the Bid Procedures Order (i) approving the Bid Procedures with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine Cure Amounts and deadlines for objections to the Assumed and Assigned Agreements, and (v) granting related relief; and (b) the Sale Order (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, with such liens, claims, encumbrances, and interests to attach to the Sale Proceeds, (ii) authorizing and approving the form of Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (iv) granting related relief.

35.     As described above, the Debtors, after extensive prepetition and postpetition efforts to maximize value, a review of various reorganization, liquidation, and sale options and discussions with the Debtors' professionals, ultimately determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to sell substantially all of their assets and to then wind-down any remaining operations. The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders and reduce potential risks, contingencies, and uncertainties in the proposed wind-down.

## V.
## BASIS FOR RELIEF REQUESTED

**A.      The Sale is Within the Sound Business Judgment
         of the Debtors and Should Be Approved.**

36.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991).

37.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). The Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto is based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

38.     Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to Section 105(a), a court may

fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g.,* *Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

39.     The Debtors submit that sound business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures.  Absent a sale of their assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as they are due, and the value of the Acquired Assets will continue to decline absent a prompt sale. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

40.     The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Indeed, the Debtors have and, upon approval of the Bid Procedures, will continue to market the Acquired Assets and will solicit the most likely interested competing bidders with the assistance of Kalil & Co., Inc., the proposed broker to the Debtors. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

41.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets.  The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence.  The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best

possible purchase price. The Debtors are subjecting the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and, thereby satisfying the third prong of the *Abbotts Dairies* standard. The "good faith" prong of the *Abbotts Dairies* standard is also satisfied as discussed further below.

**B.    The Sale is Proposed in "Good Faith".**

42.    The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.

43.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

44.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, Section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

45.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith. The Auction is an open sale process, and the Debtors will have their

own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale. Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

**C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

46.    Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

47.    The Stalking Horse Bidder, as the first lienholder in these Cases, has consented to the form of the Bid Procedures and the Agreement in substantially the forms attached hereto. As a result, the Debtors have satisfied, at minimum, the second requirements of Section 363(f) of the Bankruptcy Code, if not others as well. Therefore, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by Section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White*

*Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). As a result, the Acquired

Assets may be sold free and clear of prepetition liens.

**E.     The Cure Procedures Provide Adequate Notice and
        Opportunity to Object and Should be Approved.**

48.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-

in-possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court

approval of a debtor's decision to assume or reject an executory contract or unexpired lease is

whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In

re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business

judgment has been reasonably exercised, a court should approve the assumption or rejection of

an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St.

P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989).

The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate

that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel

Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846

(Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting

scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,*

762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Section 365(b)(1) of the Bankruptcy

Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance

that the debtor will promptly cure," any default, including compensation for any "actual

pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

49.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

50.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

51.     Additionally, as set forth above, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under Title 11, provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re*

*Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

52.     The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these Cases.

**F.     Relief from the Fourteen Day Waiting Periods
        Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

53.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen 14 days after entry of the order, unless the court orders otherwise." The Debtors request

that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

54.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

55.     As described above, time is clearly of the essence, since the Debtors have insufficient cash to operate the business on a prolonged basis, and the continuing over-all market uncertainty and volatility are causing a decline of the value of the Debtors' estates. Since a prompt closing of the Sale is of critical importance, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## VI.
## NO PRIOR REQUEST

56.     No prior Motion for the relief requested herein has been made to this or any other court.

## VII.
## NOTICE

57.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware;

(b) counsel to the Committee; (c) counsel to the Stalking Horse Bidder; (d) the Prepetition Second Lien Lender; (e) all taxing authorities having jurisdiction over any of the Acquired Assets subject to the sale, including the Internal Revenue Service; (f) the Federal Communications Commission; (g) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (h) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this order; (i) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; (j) all Contract Parties; (k) all Attorneys General for the states in which the Debtors conduct business; and (l) all potential bidders previously identified or otherwise known to the Debtors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit "A"**; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as **Exhibit "C"**; and (iii) such other and further relief as the Court deems just and proper.

Dated: August 26, 2011
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:    (302) 467-4400
Facsimile:    (302) 467-4450
Email: chipman@lrclaw.com
        olivere@lrclaw.com
        ellis@lrclaw.com

*Proposed Counsel to Debtors and*
*Debtors-in-Possession*