# EXHIBIT D

ASSET PURCHASE AGREEMENT

BY AND AMONG

NRJ TV NY OPCO LLC

and

NRJ TV NY LICENSE CO. LLC

"BUYER"

AND

MTB BRIDGEPORT-NY OPERATING LLC

and

MTB BRIDGEPORT-NY LICENSEE LLC

"SELLER"

Dated as of August ___, 2011

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**") is made this ___ day of August, 2011, by and among **MTB Bridgeport-NY Operating LLC**, a Delaware limited liability company ("**MTBB**"), and **MTB Bridgeport-NY Licensee LLC**, a Delaware limited liability company ("**MTBB License Co.**," and collectively with MTBB, "**Seller**"), and **NRJ TV NY OpCo, LLC**, a Delaware limited liability company and **NRJ TV NY License Co., LLC**, a Delaware limited liability company (collectively, "**Buyer**").

## R E C I T A L S:

A.      Seller is engaged in the business of television broadcasting and presently owns the assets of and operates commercial television broadcast station, WSAH, Digital Channel 42, licensed to Bridgeport, Connecticut (the "**Station**");

B.      On or about December 20, 2006, Multicultural Television Broadcasting LLC and its operating subsidiaries, including, MTBB, as borrowers, with the licensee subsidiaries, including, MTBB Licensee Co., as guarantors, and Wells Fargo Foothill, Inc., as administrative agent, and the lenders from time to time party thereto, entered into that certain (1) *First Lien Credit Agreement*, as amended on January 16, 2007, and October 16, 2007, (2) *Security Agreement*, and (3) *Guaranty*, all as may be further amended, restated, supplemented or otherwise modified from time to time, and together with certain agreements, documents, and instruments in respect thereof (collectively, the "**First Lien Credit Documents**"), which provided for certain financial accommodations collateralized by substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including, but not limited to substantially all, if not all, of Seller's assets. Buyer is the assignee and successor-in-interest to the agent and lenders under the First Lien Credit Documents.

C.      Seller intends to file a voluntary Chapter 11 petition (the "**Bankruptcy Case**") under Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (collectively, the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

D.      Upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, or its designee, properties and rights of Seller related to the conduct of the Station as set forth herein, in exchange for the credit bid payment assigned by NRJ TV LLC ("**NRJ**") to Buyer and made by Buyer to Seller of the purchase price set forth herein and the assumption by Buyer of certain of Seller's liabilities and obligations relating to such purchased assets;

E.      Seller believes, following consultation with Seller's legal and financial advisors, and upon consideration of available alternatives, that, in light of Seller's current liquidity and financial crisis, a sale of substantially all properties and rights of Seller related to the conduct of the Station as specifically set forth herein is necessary to maximize value and is in the best interest of Seller and all of its creditors, shareholders and all other parties-in-interest; and

F.     The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in Seller's bankruptcy case approving the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing Recitals and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.1.  Definitions.** Except as specified otherwise, when used in this Agreement, the following terms have the meanings specified:

**"Accountants"** has the meaning set forth in Section 2.4(f);

**"Accounts Receivable"** means all accounts receivable of Seller related to the Station immediately prior to the Closing as determined in accordance with GAAP;

**"Acquired Assets"** means all assets used or held for use in the operation of the Station, other than the Excluded Assets, including but not limited to: (a) the Accounts Receivable; (b) the Contracts; (c) the Customer Lists; (d) the Equipment; (e) the FCC Licenses; (f) the Intangible Property; (g) the Leases; (h) the Miscellaneous Assets; (i) the Motor Vehicles; (j) the Business Records; (k) the Trade Secrets; and (l) the Shared Contract Rights;

**"Action"** means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of apparent liability, notice of violation, order of forfeiture, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity;

**"Adjustment Amount"** has the meaning set forth in Section 2.4(e);

**"Adjustment List"** has the meaning set forth in Section 2.4(e);

**"Agreement"** means this Purchase and Sale Agreement, together with the Schedules and the Exhibits attached hereto, as the same shall be amended from time to time in accordance with the terms hereof;

**"Alternative Transaction"** shall mean any transaction between Seller and any Person other than Buyer regarding any (i) merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving Seller and its affiliates, (ii) purchase or acquisition directly or indirectly by merger, consolidation, business combination, share exchange, joint venture of substantially all of the Acquired Assets or (iii) any combination of the foregoing.

2

**"Assigned and Assumed Agreements"** shall mean those Contracts listed on <u>Schedule 1.2</u>, those Shared Contracts listed on <u>Schedule 1.2(b)</u>, and the Leases listed on <u>Schedule 1.6</u> to be assigned by Buyer to Seller pursuant to the Contract Assignment and the Lease Assignment and the liabilities for which will be assumed pursuant to the Assumption Agreement.

**"Assumed Liabilities"** means (a) the liabilities of Seller, if any, listed on <u>Schedule 1.1</u>, (b) the monetary obligations of Seller under the Contracts listed on <u>Schedule 1.2</u>, Contracts not required pursuant to Section 4.7(a) to be listed on <u>Schedule 1.2</u>, Contracts entered into after the date hereof and prior to the Closing Date in accordance with this Agreement, the Leases and the Shared Contract Obligations under those Shared Contracts listed on <u>Schedule 1.2(b)</u>, in each case arising from and accruing with respect to the operation of the Station after the Closing Date, except those Contracts and Leases, if any, included in the Excluded Assets, (c) the monetary liabilities, obligations and claims resulting from the operation of the Station prior to the Closing Date to the extent such liabilities, obligations and claims are subject of a Purchase Price adjustment in favor of Buyer pursuant to Section 2.4(f), and (d) those non-monetary obligations of Seller not relating to a breach or default by Seller under any such Contract or Lease of the type referred to in clause (b) above;

**"Assumption Agreement"** means an instrument in the form of <u>Exhibit "A"</u> attached hereto by which the Assumed Liabilities shall be assumed by Buyer;

**"Avoidance Actions"** means any and all actions which a trustee, a debtor-in-possession or other appropriate party in interest may assert on behalf of the Estate under possession or other appropriate party in interest may assert on behalf of the Estate under applicable state statute or Chapter 5 of Bankruptcy Code, including actions under one or more provisions of sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553.

**"Bankruptcy Case"** has the meaning set forth in the Recitals of this Agreement;

**"Bankruptcy Code"** has the meaning set forth in the Recitals of this Agreement;

**"Bankruptcy Court"** has the meaning set forth in the Recitals of this Agreement;

**"Benefit Arrangements"** means a benefit program or practice providing for bonuses, incentive compensation, vacation pay, severance pay, insurance, restricted stock, stock options, employee discounts, company cars, tuition reimbursement or any other perquisite or benefit (including, without limitation, any fringe benefit under Section 132 of the Code) to employees, officers or independent contractors that is not a Plan;

**"Bidding Procedures Order"** means an order of the Bankruptcy Court, substantially in the form of <u>Exhibit "B"</u> hereto, with such changes as are reasonably acceptable to Buyer and Seller;

**"Bill of Sale and Assignment"** means an instrument in the form of <u>Exhibit "C"</u> attached hereto, by which Seller shall convey to Buyer title to the Accounts Receivable, the Customer Lists, the Equipment, the Intangible Property, the Miscellaneous Assets, the Motor Vehicles, the Business Records and the Trade Secrets;

3

**"Business Records"** means files and records, including schematics, technical information and engineering data, programming information, correspondence, books of account, employment records, customer files, purchase and sales records and correspondence, advertising records, files and literature, and FCC logs, files and records and other written materials in Seller's possession relating to the Station other than those that are Excluded Assets;

**"Buyer"** has the meaning set forth in the Preamble to this Agreement;

**"Buyer's Closing Certificate"** means the certificate of Buyer in the form of <u>Exhibit "D"</u> attached hereto;

**"Buyer's Information"** has the meaning set forth in Section 10.08(b);

**"Buyer's Performance Certificate"** means the certificate of Buyer in the form of <u>Exhibit "E"</u> attached hereto;

**"Cash"** means all moneys of Seller relating to the Station, whether in the form of cash, cash equivalents, marketable securities, short term investments or deposits in bank or other financial institution accounts of any kind;

**"Closing"** means the conference to be held at 10:00 a.m., Atlanta, Georgia time on the Closing Date at the offices of Greenberg Traurig, LLP, 3290 Northside Parkway, Suite 400, Atlanta, Georgia 30327, or at such other time and place as may be designated by counsel to Buyer's lenders or as the parties may mutually agree to in writing, at which time the transactions contemplated by this Agreement shall be consummated;

**"Closing Date"** means (a) the date designated by Buyer upon at least five (5) days' prior written notice to Seller that is no later than ten (10) days after the conditions set forth in Article VII and Article VIII have been satisfied or waived, or (b) such other date as Buyer and Seller may agree upon in writing provided, however, that the Closing Date in all events shall not occur after the twelve month anniversary of the date hereof, unless Buyer and Seller agree in writing to extend the Closing Date past the twelve month anniversary of the date hereof. The Closing shall be deemed effective as of 12:01 a.m. on the first day subsequent to the Closing Date;

**"Code"** means the Internal Revenue Code of 1986, as amended;

**"Communications Laws"** means the Communications Act of 1934, as amended, together with the rules, regulations and policies of the FCC;

**"Contract Assignment"** means the Assignment and Assumption of Contracts, in the form of <u>Exhibit "F"</u> attached hereto, by which Seller shall assign the Contracts to Buyer and Buyer shall assume the then remaining rights and obligations of Seller under the Contracts;

**"Contracts"** means (a) those agreements (other than those included in the Excluded Assets and other than the Leases) under which the business of the Station is conducted, whether written, oral or implied, including all contractual obligations incurred by Seller for

the Program Rights, including without limitation those agreements listed on <u>Schedule 1.2(a)</u>, and (b) the Shared Contracts listed on <u>Schedule 1.2(b)</u>;

**"Copyrights"** means all copyrights and copyright applications related to the Station, including without limitation those items described on <u>Schedule 1.3</u>;

**"Cure Costs"** has the meaning set forth in Section 2.3(c);

**"Customer Lists"** means all lists, documents, written information and computer tapes and programs and other computer readable media used by or in Seller's possession concerning past, present and potential purchasers of advertising or services from the Station;

**"Disputed Amount"** has the meaning set forth in Section 2.4(f);

**"Environmental Laws"** means the rules and regulations of the FCC, the Environmental Protection Agency and any other federal, state or local Government Authority pertaining to human exposure to RF radiation and all applicable Laws, including statutes, regulations, ordinances, codes, and rules, as amended, relating to the discharge of air pollutants, water pollutants or process waste water or otherwise relating to the environment or Hazardous Materials or toxic substances or harmful physical agents, health and human safety, including, but not limited to, the Federal Solid Waste Disposal Act, the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act of 1976, the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Occupational Safety and Health Act of 1979, as Amended, regulations of the Environmental Protection Agency, regulations of the Nuclear Regulatory Agency, and regulations of any state department of natural resources or state environmental protection agency now or at any time hereafter in effect;

**"Equipment"** means all machinery, equipment, furniture, fixtures, furnishings, toolings, parts, blank films and tapes and other items of tangible personal property owned or leased by Seller that are used or useable in the operation of the Station, including without limitation to those items listed on <u>Schedule 1.4</u>;

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended;

**"Event of Loss"** means any loss, taking, condemnation, damage or destruction of or to any of the Acquired Assets or the Station;

**"Excluded Assets"** means (a) the Cash and all accounts in which Cash is located, (b) any and all claims of Seller with respect to transactions prior to the Closing Date including, without limitation, claims for tax refunds and refunds of fees paid to the FCC, except to the extent such claims relate to Assumed Liabilities or the Acquired Assets, (c) all contracts of insurance entered into by Seller, (d) all rights and obligations under any agreements listed on <u>Schedule 1.9(a)</u>, (e) all rights and obligations under any agreements listed on <u>Schedule 1.9(b)</u>, except to the extent such rights and obligations relate to the Station, (e) those other assets, if any, described on <u>Schedule 1.9(c)</u>, (f) all assets related to the Station Employee Benefit Plans, (g) books and records relating to the organization of Seller, (h) any

Avoidance Actions; and (i) any right, title or interest of any Person other than Seller in any of Seller's property or assets;

**"FCC"** means the Federal Communications Commission;

**"FCC Consent"** means action by the FCC granting its consent to the assignment of the FCC Licenses from Seller to Buyer;

**"FCC Licenses"** means all licenses, permits and authorizations, including any applications therefore, issued or granted by the FCC to Seller for the operation of the Station and all auxiliary facilities licensed by the FCC for operation in connection with the Station, as listed on Schedule 1.5;

**"FCC Licenses Assignment"** means the instrument in the form of Exhibit "G" attached hereto between Seller and Buyer, by which Seller assigns the FCC Licenses to Buyer;

**"Final Order"** means an FCC Consent, with respect to which no action, request for stay, petition for rehearing or reconsideration, appeal or review by the FCC on its own motion is pending and as to which the time for filing or initiation of any such request, petition, appeal or review has expired;

**"Financing Lease"** means any Lease that is properly characterized as a capitalized lease obligation in accordance with GAAP;

**"First Lien Credit Documents"** has the meaning set forth in the Recitals of this Agreement;

**"GAAP"** means United States generally accepted accounting principles as consistently applied by Seller;

**"Governmental Authority"** means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision (including the FCC), or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction;

**"Governmental Order"** means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority;

**"Hazardous Materials"** means (a) any wastes, substances, or materials (whether solids, liquids or gases) that are deemed hazardous, toxic, pollutants, or contaminants, including without limitation, substances defined as "hazardous wastes," "hazardous substances," "toxic substances," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, any Environmental Laws, and (b) includes, but is not limited to, polychlorinated biphenyls (PCB's) asbestos, lead-based paints, infectious wastes,

{895.001-W0016305.}

radioactive materials and wastes and petroleum and petroleum products (including, without limitation, crude oil or any fraction thereof);

"**Intangible Property**" means: (a) the Copyrights; (b) the Trademarks; (c) the Trade Secrets; (d) all of the rights of Seller in and to the call letters "**WSAH**"; and (e) all slogans, phrases or logos of the Station; and (f) all goodwill associated therewith and with the Acquired Assets;

"**Knowledge of Seller**" or "**to Seller's Knowledge**" means the actual knowledge of Seller;

"**Laws**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation;

"**Lease Assignment**" means the Assignment and Assumption of Leases in the form of Exhibit "H" attached hereto, by which Seller shall assign to Buyer the Leases;

"**Lease Estoppel Letters**" means letters from Persons who have leased real property to Seller related to the Station in the form of Exhibit "I" attached hereto or in such other form as is acceptable to Buyer's lenders;

"**Leases**" means those leases of real property and Equipment related to the Station, other than those included as Excluded Assets, as listed on Schedule 1.6;

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien, lease (including any capitalized lease) or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, affecting any of the Acquired Assets or the Station, including any agreement to give or grant any of the foregoing, any conditional sale or other title retention agreement and the filing of or agreement to give any financing statement with respect to any of the Acquired Assets or the Station under the Uniform Commercial Code of the State of Connecticut or comparable law of any jurisdiction;

"**Miscellaneous Assets**" means all tangible and intangible assets used or useable in the operation of the Station and not otherwise specifically referred to in this Agreement, including any warranties related to any of the Acquired Assets, excepting therefrom only the Excluded Assets;

"**Motor Vehicles**" means all motor vehicles, if any, owned by Seller related to the operation of the Station including without limitation those listed on Schedule 1.7;

"**MVPD**" means multichannel video programming distributor;

"**Permitted Liens**" means the following Liens: (a) Liens existing on the Closing Date to remain on the Acquired Assets after the Closing as listed on Schedule 1.8; (b) Liens for taxes, assessments or other governmental charges or levies not yet due; (c) statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by law created in the ordinary course of business of Seller consistent with past practices for amounts not yet due; (d) Liens (other than any Lien imposed by ERISA) incurred or deposits made in

7

the ordinary course of business of Seller consistent with past practices in connection with worker's compensation, unemployment insurance or other types of social security; (e) with respect to interests in real property, minor defects of title, easements, rights-of-way, restrictions and other similar charges or encumbrances not materially detracting from the value of such real property or interfering with the ordinary conduct of the Station; and (f) Liens created by or through Buyer or any of its affiliates;

"**Person**" means any natural person, general or limited partnership, corporation, limited liability company or other entity;

"**Plan**" means any plan, program or arrangement, whether or not written, that is or was (a) an "employee benefit plan" as such term is defined in Section 3(3) of ERISA and (i) which was or is established or maintained by Seller, (ii) to which Seller contributed or is obligated to contribute or to fund or provide benefits, or (iii) which provides or promises benefits to any Person who performs or who has performed services for Seller and because of those services is or has been (A) a participant therein or (B) entitled to benefits thereunder; (b) an "employee pension benefit plan" as such term is defined in Section 3(2) of ERISA, including, without limitation, any such plan that satisfies, or is intended by Seller to satisfy, the requirements for tax qualification described in Section 401 of the Code; (c) a "multiemployer plan" as such term is defined in Section 3(37) of ERISA; or (d) an "employee welfare benefit plan" as such term is defined in Section 3(1) of ERISA;

"**Program Rights**" means all rights of Seller presently existing or obtained prior to the Closing, in accordance with this Agreement, to broadcast television programs or shows as part of the Station's programming and for which Seller is or will be obligated to compensate the vendor of such Program Rights, including all film and program barter agreements;

"**Purchase Price**" means the credit bid sum, against the obligations owed to Buyer by Seller pursuant to the First Lien Credit Documents, of Twelve Million Dollars ($12,000,000), as adjusted pursuant to Section 2.4;

"**Replacement Contract**" has the meaning set forth in Section 6.14(a);

"**Retained Liabilities**" means all the obligations and liabilities of Seller whether now existing or previously or hereafter incurred other than the Assumed Liabilities, which Retained Liabilities shall include but not be limited to: (a) all taxes that result from or have accrued in connection with the operation of the Station prior to the Closing Date; (b) monetary liabilities and obligations arising under Contracts and Leases transferred to Buyer in accordance with this Agreement to the extent such liabilities and obligations arise during or relate to or have accrued in connection with any period prior to the Closing except to the extent any such liabilities have been taken into account in adjusting the Purchase Price pursuant to Section 2.4; (c) all monetary liabilities and obligations accruing with respect to the operation of the Station prior to the Closing except to the extent any such liabilities have been taken into account in adjusting the Purchase Price pursuant to Section 2.4; (d) non-monetary liabilities and obligations arising under Contracts and Leases transferred to Buyer in accordance with this Agreement to the extent such liabilities and obligations relate to a breach or default under any such Contract or Lease by Seller prior to the Closing Date; (e) all

8

liabilities related to the Station Employee Benefit Plans; and (f) all liabilities and obligations of Seller under this Agreement and any other agreement entered into in connection herewith;

"**Sale**" means the sale, assignment and conveyance of the Acquired Assets from Seller to Buyer in accordance with this Agreement.

"**Sale Motion**" means the motion or motions of Seller, in form and substance reasonably acceptable to Buyer and Seller, seeking approval and entry of the Bidding Procedures Order and the Sale Order;

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of Exhibit "J" hereto, with such changes as are reasonably acceptable to Buyer and Seller;

"**Schedules**" means those schedules referenced to in this Agreement which have been bound in that separate volume executed by or on behalf of the parties, and delivered concurrently with the execution of this Agreement, which schedules and volume are hereby incorporated herein and made a part hereof;

"**Seller**" has the meaning set forth in the Preamble to this Agreement;

"**Seller's Closing Certificate**" means the certificate of Seller in the form of Exhibit "K" attached hereto;

"**Seller's Information**" has the meaning set forth in Section 10.08(a);

"**Seller's Performance Certificate**" means the certificate of Seller in the form of Exhibit "L" attached hereto;

"**Shared Contracts**" means Contracts that do not relate solely to the operation of the Station as listed on Schedule 1.2(b);

"**Shared Contract Obligations**" has the meaning set forth in Section 6.14(a);

"**Shared Contract Rights**" has the meaning set forth in Section 6.14(a);

"**Station**" has the meaning set forth in the Recitals;

"**Station Employee**" means an employee of the Station as of the Closing Date;

"**Station Employee Benefit Plans**" means any Plan or Benefit Arrangement in which any current, former or retired employee of Seller participates;

"**Trade Secrets**" means all proprietary information of Seller relating to the Station;

"**Trademarks**" means all of those names, trademarks, service marks, jingles, slogans, logos, trademark and service mark registrations and trademark and service mark applications owned, used, held for use, licensed by or leased by Seller relating to the Station including without limitation those set forth on Schedule 1.10;

9

"**Tradeout Agreement**" means any contract, agreement or commitment of Seller, oral or written, pursuant to which Seller has sold or traded commercial air time of the Station in consideration for any property or services in lieu of or in addition to Cash, excluding film and program barter agreements; and

"**Transferred Employee**" means a Station Employee who becomes an employee of Buyer as contemplated by Section 9.2.

**Section 1.2.** **Construction.** Where the context so requires or permits, the use of the singular form includes the plural, and the use of the plural form includes the singular, and the use of any gender includes any and all genders. Except as specifically set forth herein, all Section and Article references are to Sections and Articles of this Agreement.

# ARTICLE II
# PURCHASE AND SALE

**Section 2.1.** **Purchase and Sale.** At the Closing on the Closing Date, and upon all of the terms and subject to all of the conditions of this Agreement, and subject to Bankruptcy Court approval of this Agreement as provided under Sections 363(b) and 363(f) of the Bankruptcy Code and entry of the Sale Order, Seller shall sell, assign, convey, transfer and deliver to Buyer, or its designee, and Buyer, or its designee, shall purchase the Acquired Assets, including all of Seller's legal and equitable interests therein. Notwithstanding any provision of this Agreement to the contrary, Seller shall not transfer, convey or assign to Buyer, but shall retain, all of its right, title and interest in and to the Excluded Assets

**Section 2.2.** **Payment on Closing.** At the Closing on the Closing Date:

(a) Buyer shall deduct the Purchase Price from the amounts owed to Buyer by Seller pursuant to the First Lien Credit Documents; and

(b) Buyer shall assume the Assumed Liabilities pursuant to the Assumption Agreement.

**Section 2.3.** **Closing Date Deliveries.** At the Closing on the Closing Date:

(a) Seller shall deliver, or cause to be delivered to Buyer, properly executed and dated as of the Closing Date: (i) the Assumption Agreement; (ii) the Bill of Sale and Assignment; (iii) the Contract Assignment; (iv) the FCC License Assignment; (v) the Lease Assignment; (vi) the Lease Estoppel Letters (if obtained); (vii) Seller's Closing Certificate; (viii) Seller's Performance Certificate; and (ix) such other documents as provided in Article VII hereof or as Buyer shall reasonably request; and

(b) In addition to the payments or actions described in Section 2.2, Buyer shall deliver, or cause to be delivered to Seller, properly executed and dated as of the Closing Date: (i) the Assumption Agreement; (ii) the Bill of Sale and Assignment; (iii) Buyer's Closing Certificate; (iv) Buyer's Performance Certificate; (v) the Contract Assignment; (vi) the FCC License Assignment; (vii) the Lease Assignment; (viii) a certificate of existence or good

10

standing from the Secretary of State of Buyer's state of incorporation; and (ix) such other documents as provided in Article VIII hereof or as Seller shall reasonably request.

(c)     To the extent any amount is required to be paid to cure any monetary defaults which exist as of the Closing Date with respect to any of the Assigned and Assumed Agreements, Buyer shall cure such monetary defaults at or prior to the Closing to the extent such cure is required by Section 365 of the Bankruptcy Code (any such amounts paid to cure any such defaults, being referred to the "Cure Costs"). Section 2.3(c) of the Disclosure Schedule sets forth the Cure Costs that Buyer reasonably believes due and payable. If, following the date hereof, Buyer determines to assume any contract or agreement that is specified herein as an Excluded Asset as of the date hereof, Buyer shall be required to cure all monetary defaults, solely with respect to such newly assumed contracts or agreements, at or prior to the Closing to the extent such cure is required by Section 365 of the Bankruptcy Code.

## Section 2.4. **Adjustments to Purchase Price**.

(a)     All prepaid revenue, prepaid expenses, accrued income and accrued expenses of the Station as of the end of the Closing Date shall, except as otherwise expressly provided herein, be adjusted and allocated between Seller and Buyer to reflect the principle that all revenue, income and expenses arising from the operation of the Station or relating to the Acquired Assets on or before the Closing Date shall be for the account of Seller, and all revenue, income and expenses arising from the operation of the Station or relating to the Acquired Assets from and after the Closing Date shall be for the account of Buyer.

(b)     Any and all rebates that, under any agreements in effect on the Closing Date, may be payable after such date to any advertiser or other user of the Station's facilities, based in part on business, advertising or services prior to the Closing Date, shall be borne by Seller and Buyer ratably in proportion to revenues received or volume of business done by each during the applicable period. Any and all agency commissions which are subject to adjustment after the Closing based on revenue, volume of business done or services rendered in part before the Closing Date and in part on or after the Closing Date shall be borne by Seller and Buyer ratably in proportion to the revenue, volume of business done or services rendered, as the case may be, by each during the applicable period.

(c)     Buyer shall receive a credit against the Purchase Price to the extent any liabilities of the Station as set forth on the books of the Station in accordance with GAAP, under Tradeout Agreements on the Closing Date exceed the value, as set forth on the books of the Station in accordance with GAAP, of any assets from Tradeout Agreements as of the date received; and Seller shall receive credit in the Adjustment List and against other credits of Buyer, to the extent any liabilities of the Station as set forth on the books of the Station in accordance with GAAP under Tradeout Agreements on the Closing Date are less than the value, as set forth on the books of the Station in accordance with GAAP, of any assets from Tradeout Agreements as of the date received.

(d)     To the extent not inconsistent with the express provisions of this Agreement, the allocations made pursuant to this Section 2.4 shall be made in accordance with GAAP.

11

(e)     Net settlement of the adjustments contemplated under this Section 2.4 shall be made at the Closing, if feasible. For items not readily subject to ascertainment at the Closing, the following procedures shall apply. Buyer shall prepare and deliver to Seller within thirty (30) business days following the Closing Date, or such earlier or later date as shall be mutually agreed to by Seller and Buyer, an itemized list (the "**Adjustment List**") of all sums that are an increase or decrease to the Purchase Price, with a brief explanation thereof. Such list shall show the net amount of the increase or decrease to the Purchase Price (the "**Adjustment Amount**"). If the Adjustment Amount is a decrease to the Purchase Price, Seller shall pay such amount to Buyer or, if Seller has no Cash, Buyer shall be granted an increased allowed claim in Seller's Bankruptcy Case equal to such amount; if the Adjustment Amount is an increase to the Purchase Price, Buyer shall reduce the amount owed to Buyer by Seller pursuant to the First Lien Credit Documents in a corresponding amount. Except as provided otherwise in Section 2.4(g), payment of the Adjustment Amount shall be made not later than ten (10) business days following the delivery of the Adjustment List.

(f)     Not later than ten (10) business days following the delivery of the Adjustment List, Seller may furnish Buyer with written notification of any dispute concerning any items shown thereon or omitted therefrom together with a detailed explanation in support of Seller's position in respect thereof. Buyer and Seller shall consult to resolve any such dispute for a period of ten (10) business days following the notification thereof. In the event of any such dispute, that portion of the Adjustment Amount that is not in dispute shall be paid to the party entitled to receive the same on the day for payment provided in Section 2.4(e). If such ten (10) business day consultation period expires and the dispute has not been resolved, the matter shall be referred to an independent public accounting firm mutually agreed upon by Seller and Buyer (the "**Accountants**"), which shall resolve the dispute and shall render its decision (together with a brief explanation of the basis therefore) to Buyer and Seller not later than twenty (20) business days following submission of the dispute to it; provided, however, if Buyer and Seller are unable to mutually agree upon an independent public accounting firm, then Buyer and Seller shall each choose an independent public accounting firm and those firms shall appoint a third independent public accounting firm to act as the Accountants. The disputed portion of the Adjustment Amount (the "**Disputed Amount**") shall be paid by the party required to pay the same within five (5) business days after the delivery of a copy of such decision to Seller and Buyer. The fees and expenses of the Accountants shall be shared equally by Seller and Buyer.

(g)     The Adjustment List (to the extent not disputed within the specified period by Seller), any mutually agreed written settlement of any such dispute concerning the Adjustment List and any determination of disputed items by the Accountants shall be final, conclusive and binding on the parties hereto absent manifest error.

**Section 2.5.     Non-Assumption of Liabilities**. Buyer does not and shall not assume or become obligated to pay any debt, obligation or liability of any kind or nature of Seller or the Station, whether or not incurred or accrued in connection with the operation of the Station, except the Assumed Liabilities or such other liabilities or charges as are specifically allocated to Buyer elsewhere in this Agreement.

12

**Section 2.6.** <u>Taxes</u>. All federal, state, local and other transfer, sales and use taxes applicable to, imposed upon or arising out of the transfer to Buyer of the Acquired Assets as contemplated by this Agreement shall be paid one-half (1/2) by Buyer and one-half (1/2) by Seller.

**Section 2.7.** <u>Risk of Loss</u>. Subject to Section 9.1 hereof, the risk of all Events of Loss prior to the Closing shall be upon Seller and the risk of all Events of Loss at or subsequent to the Closing shall be upon Buyer.

**Section 2.8.** <u>Allocation of Purchase Price</u>. The allocation of the Purchase Price among the Acquired Assets shall be based upon an appraisal to be paid by Buyer to be conducted by BIA-Kelsey under the residual method of allocating assets, which allocation shall be incorporated in a schedule to be provided by Buyer and executed by the parties within one hundred twenty (120) days after the Closing. Buyer and Seller each agree to report such allocation to the Internal Revenue Service in the form required by Treasury Regulation 1.1060T.

**Section 2.9.** <u>Access of Seller</u>. After Closing, Seller and its authorized agents, officers and representatives, upon prior written request, shall have access to the appropriate records of Buyer to conduct such examination and investigation as Seller deems necessary to assure compliance with this Article II, and to permit Seller to comply with its tax reporting compliance requirements, provided that such examination and investigation shall be during the Station's normal business hours, shall not unreasonably interfere with the Station's operations and activities and shall not constitute Seller's exercising control over the Station under FCC rules, regulations or guidelines.

## ARTICLE III
## GOVERNMENTAL APPROVALS AND CONTROL OF STATION

**Section 3.1.** <u>FCC Consent</u>. It is specifically understood and agreed by Buyer and Seller that the Closing shall be in all respects subject to, and conditioned upon, the receipt of prior FCC Consent. Buyer and Seller shall prepare and file with the FCC as soon as practicable but in no event later than ten (10) days after the execution of this Agreement, or such later date as agreed upon by Buyer and Seller or required by delay on the part of the FCC through no fault of Buyer or Seller, all requisite applications and other necessary instruments and documents to request the FCC Consent. After the aforesaid applications, instruments and documents have been filed with the FCC, Buyer and Seller shall prosecute such applications with all reasonable diligence and take all steps reasonably necessary to obtain the requisite FCC Consent. No party hereto shall take any action that such party knows or should know would adversely affect obtaining the FCC Consent, or adversely affect the FCC Consent becoming a Final Order. Seller shall pay all FCC filing or transfer fees relating to the transactions contemplated hereby irrespective of whether the transactions contemplated by this Agreement are consummated and irrespective of whether such fees are assessed before or after the Closing.

**Section 3.2.** <u>Control Prior to Closing</u>. Between the date hereof and the Closing Date, Buyer shall not directly or indirectly control, supervise or direct, or attempt to control,

supervise or direct, the operation of the Station. Such operation, including complete control and supervision of all programs, employees and policies, shall be the sole responsibility of Seller. Neither title nor right to possession of the Acquired Assets shall pass to Buyer until the Closing, but Buyer shall, however, be entitled to reasonable inspection of the Station and the Acquired Assets (upon reasonable prior notice) during normal business hours with the purpose that an uninterrupted and efficient transfer of the assets and business of the Station may be accomplished. After the Closing, Seller shall have no right to control the Station, and Seller shall have no reversionary rights in the Station.

**Section 3.3.** **Other Governmental Approvals**. Promptly following the execution of this Agreement, Buyer and Seller shall proceed to prepare and file with the appropriate Governmental Authorities any other requests for approvals or waivers, if any, that are required from other Governmental Authorities in connection with the Closing, and shall diligently and expeditiously prosecute, and shall cooperate fully with each other in the prosecution of, such requests for approvals or waivers and all proceedings necessary to secure such approvals and waivers. Buyer and Seller shall each pay one-half (1/2) of all fees required to be paid in connection with the approvals and waivers under this Section 3.3 which relate to the transactions contemplated hereby, irrespective of whether the transactions contemplated by this Agreement are consummated.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

**Section 4.1.** **Organization**. Each of MTBB and MTBB License Co. is a limited liability company duly organized, validly existing under the law of the State of Delaware and each of MTBB and MTBB License Co. is qualified as a foreign limited liability company in Connecticut. Seller has the power and authority to own, lease, and operate the Acquired Assets and to conduct the business of the Station as it is now being conducted. Complete and correct copies of the certificate of formation and limited liability company agreements of MTBB and MTBB License Co. as in effect through the date hereof has been delivered to Buyer.

**Section 4.2.** **Authorization; Enforceability**. The execution, delivery and performance of this Agreement and all of the documents and instruments required hereby by Seller are within the limited liability company power of Seller and have been duly authorized by all necessary limited liability company action by Seller. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Seller, the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium or similar Laws at the time in effect affecting the enforceability or rights of creditors generally and by general equitable principles, which may limit the right to obtain equitable remedies.

**Section 4.3.** **Absence of Conflicting Agreements**. Except as set forth on Schedule 4.3, neither the execution, delivery or performance of this Agreement in accordance with its terms by Seller nor the consummation of the sale and purchase of the Acquired Assets or any other

transaction contemplated by this Agreement, does or will, after the giving of notice, or the lapse of time or both, or otherwise:

(a)     conflict with, result in a breach of, or constitute a default under, (i) the certificates of formation or limited liability company agreements of Seller, or (ii) any Law or Governmental Order applicable to Seller;

(b)     assuming that the required consents disclosed on Schedule 4.3 are obtained, conflict with, result in a breach of, constitute a default under, result in a termination, amendment or modification of, or cause any acceleration of any obligation of Seller under, any material contract, agreement, arrangement, commitment or plan to which Seller is a party or by which Seller is bound and which relates to, the ownership or operation of the Station or the Acquired Assets;

(c)     result in the creation of any Lien upon any of the Acquired Assets, except for Permitted Liens; or

(d)     require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration or filing with, any Governmental Authority other than the FCC Consent.

**Section 4.4.     Acquired Assets**.  The Acquired Assets include all of the assets, properties and rights of every type and description, real, personal and mixed, tangible and intangible, that are necessary for the conduct of the business of owning and operating the Station in the manner in which that business is now conducted, with the exception of the Excluded Assets.

**Section 4.5.     Title to Acquired Assets; Liens and Encumbrances**.  Except as set forth on Schedule 4.5, Seller owns good title to or has valid leasehold interests in all of the Acquired Assets free and clear of any and all Liens except for Permitted Liens.  Schedule 4.5 lists each county and state where the Acquired Assets are located.

**Section 4.6.     Equipment**.  Except as set forth on Schedule 4.6, the Equipment includes all items of tangible personal property utilized in connection with owning and operating the Station.

**Section 4.7.     The Contracts**.  Except as set forth on Schedule 4.7:

(a)     Schedule 1.2 lists all Contracts except for (i) agreements (other than Tradeout Agreements) for the sale of time on the Station that involve the purchase of less than $5,000 in advertising time and require performance over a period of less than sixty (60) days and, (ii) other agreements which are cancelable by Seller or its assignee without breach or penalty on not more than thirty (30) days notice and which involve average annual payments or receipts by the Station of less than $10,000 in the case of any single contract and $50,000 in the aggregate;

(b)     Seller has performed in all material respects or is in material compliance with, each material term, covenant and condition of each of the Contracts required to be listed on

Schedule 1.2, and, to the Knowledge of Seller, no default on the part of Seller or any other party thereto exists under any of the Contracts;

**(c)** to the Knowledge of Seller, each of the Contracts listed on Schedule 1.2 is in full force and effect and constitutes the legal and binding obligation of, and is legally enforceable against Seller and against each other party thereto in accordance with its terms;

**(d)** Seller has furnished true and complete copies of all Contracts listed on Schedule 1.2, including all amendments, modifications and supplements thereto, and Schedule 1.2 contains summaries of all oral contracts; and

**(e)** except as set forth on Schedule 1.2, the Station does not have any Tradeout Agreements.

**Section 4.8. Intangible Property.** Except as set forth on Schedule 4.8:

**(a)** there are no Actions instituted, pending or, to the Knowledge of Seller, threatened by any third party pertaining to or challenging Seller's right to use any of the Intangible Property;

**(b)** to the Knowledge of Seller, Seller is not infringing upon any trademark, trade name, patent or copyright owned by a third party; and

**(c)** all Copyrights and Trademarks are listed on Schedule 1.3 and Schedule 1.10, respectively, all of which are transferable to Buyer by the sole act of Seller.

**Section 4.9. Real Property.** Seller does not own any real property.

**Section 4.10. The Leases.** Except as set forth on Schedule 4.10:

**(a)** the Leases described on Schedule 1.6 constitute all of the lease agreements between Seller and third parties relating to the operation of the Station or the Acquired Assets;

**(b)** Seller has performed in all material respects each material term, covenant and condition of each of the Leases that is required to be performed by Seller at or before the date hereof, and, to the Knowledge of Seller, no default on the part of Seller or on the part of any other party thereto, exists under any Lease;

**(c)** each of the Leases is in full force and effect, unimpaired by any acts or omissions of Seller, and, to the Knowledge of Seller, constitutes the legal and binding obligation of, and is legally enforceable against Seller, and , against each other party thereto in accordance with its terms;

**(d)** Seller has furnished true and complete copies of the Leases to Buyer, including any and all amendments thereto;

16

(e)     there are no leasing commissions or similar payments due, arising out of, resulting from or with respect to any Lease that are owed by Seller; and

(f)     each of Seller's Financing Leases is listed as such on Schedule 4.10.

**Section 4.11. No Litigation; Labor Disputes; Compliance with Laws.** Except as set forth on Schedule 4.11:

(a)     except for FCC rulemaking proceedings generally affecting the television broadcasting industry, there is no Action before or by any Governmental Authority or any third party pending or, to the Knowledge of Seller, threatened, to which Seller is a party or otherwise relating to the Station or the Acquired Assets; and

(b)     Seller owns and operates the Station and the Acquired Assets, and carries on and conducts the business and affairs of the Station in compliance in all material respects with all Laws, and all Governmental Orders.

**Section 4.12. Taxes.** Except as disclosed on Schedule 4.12:

(a)     Seller has duly and timely filed all required federal, state and local tax returns, reports and estimates for all years and periods (and portions thereof) for which any such returns, reports and estimates were due, and any and all amounts shown on such returns and reports to be due and payable by Seller have been paid in full except as may be contested in good faith. All of such returns, reports and estimates are true and complete in all respects. Seller has withheld all tax required to be withheld by Seller under applicable law and regulations, and such withholdings have either been paid to the proper governmental agency or set aside in accounts for such purpose, or accrued, reserved against and entered upon the books of Seller, as the case may be; and

(b)     there are, and after the date of this Agreement will be, no tax deficiencies (including penalties and interest) of any kind assessed against or relating to Seller or the Acquired Assets with respect to any taxable periods ending on or before, or including, the Closing Date of a character or nature that would result in Liens or claims on any of the Acquired Assets or on Buyer's title or use of the Acquired Assets or that would result in any claim against Buyer or the Acquired Assets.

**Section 4.13. Governmental Authorizations.** Seller holds, and on the Closing Date Seller will hold, all of the FCC Licenses, which, collectively, are all of the licenses, permits and authorizations required to operate the Station as a television broadcast station in substantially the same manner as it is being operated as of the date hereof. Schedule 1.5 includes a true and complete list of the FCC Licenses. Seller has delivered to Buyer true and complete copies of the FCC Licenses (including amendments and modifications thereto). The FCC Licenses are in full force and effect and have been validly issued and Seller is the authorized legal holder thereof. Except as set forth on Schedule 4.13, no qualifications, registrations, filings, licenses, permits, approvals or authorizations other than the FCC Licenses and those as set forth on Schedule 4.13 are required for Seller to own and operate the Station in the manner operated on the date hereof. As of the date hereof, no action or proceeding is pending or, to the

17

Knowledge of Seller, threatened before the FCC or any other Governmental Authority to revoke, refuse to renew or modify such FCC Licenses or other authorizations of the Station. Except as set forth on Schedule 4.13, Seller has no reason to believe that any of the FCC Licenses would not be renewed for a full term with no adverse conditions by the FCC or other granting authority in the ordinary course.

**Section 4.14. Compliance with Communications Laws**. Seller and the Station are in compliance in all material respects with all Communications Laws. Seller has complied in all material respects with all requirements of the FCC and the Federal Aviation Administration with respect to the construction and/or alteration of Seller's antenna structures, and "no hazard" determinations for each antenna structure have been obtained, where required. To the Knowledge of Seller, there are no matters relating to Seller or the Station that might reasonably be expected to result in the denial or delay of the FCC Consent.

**Section 4.15. MVPD Matters**. The Station's primary programming stream is carried on the MVPDs listed on Schedule 4.15. All carriage on MVPDs is pursuant to must-carry.

**Section 4.16. Brokers**. Neither this Agreement nor the sale and purchase of the Acquired Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of or representing Seller as broker, finder, investment banker, financial advisor or in any similar capacity, other than the Persons listed on Schedule 4.16, whose fees and expenses shall be paid and satisfied by Seller at the Closing.

**Section 4.17. Powers of Attorney**. Except as set forth on Schedule 4.17, there are no Persons holding a power of attorney on behalf of Seller that would enable such Persons to sell the Acquired Assets.

**Section 4.18. Employees**. Schedule 4.18 is a true and complete list of all of Seller's employees which list identifies the name and position of such employees, and the following compensation information for fiscal year 2010: (a) annual base salary; (b) years of service; and (c) vacation and sick pay. Except as set forth on Schedule 4.18 hereto, there are no collective bargaining agreements, employment agreements, consulting agreements or independent contractor agreements to which Seller is a party relating to the Station which are not terminable at will. The consummation of the transactions contemplated under this Agreement will not cause Buyer to incur or suffer any liability relating to, or obligation to pay, severance, termination, or other payments to any Person or entity.

**Section 4.19. Employee Benefit Plans**. Seller has not at any time maintained or been a party to or made contributions to any Station Employee Benefit Plan.

**Section 4.20. Environmental Compliance**. Seller has complied in all material respects with and is in material compliance with all Environmental Laws.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller from the Closing Date as follows:

**Section 5.1.  Organization**.  Buyer, or each of its designees, is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware and on the Closing Date Buyer, or each of its designees, shall be duly qualified to do business as a foreign limited liability company in Connecticut, and Buyer has full limited liability company power to purchase the Acquired Assets pursuant to this Agreement.

**Section 5.2.  Authorization; Enforceability**.  The execution, delivery and performance of this Agreement and all of the documents and instruments required hereby of Buyer are within the limited liability company power of Buyer and have been duly authorized by all necessary action by Buyer.  This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject only to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforceability or right of creditors generally and by general equitable principles which may limit the right to obtain equitable remedies.

**Section 5.3.  Absence of Conflicting Laws and Agreements**.  Except as set forth on Schedule 5.3, neither the execution, delivery or performance of this Agreement by Buyer nor the consummation of the sale and purchase of the Acquired Assets or any other transaction contemplated by this Agreement, does or will, after the giving of notice, or the lapse of time, or otherwise:

    **(a)**  conflict with, result in a breach of, or constitute a default under, (i) the certificate of formation or limited liability company agreement of Buyer, or (ii) any Law or Governmental Order applicable to Buyer;

    **(b)**  conflict with, result in a breach of, or constitute a default under, any material contract, agreement, arrangement, commitment or plan to which Buyer is a party or by which Buyer or its assets is bound;

    **(c)**  require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration or filing with, any Governmental Authority other than the FCC Consent; or

    **(d)**  require the consent of any person under any material agreement, arrangement or commitment of any nature to which Buyer is a party or by which it is bound.

**Section 5.4.  Brokers**.  Neither this Agreement nor the sale and purchase of the Acquired Assets or any other transaction contemplated by this Agreement was induced or procured through any Person acting on behalf of or representing Buyer as broker, finder, investment banker, financial advisor or in any similar capacity other than those Persons listed on Schedule 5.4, whose fees and expenses shall be the responsibility of Buyer.

**Section 5.5.  FCC Qualification**.  Except as set forth on Schedule 5.5 and except for proceedings of general applicability to the television industry, Buyer knows of no facts that would, under the Communications Laws, disqualify Buyer as an assignee of the FCC Licenses or as an owner or operator of the Station.

{895.001-W0016305.}

**Section 5.6.** <u>Solvency</u>. Buyer is, on the date hereof, and will be as of the Closing, solvent and will not be rendered insolvent by the performance of the transactions contemplated by this Agreement, will not be undercapitalized upon consummation of the transactions contemplated hereunder and will not, as a result of the transactions contemplated by this Agreement, incur debts beyond its ability to pay as such debts mature.

**Section 5.7.** <u>Available Funds</u>. Buyer has, on the date hereof, and will have on the Closing Date access to immediately available funds, in cash, sufficient to pay any amounts payable by the Buyer pursuant to this Agreement and each other document or instrument required hereby.

**Section 5.8.** <u>No Reliance</u>. Buyer acknowledges and agrees that neither Seller nor any Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article IV and Buyer has not been induced by, or relied upon (and Seller expressly disclaims) any representations, warranties or statements (written or oral), whether express or implied, made by any Person, that are not expressly set forth in Article IV of this Agreement. Without limiting the generality of the foregoing, Buyer acknowledges that no representations or warranties are made with respect to any projections, forecasts, estimates, budgets or prospective information that may have been made available to Buyer or any of its representatives.

**ARTICLE VI**
**CERTAIN MATTERS PENDING THE CLOSING**

From and after the date of this Agreement and until the Closing (unless otherwise provided herein):

**Section 6.1.** <u>Access</u>. Buyer and its authorized agents, officers and representatives shall have reasonable access to the Station and the Acquired Assets to conduct such examination and investigation of the Station, the business of Seller and the Acquired Assets as it deems reasonably necessary, provided that such examinations shall be during the Station's normal business hours, shall not unreasonably interfere with the Station's normal operations and activities and shall not be in violation of Section 3.2 concerning "control."

**Section 6.2.** <u>Notice of Adverse Changes</u>. Pending the Closing, Seller shall give Buyer prompt written notice of the occurrence of any of the following:

(a) Knowledge of Seller of the commencement of any Action before the FCC or any other Governmental Authority which involves any of the FCC Licenses or which could reasonably be expected to have a material adverse effect on the Station or the Acquired Assets, other than proceedings or litigation of general applicability to the television broadcasting industry;

(b) Knowledge of Seller of any violation by Seller or the Station, or written notice of any alleged violation, or any Law; or

(c) Knowledge of Seller of any notice of breach, default, claimed default or termination of any Contract or Lease other than pursuant to its terms.

20

**Section 6.3.** **Operations Pending Closing**. Subject to the provisions of Section 3.2 regarding control of the Station, after the date hereof and prior to the Closing, Seller shall:

(a) use commercially reasonable efforts to operate the Station in the ordinary course of business in accordance with past practices;

(b) operate the Station in all material respects in accordance with the FCC Licenses and the Communications Laws;

(c) not sell, lease, mortgage, pledge or otherwise dispose of any of the Acquired Assets except for transactions in the ordinary and regular course of the operation of the Station;

(d) not increase or otherwise change the rate or nature of the compensation (including wages, salaries and bonuses) which is paid or payable to any Person, except pursuant to existing compensation and fringe benefit plans, practices and arrangements which have been disclosed to Buyer, and not enter into, renew or allow the renewal of, any employment or consulting agreement or other contract or arrangement with respect to the performance of personal services;

(e) except with Buyer's prior written consent, not enter into, or become obligated under, any agreement or commitment on behalf of the Station including any Program Rights agreement except for (i) commitments for advertising time on the Station at market rates to be paid in cash, entered into in the ordinary and regular course of the operation of its business, and (ii) those other agreements or commitments otherwise permitted under this Section 6.3, or change, amend, terminate or otherwise modify any Contract, Lease, material agreement or material commitment in any material respects except for those which terminate or expire by their own terms;

(f) keep Buyer apprised of material developments in negotiations for Program Rights agreements and promptly provide Buyer with copies of all Program Rights agreements entered into by Seller;

(g) maintain in full force and effect policies of liability and casualty insurance of substantially the same type, character and coverage as the policies currently carried with respect to the business, operations and assets of the Station;

(h) not enter into any Tradeout Agreements relating to the Station which create obligations or liabilities of Seller extending to or beyond the Closing Date without the prior written consent of Buyer;

(i) use its commercially reasonable efforts to maintain carriage, if any, of the Station's signals on all MVPDs listed on Schedule 4.15;

(j) not adopt, or commit to adopt, any Plan Benefit Arrangement or other pension, profit sharing, deferred compensation or similar plan, program or trust on behalf of personnel of the Station, other than the Station Employee Benefit Plans or any other such plan, program

or trust currently maintained by Seller or modify the existing Station Employee Benefit Plans;

(k)  promptly notify Buyer of any attempt or actual collective bargaining organizing activity with respect to any employees of the Station; and not enter into any collective bargaining agreement applicable to any employees of the Station;

(l)  follow Seller's usual and customary policy with respect to extending credit for sales of broadcast time on the Station and with respect to collecting Accounts Receivable arising from such extension of credit and not engage in any activity with the purpose or effect of accelerating the collection of Accounts Receivable; and

(m)  promptly provide Buyer with copies of all correspondence with Market MVPD Systems concerning must carry status, retransmission consent and other matters arising under the MVPD Act Requirements, and keep Buyer advised of the status of material developments in all negotiations with MVPDs concerning such matters.

**Section 6.4.**  **FCC Reports**.  Seller will furnish to Buyer within ten (10) business days after filing all reports filed with the FCC with respect to the Station after the date hereof.

**Section 6.5.**  **Consents**.  Seller will use its commercially reasonable efforts to obtain all consents and approvals required from third Persons, whose consent or approval is required pursuant to any Contract or Lease comprising part of the Acquired Assets, prior to the Closing Date including the Lease Estoppel Letters; provided, however, that Seller shall not be required to expend any money in connection with such efforts.

**Section 6.6.**  **Cooperation**.  Buyer and Seller will cooperate in all respects in connection with: (a) securing any nongovernmental approvals, consents and waivers of third parties listed in Schedule 4.3; and (b) giving notices to any Governmental Authority, or securing the permission, approval, determination, consent or waiver of any Governmental Authority, required by Law in connection with the transfer of the Acquired Assets from Seller to Buyer.

**Section 6.7.**  **Tax Returns and Payments**.

(a)  All tax returns, estimates and reports required to be filed by Seller prior to the Closing Date or relating to periods prior to the Closing Date will be timely filed when due with the appropriate governmental agencies or extensions will have been granted; and

(b)  all taxes pertaining to ownership of the Acquired Assets or operation of the Station prior to the Closing Date will be paid when due and payable unless protested in good faith.

**Section 6.8.**  **Release of Liens**.  Except for the Permitted Liens disclosed on Schedule 6.8, at or prior to the Closing, Seller shall obtain the release of all Liens disclosed in the Schedules hereto and any other Liens on the Acquired Assets and shall duly file releases or terminations of all such Liens in each governmental agency or office in which any such Lien or evidence thereof shall have been previously filed and Seller shall transfer and convey, or cause to be

22

transferred and conveyed, to Buyer at Closing good and marketable title to all of the Acquired Assets free and clear of all Liens, except for those Liens disclosed on <u>Schedule 6.8</u>; provided, however, Buyer may waive this requirement in Buyer's sole discretion to the extent that Buyer determines in Buyer's sole discretion that the Sale Order satisfies this requirement.

**Section 6.9.    Financing Leases**.  At or prior to the Closing, Seller shall obtain the release of all obligations under any Financing Leases.

**Section 6.10. Public Announcement**.  Seller shall publish and broadcast a public notice concerning the filing of the application for assignment of the FCC Licenses in accordance with the requirements of Section 73.3580 of the FCC's Rules.  As to any other announcements, no party hereto shall issue any press release or public announcement or otherwise divulge the existence of this Agreement or the transactions contemplated hereby without prior approval of the other parties hereto which shall not be unreasonably withheld except as and to the extent that such party shall be obligated by Law, in which case the other party shall be so advised and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued.

**Section 6.11.  Adequate Assurances Regarding Assigned and Assumed Agreements and Required Orders.**  With respect to each Assigned and Assumed Agreement, Buyer shall provide adequate assurance of the future performance of such Assigned and Assumed Agreement by Buyer.  Buyer shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 6.12. Alternative Transaction Solicitations**.

(a)     Seller shall work with the Buyer and, with respect to the Station, shall not solicit inquiries, proposals, offers or bids from, and negotiate with any Person other than Buyer with respect to any Alternative Transaction (as defined below) until the entry of the Bidding Procedures Order except to the extent authorized by Buyer in Buyer's sole discretion.  From the date on which the Bankruptcy Court enters the Bidding  Procedures Order until the entry of the Sale Order, Seller and its affiliates and representatives shall be permitted to market and solicit inquiries, proposals, offers or bids from, and negotiate with, any Person other than Buyer regarding any Alternative Transaction, and may take any other affirmative action in connection therewith (including, but not limited to) (A) entering into any definitive agreement or letter-of-intent with respect thereto, (B) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith), or (C) seeking approval of the Bankruptcy Court for any Alternative Transaction, and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts).  Neither Seller nor any of its respective affiliates or representatives shall have any liability to Buyer or any of its affiliates or representatives, either under or relating to this Agreement or any Law, by virtue of entering into or seeking Bankruptcy Court approval of such a definitive agreement for an Alternative Transaction.

**(b)**     As soon as practicable (but in no event later than five (5) Business Days) after the date hereof, Seller must file with the Bankruptcy Court an application or motion seeking approval of the Bidding Procedures Order that provides for the conduct of the Sale in accordance with the bidding procedures that will contain such provisions described more fully on Exhibit B and shall be in a form and substance agreed upon by Buyer and Seller (the "Bidding Procedures"). Seller will seek Bankruptcy Court approval for the Bidding Procedures Order as a matter preliminary to the Bankruptcy Court's subsequent approval of this Agreement and the transactions contemplated herein by entry of the Sale Order. If this Agreement represents the highest and best bid for the Acquired Assets as determined in accordance with the procedures set forth in the Bidding Procedures Order, Seller shall present the Sale Order at the hearing to approve a sale of the Acquired Assets.

**(c)**     Following entry of the Sale Order by the Bankruptcy Court, Seller shall not seek, solicit, encourage or negotiate any offer to purchase or acquire all or any portion of the Acquired Assets, whether pursuant to a potential sale, plan or otherwise.

**Section 6.13.   Best Efforts.**   Without limiting the specific obligations of any party hereto under any agreement or covenant hereunder, each party hereto shall use reasonable best efforts to take all action and do all things necessary in order to consummate the transactions contemplated by this Agreement, including, without limitation, cooperation with third parties involved in the due diligence process of financing of Buyer's acquisition hereunder, and satisfaction, but not waiver, of the closing conditions set forth in Article VII and Article VIII.

**Section 6.14.   Shared Contracts.**

**(a)**     Buyer and Seller shall, as soon as practicable after the date of this Agreement, make appropriate requests and shall use commercially reasonable efforts to obtain as expeditiously as possible reasonably comparable replacement or separated contracts (each, a "Replacement Contract") that provide to Buyer those rights relating to the Station which arise under a Shared Contract, subject to the terms and conditions of such Shared Contract (such rights, which shall constitute Acquired Assets, the "Shared Contract Rights"), and that allocate to Buyer those obligations relating to the Station which arise under a Shared Contract, subject to the terms and conditions of such Shared Contract (such obligations, which shall constitute Assumed Liabilities, the "Shared Contract Obligations"). For the avoidance of doubt, all rights and obligations which arise under a Shared Contract other than Shared Contract Rights and Shared Contract Obligations shall be included in the Excluded Assets and the Retained Liabilities.

**(b)**     Neither Seller nor Buyer shall be required to accept or agree to any Replacement Contract which contains any different terms than the Shared Contract that would make, or is reasonably likely to make, the Replacement Contract materially more onerous in the aggregate or that would materially reduce, or is reasonably likely to materially reduce, the benefits available under the Shared Contract to which the Replacement Contract relates. For the avoidance of doubt, obtaining Replacement Contracts for any Shared Contracts is not a condition to the Closing.

24

(c)     In the event a Replacement Contract for a Shared Contract is not obtained by the Closing and the Closing occurs, such Shared Contract shall be held, as of and from the Closing Date, by Seller for the benefit of Buyer and the Shared Contract Obligations shall be performed by Buyer in Seller's name and all Shared Contract Rights shall be for Buyer's account. Seller shall take or cause to be taken at Buyer's expense such actions in its name or otherwise as Buyer may reasonably request so as to provide Buyer with the Shared Contract Rights (including the collection of money or other consideration that becomes due and payable under the Shared Contracts) so long as Buyer fully cooperates with Seller and promptly reimburses Seller for all payments made by Seller (with Buyer's prior approval) in connection therewith, and Seller shall promptly pay over to Buyer all money or other consideration received by it in respect of all Shared Contracts (to the extent relating to the Station). As of and from the Closing Date, Seller authorizes Buyer, to the extent permitted by applicable Law and the terms of the Shared Contracts, at Buyer's expense, to perform the Shared Contract Obligations and receive the Shared Contract Rights under the Shared Contracts.

(d)     To the extent that any allocation of rights and obligations which arise under a Shared Contract is necessary in connection with the implementation of the provisions of this Section 6.14, the rights and obligations under the Shared Contracts shall be equitably allocated among television stations in a manner reasonably determined by Seller and Buyer, in accordance with the following equitable allocation principles: (i) any allocation set forth in the Shared Contract shall control; (ii) if none, then any allocation previously made by the Station in the ordinary course of Station operations and disclosed to Buyer shall control; (iii) if none, then the quantifiable proportionate benefit to be received by the parties after the Closing Date (to be reasonably determined in good faith by Buyer and Seller) shall control; and (iv) if not quantifiable, then reasonable accommodation (to be reasonably determined in good faith by Buyer and Seller shall control.

**Section 6.15.   Sale Order**.  The Sale Order to be filed by Seller with the Bankruptcy Court shall contain a determination that: (i) NRJ validly assigned its credit bid to Buyer; and (ii) Buyer is not a successor to Seller or otherwise liable for any of Seller's liabilities (other than Assumed Liabilities) and shall permanently enjoin all Persons from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, Action or Lien against Buyer or the Acquired Assets.

## ARTICLE VII
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

Each and every obligation of Buyer to be performed on the Closing Date shall be subject to the satisfaction prior to or at the Closing of the following express conditions precedent:

**Section 7.1.   Compliance with Agreement**.  Seller shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing.

**Section 7.2. Proceedings and Instruments Satisfactory**. All proceedings, corporate or otherwise, to be taken by Seller in connection with the performance of this Agreement, and all documents incident thereto, shall be complete to the reasonable satisfaction of Buyer and Buyer's counsel and Seller shall have made available to Buyer for examination the originals or true and correct copies of all documents which Buyer may reasonably request in connection with the transactions contemplated by this Agreement.

**Section 7.3. Representations and Warranties**. The representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as though such representations and warranties had been made on the Closing Date, except for changes permitted or contemplated by this Agreement and except that representations and warranties that by their terms speak as of a specific date, shall be true and correct in all material respects only as of such specified date.

**Section 7.4. Event of Loss**. Between the date of this Agreement and the Closing, neither the Station nor the Acquired Assets shall have sustained an Event of Loss which individually or in the aggregate would cost in excess of $100,000 to repair and such repair shall not have been completed on or prior to the Closing Date to Buyer's reasonable satisfaction; provided, however, Seller may elect to extend the Closing Date for a reasonable period not to exceed sixty (60) days necessary to complete such repairs, and provided, further if Buyer waives this condition, the provisions of Section 9.1 shall be applicable.

**Section 7.5. Deliveries at Closing**. Seller shall have delivered or caused to be delivered to Buyer the documents, each properly executed and dated as of the Closing Date as required pursuant to Section 2.3(a).

**Section 7.6. Other Documents**. Seller shall have delivered to Buyer such documents and certificates of officers of Seller and public officials as shall be reasonably requested by Buyer's counsel to establish the existence of Seller and the due authorization of this Agreement and the transactions contemplated hereby by Seller.

**Section 7.7. Required Approvals and Consent**. There shall have been secured such permissions, approvals, determinations, consents and waivers, if any, as may be required by law, regulatory authorities, the Leases or the Contracts as listed on Schedule 7.8.

**Section 7.8. Absence of Investigations and Proceedings**. Except for governmental investigations relating to the broadcast industry generally, and as set forth on Schedule 7.9, there shall be no Governmental Order, and no Action before or by any Governmental Agency pending to which Seller is a party or to which the Station or the Acquired Assets are subject, including any with respect to condemnation, zoning, use or occupancy, which would materially adversely affect the ability of Buyer to operate the Station or to use or acquire the Acquired Assets in the same manner as operated and used by Seller. Without limiting the generality of the foregoing, no Action or formal investigation by any Person or Governmental Authority shall be pending with the object of challenging or preventing the Closing and no other proceedings shall be pending with such object or to collect damages from Buyer on account thereof and for which Buyer is not indemnified hereunder. No Action shall be

26

pending before the FCC or any Governmental Authority to revoke, modify in any material respect or refuse to renew any of the Licenses. No Action shall be pending before any court or Governmental Authority in which it is sought to restrain or prohibit, or obtain damages or other relief in connection with, this Agreement or the consummation of the transactions contemplated hereby.

**Section 7.9.** **Governmental Consents**. The FCC Consent (a) shall have been issued, (b) shall, at Closing, be in full force and effect, (c) shall contain no provision materially adverse to Buyer, and (d) shall be a Final Order; provided, however, that Buyer in its sole discretion and upon ten (10) days' prior written notice may waive the requirement that the FCC Consent has become a Final Order. All other authorizations, consents and approvals of any and all Governmental Authorities necessary in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

**Section 7.10.** **FCC Licenses**. Seller shall be the holder of the FCC Licenses and there shall not have been any modification of any of such FCC Licenses which would have an adverse effect on the Station or the conduct of its business operations. The Station shall be operating in material compliance with all Communications Laws and no proceeding shall be pending or, to the Knowledge of Seller, threatened, the effect of which would be to revoke, cancel, fail to renew, suspend or modify adversely any of the FCC Licenses.

**Section 7.11.** **Absence of Liens**. On the Closing Date and simultaneously with the Closing, there shall not be any Liens on the Acquired Assets except for Permitted Liens.

**Section 7.12.** **Non-Foreign Affidavit**. Seller shall have furnished to Buyer an affidavit of Seller, in form reasonably satisfactory to Buyer, stating under penalty of perjury Seller's United States taxpayer identification number and that Seller is not a foreign person within the meaning of Section 1445(b)(2) of the Code.

**Section 7.13.** **Lease Estoppel Letters** Buyer shall have received the Lease Estoppel Letters, executed and dated as of the Closing Date.

**Section 7.14.** **Entry of Bidding Procedures Order**. The Bankruptcy Court shall have entered the Bidding Procedures Order.

**Section 7.15.** **Entry of Sale Order**. The Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Buyer containing, at a minimum, the required provisions outlined in Section 6.15, and the Sale Order shall have become a final, non-appealable order not subject to any stay.

If any of the conditions set forth in this Article VII have not been satisfied prior to or at Closing, Buyer may in its sole discretion nevertheless elect to proceed with the consummation of the transactions contemplated hereby.

{895.001-W0016305.}

# ARTICLE VIII
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER

Each and every obligation of Seller to be performed on the Closing Date shall be subject to the satisfaction prior to or at the Closing of the following express conditions precedent:

**Section 8.1.** **Compliance with Agreement**.  Buyer shall have performed and complied in all material respects with all of its obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing.

**Section 8.2.** **Proceedings and Instruments Satisfactory**.  All proceedings to be taken by Buyer in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be complete to the reasonable satisfaction of Seller and Seller's counsel, and Buyer shall have made available to Seller for examination the originals or true and correct copies of all documents which Seller may reasonably request in connection with the transactions contemplated by this Agreement.

**Section 8.3.** **Representations and Warranties**.  The representations and warranties made by Buyer shall be true and correct in all material respects as of the Closing Date with the same force and effect as though such representations and warranties had been made on the Closing Date.

**Section 8.4.** **Deliveries at Closing**.  Buyer shall have delivered, or caused to be delivered, to Seller the documents, each properly executed and dated as of the Closing Date, required pursuant to Section 2.3(b).  Buyer shall also have made the payments described in Section 2.2.

**Section 8.5.** **Other Documents**.  Buyer shall have delivered, or caused to be delivered, to Seller such documents and certificates of officers of Buyer and of public officials as shall be reasonably requested by Seller's counsel to establish the existence and good standing of Buyer and the due authorization of this Agreement and the transactions contemplated hereby by Buyer.

**Section 8.6.** **Absence of Investigations and Proceedings**.  No Action by any Person or Governmental Authority shall be pending with the object of challenging or preventing the Closing and no other proceedings shall be pending with such object or to collect damages from Seller on account thereof.

**Section 8.7.** **Governmental Consents**.  The FCC Consent shall have been issued, and shall, at Closing, be in full force and effect.  All other material authorizations, consents or approvals of any and all Governmental Authorities necessary in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

If any of the conditions set forth in this Article VIII have not been satisfied prior to or at Closing, Seller may nevertheless elect to proceed with the consummation of the transactions contemplated hereby.

# ARTICLE IX
# FURTHER AGREEMENTS

**Section 9.1.** **Event of Loss**.  Upon the occurrence of an Event of Loss or Events of Loss in excess of $100,000 prior to the Closing, Seller shall take steps to repair, replace and restore the damaged, destroyed or lost property to its former condition.  At Closing if Buyer has waived the condition set forth in Section 7.4, Seller shall assign to Buyer all its rights under any insurance and all proceeds of insurance (excluding business interruption proceeds for periods prior to the Closing Date) covering the property damage, destruction or loss not so repaired, replaced or restored prior to Closing.

**Section 9.2.** **Station Employees**.

(a)  Buyer may at any time after the date of this Agreement approach Station Employees and make arrangements or enter into agreements with such employees concerning becoming employees of Buyer, although Buyer assumes by this Agreement no obligation to employ or continue the employment of any Person after the Closing.  All such offers of employment shall be expressly conditioned upon the consummation of the Closing and Buyer shall not negotiate or enter into agreements with Station Employees to become employees of any other television station owned by Buyer.  Any Station Employee who thereby becomes employed by Buyer shall constitute a Transferred Employee.  Seller agrees to fully cooperate with Buyer in connection with its offer to hire any Station Employees and will not take any action, directly or indirectly, to prevent any Station Employee from becoming employed by Buyer from and after the Closing.  Seller agrees that for a period of twelve (12) months following the Closing, Seller shall not solicit or induce any Station Employee to remain in, or any Transferred Employee to return to, the employ of Seller or any of its affiliates or otherwise attempt to retain or obtain the services of any such employee.

(b)  Seller shall be solely responsible for and shall pay all salaries and other compensation (including, but not limited to, any deferred or incentive compensation and any severance pay) which will or may become payable at any time in the future to any Transferred Employee for services rendered by Transferred Employee to Seller on or before the later of the Closing Date or the date a Transferred Employee becomes employed by Buyer.

(c)  Buyer does not and shall not assume any obligations or liability under any collective bargaining agreement currently in existence or which may come into existence prior to Closing.

(d)  Seller shall, prior to the Closing, but not earlier than the day prior to the Closing Date, terminate all Seller's Employees.  Any notification required by any federal, state or local law governing mass layoffs or terminations, including without limitation the federal Worker Adjustment and Retraining Notification Act of 1988, shall be given by Seller.  Compliance with all such Laws shall be Seller's sole responsibility and liability.  Seller shall indemnify, defend and hold Buyer harmless from and against all liabilities, claims and causes of action (including, without limitation, reasonable attorney fees and other legal costs and expenses) arising out of the violation, or alleged violation, of any such Laws.

29

**Section 9.3.** **Bulk Transfer.** Buyer and Seller hereby waive compliance with the Connecticut Bulk Transfer provisions of the Uniform Commercial Code and all similar Laws. Except for the Assumed Liabilities, Seller shall promptly pay and discharge when and as due all liabilities and obligations arising out of or relating to Seller's ownership and operation of the Station prior to Closing and its sale of the Station to Buyer. Except for the Assumed Liabilities, Seller hereby agrees to indemnify, defend and hold Buyer harmless from and against any and all liabilities, losses, costs, damages or causes of action (including, without limitation, reasonable attorney fees and other legal costs and expenses) arising out of or relating to claims asserted against Buyer pursuant to the Bulk Transfer provisions of the Uniform Commercial Code of Connecticut or any similar Law.

## ARTICLE X
## TERMINATION; MISCELLANEOUS

**Section 10.1.** **Termination.** This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date, as follows:

    **(a)** by mutual written agreement of Seller and Buyer; or

    **(b)** by written notice from Buyer to Seller or Seller to Buyer if the Closing shall not have occurred on or before the date that is 18 months after the date of execution of this Agreement for any reason other than delay or nonperformance or breach by the party seeking such termination; or

    **(c)** by Buyer, if Buyer is not then in material breach of this Agreement and Seller is then in material breach of this Agreement, and such breach remains uncured within thirty (30) days after receipt of written notice thereof from Buyer; or

    **(d)** by Buyer, so long as Buyer is not then in breach of its obligations under this Agreement in any material respect, if (i) the Bidding Procedures Order is not entered within sixty (60) days from the date hereof, or (ii) the Sale Order is not entered within ninety (90) days from the date hereof;

    **(e)** by Seller, if Seller is not then in material breach of this Agreement and Buyer is then in material breach of this Agreement, and such breach remains uncured within thirty (30) days after receipt of written notice thereof from Seller; or

    **(f)** by Buyer or Seller, if the Bankruptcy Court shall enter an order approving the Sale to a Person other than Buyer and such sale actually closes, subject to the limitations set forth in the Bidding Procedures Order.

**Section 10.2.** **Rights on Termination; Waiver.**

    **(a)** If this Agreement is terminated pursuant to Section 10.1(a) or 10.1(b) or 10.1(e) or 10.1(f), all further obligations of the parties under or pursuant to this Agreement shall immediately terminate without further liability of any party to the other.

30

**(b)** If this Agreement is terminated pursuant to Section 10.1 (c) or (d), Buyer shall be entitled to pursue all legal and equitable remedies against Seller for such default or breach including specific performance (Seller hereby acknowledging that the Acquired Assets are unique and that Buyer has no adequate remedy at law if Seller breaches this Agreement).

**Section 10.3. Further Assurances.** From time to time after the Closing Date, upon the reasonable request of Buyer, Seller shall execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment and transfer and take such further action as Buyer may reasonably request in order more effectively to sell, assign, convey, transfer, reduce to possession and record title to Buyer to any of the Acquired Assets. Seller agrees to cooperate with Buyer in all reasonable respects to assure to Buyer the continued title to and possession of the Acquired Assets in the condition and manner contemplated by this Agreement; provided, however, that Buyer shall not be required to spend additional sums of money.

**Section 10.4. Survival.** The agreements contained herein shall survive the Closing and the consummation of the transactions contemplated by this Agreement, and any dissolution, merger or consolidation of Buyer or Seller and shall bind the legal representatives, assigns and successors of Buyer and Seller. The representations and warranties in Articles IV and V hereof shall not survive the Closing.

**Section 10.5. Entire Agreement; Amendment; and Waivers.** This Agreement and the documents required to be delivered pursuant hereto constitute the entire agreement between the parties pertaining to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions of the parties, whether oral or written, and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, unless otherwise expressly provided.

**Section 10.6. Expenses.** Except as otherwise specifically provided herein and in the Bidding Procedures Order, whether or not the transactions contemplated by this Agreement are consummated, each of the parties shall pay the fees and expenses of its respective counsel, accountants and other experts incident to the negotiation, drafting and execution of this Agreement and consummation of the transactions contemplated hereby.

**Section 10.7. Benefit; Assignment.** This Agreement shall be binding upon and inure to the benefit of and shall be enforceable by Buyer and Seller and their respective proper successors and assigns. This Agreement (and any rights, obligations or liabilities hereunder) may not be assigned or delegated in whole or in part by any party without the prior written consent of the other party; provided, however, that Buyer may, without such consent, assign in whole or in part its rights, obligations or liabilities under this Agreement to an affiliate of Buyer; and provided, further, that Buyer may, without such consent, collaterally assign its rights

hereunder to its lenders. Any such assignee of Buyer shall fully assume the obligations of Buyer hereunder.

**Section 10.8. Confidentiality.**

(a)     Buyer agrees that prior to Closing, Buyer and its respective agents and representatives shall not use for its or their own benefit (except when required by the Bankruptcy Court, the Bidding Procedures Order, the Sale Order, law, rule or regulation and except for use in connection with Buyer's financing of the transaction and Buyer's investigation of the Station and its assets in connection with this Agreement), and shall hold in strict confidence and not disclose, (i) any data or information relating to Seller, its affiliates, or the Station obtained from Seller or any of its directors, officers, employees, agents or representatives in connection with this Agreement, or (ii) any data and information relating to the business, customers, financial statements, conditions or operations of the Station which is confidential in nature and not generally known to the public (clauses (i) and (ii) together, "**Seller's Information**"). If the transactions contemplated in this Agreement are not consummated for any reason, Buyer shall return to Seller all data, information and any other written material obtained by Buyer from Seller in connection with this transaction and any copies, summaries or extracts thereof, and shall refrain from disclosing any of Seller's Information to any third party or using any of Seller's Information for its own benefit or that of any other person.

(b)     Seller agrees that Seller and its agents and representatives shall not use for its or their own benefit (except when required by the Bankruptcy Court, the Bidding Procedures Order, the Sale Order, law, rule or regulation and except for use in connection with their investigations and review of Buyer in connection with this Agreement), and shall hold in strict confidence and not disclose, (i) any data or information, relating to Buyer or its affiliates obtained from Buyer, or from any of its directors, officers, employees, agents or representatives, in connection with this Agreement, or (ii) any data and information relating to the business, customers, financial statements, conditions or operations of Buyer which is confidential in nature and not generally known to the public (clauses (i) and (ii) together "**Buyer's Information**").   If the transactions contemplated in this Agreement are not consummated for any reason, Seller shall return to Buyer all data, information and any other written material obtained by Seller from Buyer in connection with this transaction and any copies, summaries or extracts, thereof and shall refrain from disclosing any of Buyer's Information to any third party or using any of Buyer's Information for its own benefit or that of any other person.

(c)     Notwithstanding any other provision to the contrary herein, the provisions of this Section 10.8 shall survive the termination of this Agreement.

**Section 10.9. Notices.**    All communications or notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given (i) on the date of personal delivery to an officer of the other party, or (ii) if sent by telecopy or facsimile machine to the number shown below, on the date of such confirmed facsimile or telecopy transmission, or (iii) when properly deposited for delivery by commercial overnight delivery service, prepaid, or by deposit in the United States mail, certified or registered mail, postage

32

prepaid, return receipt requested, on the date that is two days after the date set forth in the records of such delivery service or on the return receipt and addressed as follows, unless and until either of such parties notifies the other in accordance with this Section of a change of address or change of telecopy number:

| | |
|---|---|
| If to Buyer: | NRJ TV NY OpCo LLC |
| | NRJ TV NY License Co. LLC |
| | 722 S. Denton Tap Road |
| | Suite 130 |
| | Coppell, TX 75019 |
| | Attention: Ted B. Bartley |
| | |
| With a copy to: | Greenberg Traurig, LLP |
| | 3290 Northside Parkway, Suite 400 |
| | Atlanta, Georgia 30327 |
| | Attention: James S. Altenbach, Esq. |
| | Telecopy No.: (678) 553-2188 |
| | |
| If to Seller: | c/o Multicultural Capital Trust |
| | 11077 Swansfield Road |
| | Columbia, MD 21044-2724 |
| | Telecopy Number: (703) 991-7120 |
| | Attn: Lee W. Shubert, LC, Trustee |
| | |
| With a copy to: | Sciarrino & Associates, PLLC, a Member of |
| | Sciarrino & Shubert, PLLC |
| | 5425 Tree Line Drive |
| | Centreville, VA 20120 |
| | Telecopy Number: (703) 991-7120 |
| | Attn: Dawn M. Sciarrino, Esq. |

**Section 10.10. Counterparts; Headings**.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement.  This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile transmission, and any such counterpart executed and delivered via facsimile transmission shall be deemed an original for all intents and purposes. The Table of Contents and Article and Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

**Section 10.11. Income Tax Position**.  Neither Buyer nor Seller shall take a position for income tax purposes which is inconsistent with this Agreement.

**Section 10.12. Severability**.  If any provision, clause or part of this Agreement or the application thereof under certain circumstances is held invalid, or unenforceable, the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby.

33

**Section 10.13. <u>No Reliance</u>**. Except for (a) any assignees permitted by Section 10.7 of this Agreement, and (b) lenders (and their successors and assigns) providing financing for the consummation of the transactions contemplated by this Agreement:

    **(a)**    no third party is entitled to rely on any of the representations, warranties or agreements of Buyer or Seller contained in this Agreement; and

    **(b)**    Buyer and Seller assume no liability to any third party because of any reliance on the representations, warranties or agreements of Buyer and Seller contained in this Agreement.

**Section 10.14. <u>Judicial Interpretation</u>**. Should any provision of this Agreement require judicial interpretation, the parties hereto agree that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party which itself or through its agent prepared the same, it being agreed that the agents of each party have participated in the preparation hereof.

**Section 10.15. <u>Saturdays, Sundays and Legal Holidays</u>**. If the time period by which any acts or payments required hereunder must be performed or paid expires on a Saturday, Sunday or legal holiday, then such time period shall be automatically extended to the close of business on the next regularly scheduled business day.

**Section 10.16. <u>Consent to Jurisdiction</u>**. EACH OF THE PARTIES HERETO AGREES THAT ANY LEGAL ACTION BETWEEN THE PARTIES RELATING TO THE ENTRY INTO OR PERFORMANCE OF THIS AGREEMENT OR ANY ANCILLARY AGREEMENT, OR THE INTERPRETATION OR ENFORCEMENT OF THE TERMS HEREOF OR THEREOF, SHALL EXCLUSIVELY BE BROUGHT IN A FEDERAL OR STATE COURT LOCATED IN THE NEW CASTLE COUNTY, DELAWARE, HAVING JURISDICTION OF THE SUBJECT MATTER THEREOF, AND EACH PARTY IRREVOCABLY CONSENTS TO PERSONAL JURISDICTION IN ANY SUCH FEDERAL OR STATE COURT, WAIVES ANY RIGHT TO OBJECT TO SUCH VENUE OR TO ASSERT THE DEFENSE OF FORUM NON-CONVENIENS, AND AGREES THAT SERVICE OF COMPLAINT OR OTHER PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL ADDRESSED TO SUCH PARTY AT ITS ADDRESS SET FORTH IN, OR DETERMINED IN ACCORDANCE WITH, <u>SECTION 10.9</u> HEREOF.

**Section 10.17. <u>Bankruptcy Court Matters</u>**

    **(a)**    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids.

    **(b)**    Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the

34

Acquired Assets, Seller shall enter into a customary confidentiality agreement with such Person.

(c)     Following, but not prior to, entry of the Bidding Procedures Order by the Bankruptcy Court, and pursuant to the terms thereof and the termination provisions hereof, Seller is permitted to cause its representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer or its representatives) in connection with any sale or other disposition of all or any part of the Acquired Assets, alone or in connection with the sale or other disposition of any other asset of Seller except to the extent authorized by Buyer in Buyer's sole discretion. In addition, during such time period, Seller has the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Acquired Assets to prospective purchasers.

(d)     As promptly as practicable following the execution of this Agreement, but in no event later than ten (10) business days after the execution of this Agreement, Seller shall file and seek the approval of the Bankruptcy Court of the Sale Motion and the Bidding Procedures Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Buyer, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, Seller shall promptly notify Buyer of such appeal or stay request and shall provide Buyer within three (3) business days a copy of the relevant notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(e)     Notice of the sale of the Acquired Assets contemplated in this Agreement shall be in a form reasonably acceptable to Buyer and be served in accordance with applicable Laws (including, to the extent applicable, Rules 2002, 3016, 3017 and 6004 of the Federal Rules of Bankruptcy Procedure and any local rules or orders of the Bankruptcy Court) and the Bidding Procedures Order on all Persons required to receive notice under applicable Law.

**Section 10.18. Governing Law**. This Agreement shall be construed and interpreted according to the Laws of the State of Delaware, without regard to the conflict of law principles thereof.

*[SIGNATURES ARE ON FOLLOWING PAGE]*

{895.001-W0016305.}

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**"BUYER"**

**NRJ TV NY OPCO LLC**

By:_____

Name:_____

Title:_____

**NRJ TV NY LICENSE CO. LLC**

By:_____

Name:_____

Title:_____

**"SELLER"**

**MTB Bridgeport-NY Operating LLC**

By:_____

Name:_____

Title:_____

**MTB Bridgeport-NY Licensee LLC**

By:_____

Name:_____

Title:_____

# Table of Contents

Article I DEFINITIONS ................................................................................................ 2

    Section 1.1.    Definitions ................................................................................. 2

    Section 1.2.    Construction ............................................................................. 10

Article II PURCHASE AND SALE ........................................................................... 10

    Section 2.1.    Purchase and Sale .................................................................... 10

    Section 2.2.    Payment on Closing ................................................................. 10

    Section 2.3.    Closing Date Deliveries ........................................................... 10

    Section 2.4.    Adjustments to Purchase Price ................................................ 11

    Section 2.5.    Non-Assumption of Liabilities ................................................ 12

    Section 2.6.    Taxes ......................................................................................... 13

    Section 2.7.    Risk of Loss .............................................................................. 13

    Section 2.8.    Allocation of Purchase Price .................................................. 13

    Section 2.9.    Access of Seller ....................................................................... 13

Article III GOVERNMENTAL APPROVALS AND CONTROL OF STATION ........ 13

    Section 3.1.    FCC Consent ............................................................................. 13

    Section 3.2.    Control Prior to Closing .......................................................... 13

    Section 3.3.    Other Governmental Approvals .............................................. 14

Article IV REPRESENTATIONS AND WARRANTIES OF SELLER ..................... 14

    Section 4.1.    Organization ............................................................................. 14

    Section 4.2.    Authorization; Enforceability ................................................. 14

    Section 4.3.    Absence of Conflicting Agreements ....................................... 14

    Section 4.4.    Acquired Assets ....................................................................... 15

    Section 4.5.    Title to Acquired Assets; Liens and Encumbrances .............. 15

    Section 4.6.    Equipment ................................................................................. 15

    Section 4.7.    The Contracts ........................................................................... 15

    Section 4.8.    Intangible Property .................................................................. 16

{895.001-W0016305.}

Section 4.9.     Real Property..............................................................................................16

Section 4.10.    The Leases..................................................................................................16

Section 4.11.    No Litigation; Labor Disputes; Compliance with Laws..............................17

Section 4.12.    Taxes.........................................................................................................17

Section 4.13.    Governmental Authorizations....................................................................17

Section 4.14.    Compliance with Communications Laws....................................................18

Section 4.15.    MVPD Matters...........................................................................................18

Section 4.16.    Brokers......................................................................................................18

Section 4.17.    Powers of Attorney....................................................................................18

Section 4.18.    Employees..................................................................................................18

Section 4.19.    Employee Benefit Plans.............................................................................18

Section 4.20.    Environmental Compliance........................................................................18

Article V REPRESENTATIONS AND WARRANTIES OF BUYER....................................18

Section 5.1.     Organization...............................................................................................19

Section 5.2.     Authorization; Enforceability....................................................................19

Section 5.3.     Absence of Conflicting Laws and Agreements...........................................19

Section 5.4.     Brokers......................................................................................................19

Section 5.5.     FCC Qualification......................................................................................19

Section 5.6.     Solvency....................................................................................................20

Section 5.7.     Available Funds.........................................................................................20

Section 5.8.     No Reliance................................................................................................20

Article VI CERTAIN MATTERS PENDING THE CLOSING..............................................20

Section 6.1.     Access.......................................................................................................20

Section 6.2.     Notice of Adverse Changes.......................................................................20

Section 6.3.     Operations Pending Closing.......................................................................21

Section 6.4.     FCC Reports...............................................................................................22

Section 6.5.     Consents.....................................................................................................22

{895.001-W0016305.}

Section 6.6.    Cooperation ........................................................................................................ 22

Section 6.7.    Tax Returns and Payments. ................................................................................. 22

Section 6.8.    Release of Liens ................................................................................................... 22

Section 6.9.    Financing Leases ................................................................................................. 23

Section 6.10.   Public Announcement .......................................................................................... 23

Section 6.11.   Adequate Assurances Regarding Assigned and Assumed Agreements and
                Required Orders. ................................................................................................. 23

Section 6.12.   Alternative Transaction Solicitations ................................................................. 23

Section 6.13.   Best Efforts ......................................................................................................... 24

Section 6.14.   Shared Contracts ................................................................................................. 24

Section 6.15.   Sale Order ........................................................................................................... 25

Article VII CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER ......................... 25

Section 7.1.    Compliance with Agreement ............................................................................... 25

Section 7.2.    Proceedings and Instruments Satisfactory .......................................................... 26

Section 7.3.    Representations and Warranties .......................................................................... 26

Section 7.4.    Event of Loss ...................................................................................................... 26

Section 7.5.    Deliveries at Closing ........................................................................................... 26

Section 7.6.    Other Documents ................................................................................................. 26

Section 7.7.    Required Approvals and Consent ........................................................................ 26

Section 7.8.    Absence of Investigations and Proceedings ....................................................... 26

Section 7.9.    Governmental Consents ....................................................................................... 27

Section 7.10.   FCC Licenses ...................................................................................................... 27

Section 7.11.   Absence of Liens ................................................................................................ 27

Section 7.12.   Non-Foreign Affidavit ........................................................................................ 27

Section 7.13.   Lease Estoppel Letters ........................................................................................ 27

Section 7.14.   Entry of Bidding Procedures Order ..................................................................... 27

Section 7.15.   Entry of Sale Order ............................................................................................. 27

{895.001-W0016305.}

Article VIII CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER ............................................... 28

Section 8.1.    Compliance with Agreement............................................................. 28

Section 8.2.    Proceedings and Instruments Satisfactory ..................................... 28

Section 8.3.    Representations and Warranties ...................................................... 28

Section 8.4.    Deliveries at Closing ....................................................................... 28

Section 8.5.    Other Documents............................................................................. 28

Section 8.6.    Absence of Investigations and Proceedings ................................... 28

Section 8.7.    Governmental Consents .................................................................. 28

Article IX FURTHER AGREEMENTS ................................................................................ 29

Section 9.1.    Event of Loss................................................................................... 29

Section 9.2.    Station Employees........................................................................... 29

Section 9.3.    Bulk Transfer .................................................................................. 30

Article X TERMINATION; MISCELLANEOUS ............................................................... 30

Section 10.1.    Termination ................................................................................... 30

Section 10.2.    Rights on Termination; Waiver...................................................... 30

Section 10.3.    Further Assurances ........................................................................ 31

Section 10.4.    Survival ........................................................................................ 31

Section 10.5.    Entire Agreement; Amendment; and Waivers............................... 31

Section 10.6.    Expenses........................................................................................ 31

Section 10.7.    Benefit; Assignment...................................................................... 31

Section 10.8.    Confidentiality............................................................................... 32

Section 10.9.    Notices .......................................................................................... 32

Section 10.10.    Counterparts; Headings ............................................................... 33

Section 10.11.    Income Tax Position..................................................................... 33

Section 10.12.    Severability .................................................................................. 33

Section 10.13.    No Reliance .................................................................................. 34

Section 10.14.    Judicial Interpretation.................................................................. 34

{895.001-W0016305.}

Section 10.15. Saturdays, Sundays and Legal Holidays ................................................................ 34

Section 10.16. Consent to Jurisdiction ................................................................................. 34

Section 10.17. Bankruptcy Court Matters .............................................................................. 34

Section 10.18. Governing Law ........................................................................................... 35

.

{895.001-W0016305.}

## EXHIBITS

| | |
|---|---|
| Assumption Agreement | Exhibit "A" |
| Bidding Procedures Order | Exhibit "B" |
| Bill of Sale and Assignment | Exhibit "C" |
| Buyer's Closing Certificate | Exhibit "D" |
| Buyer's Performance Certificate | Exhibit "E" |
| Assignment and Assumption of Contracts | Exhibit "F" |
| FCC License Assignment | Exhibit "G" |
| Lease Assignment | Exhibit "H" |
| Lease Estoppel Letters | Exhibit "I" |
| Sale Order | Exhibit "J" |
| Seller's Closing Certificate | Exhibit "K" |
| Seller's Performance Certificate | Exhibit "L" |

{895.001-W0016305.}

## SCHEDULES

| | |
|---|---|
| 1.1 Assumed Liabilities | 4.11 Litigation |
| 1.2 Contracts | 4.12 Tax Exceptions |
| 1.3 Copyrights | 4.13 FCC License Exceptions |
| 1.4 Equipment | 4.15 MVPD Matters |
| 1.5 FCC Licenses | 4.16 Brokers |
| 1.6 Leases | 4.17 Powers of Attorney |
| 1.7 Motor Vehicles | 4.18 Employees |
| 1.8 Permitted Liens | 5.3 Conflicting Agreements of Buyer |
| 1.9 Excluded Assets | 5.4 Brokers |
| 1.10 Trademarks | 5.5 FCC Qualifications |
| 4.3 Conflicting Agreements of Seller | 6.8 Permitted Liens |
| 4.5 Title Exceptions/Locations – Personal Property | 7.8 Required Approvals and Consents |
| 4.6 Equipment Exceptions | 7.9 Investigations and Proceedings |
| 4.7 Contract Exceptions | |
| 4.8 Intangible Property Exceptions | |
| 4.10 Lease Exceptions | |

{895.001-W0016305.}