# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MTB BRIDGEPORT-NY OPERATING | ) | Case No. 11-12707 KJC |
| LLC, *et al.*,[1] | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | **Hearing Date: November 16, 2011 at 3:30 p.m. (ET)** |
| | ) | **Objection Deadline: November 1, 2011 at 4:00 p.m. (ET)[2]** |
| | ) | |
| | ) | **Related to Docket No. 13** |
| | ) | |

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF [RE DOCKET NO. 13]**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are MTB Bridgeport-NY Operating LLC (0459) and MTB Bridgeport-NY Licensee LLC (4381).

[2] By agreement of the Debtors, MTBL's response deadline was extended to November 9, 2011 at 4:00 p.m. eastern.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ................................................................... 7

    A.    PREPETITION HISTORY AND FORMATION OF TRUST ............................ 7

    B.    FORTRESS/NRJ CONNECTIONS ...................................................... 9

    C.    SHUBERT'S ACTIONS/INACTIONS .................................................. 12

    D.    ASSET PURCHASE AGREEMENT ..................................................... 15

OBJECTION ..................................................................................... 16

    A.    THE SALE MOTION SHOULD BE DENIED BECAUSE IT DOES NOT
            CONSTITUTE A SOUND EXERCISE OF BUSINESS JUDGMENT UNDER
            SECTION 363(B) OF THE BANKRUPTCY CODE ............................... 16

            1.    The Sale Is A Pretext to Hand The Keys Over To NRJ/Fortress............. 17

            2.    The Identity Of The Purchaser is Uncertain, And As Such, The NRJ Bid Is
                 Not The Best Bid ................................................................. 18

            3.    The Stalking Horse Bidder Cannot Meet FCC Qualifications
                 Requirements to Acquire the WSAH License ............................ 19

            4.    Relevant FCC Law ................................................................ 20

            5.    The Disqualifying FCC Misconduct of NRJ and Fortress...................... 21

            6.    The Trustee, Fortress, and NRJ perpetrated an unauthorized transfer of
                 control ............................................................................. 27

    B.    THE SALE MOTION, TO THE EXTENT IT SEEKS AUTHORIZATION FOR
            THE DEBTORS TO SELL SUBSTANTIALLY ALL OF THE DEBTORS'
            ASSETS TO NRJ FOR NO CASH, SHOULD BE DENIED BECAUSE (A) NRJ
            DOES NOT HAVE A LIEN ON THE DEBTORS' FCC LICENSES, AND
            THEREFORE CANNOT CREDIT BID AGAINST THEM, AND (B) CAUSE
            EXISTS FOR PRECLUSION OF NRJ'S CREDIT BID UNDER SECTION
            363(k) OF THE BANKRUPTCY CODE ........................................ 29

            1.    NRJ Does Not Hold A Lien On The Debtors' FCC Licenses ................. 29

            2.    Cause Exists to Deny NRJ Credit Bidding Rights..................................... 31

    C.    THE SALE MOTION SHOULD BE DENIED INSOFAR AS IT SEEKS A
            FINDING THAT NRJ HAS ACTED IN GOOD FAITH WITHIN THE
            MEANING OF SECTION 363(m) OF THE BANKRUPTCY CODE ............... 35

CONCLUSION ................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astroline Communications Co. Ltd Partnership v. FCC,*
857 F2d 1556, 1564 (D.C. Cir. 1988)....................................................................................20, 27

*Beal Bank, S.S.B. v. Waters Edge Ltd. P'shp,*
248 13.R. 668, 679-80 (D. Mass. 2000) ........................................................................30

*Fine Arts Broadcasting, Inc.,*
57 FCC 2d108, 111 (1975)..........................................................................................28

*Fox Television Stations, Inc.,*
11 FCC Rcd 5714, 5720 (1995).....................................................................................22

*Greater Boston Television Corp. v. FCC,*
444 F2d 841 (D.C. Cir. 1970), *cert. denied,* 403 U.S. 923 (1971) ..........................................21

*Hicks Broadcasting of Indiana, LLC, Hearing Designation Order,*
13 FCC Rcd 10662 (1998)......................................................................................20, 21

*In re Abbotts Diaries,*
788 F.2d at 148 ......................................................................................................36

*In re Aloha Airlines,*
2009 WL 1371950, at *8 (Bankr.D.Hawaii May 14, 2009) .....................................................32

*In re Application of Radio KDAN, Inc.,*
1968 SL 13765, at *2 n.1 (Feb. 21, 1968) ........................................................................30

*In re Applications of Kirk Merkley, Receiver,*
1983 WL 182883, at *2 (June 29, 1983) ..........................................................................30

*In re Cable One CATV,*
169 B.R. 488, 493 (Bankr. D.N.1-1. 1994).........................................................................36

*In re Daufuskie Island Props., LLC,*
441 13.R. 60, 63-64 (Bankr. D.S.C. 2010) .........................................................................31

*In re Decora Industries, Inc.,*
2002 WL 32332749 (D. Del. May 20, 2002).......................................................................16

*In re Delaware & Hudson Railway Co.,*
124 B.R. 169, 176 (D. Del.1991)) ..................................................................................16

*In re Hickey Props.,*
181 B.R. 171, 173 (Bankr. D. Vt. 1995)............................................................................30

*In re Kingston Square Associates, et al.,*
214 B.R. 713 (Bankr. S.D.N.Y. 1997)..............................................................................18

*In re KOWL, Inc.,*
49 FCC2d, 962, 964 (Rev. Bd. 1974) ..............................................................................20

*In re Philadelphia Newspapers, LLC,*
 599 F.3d 298 (3rd Cir. 2010) ............................................................................ 34

*In re Pine Coast Enters., Ltd.,*
 147 B.R. 30, 31 (Bankr. N.D. Ill. 1992) ........................................................... 30

*In re Stroud Ford. Inc.,*
 163 B.R. 730, 733 (Bankr. M.D. Pa. 1993) ....................................................... 36

*In re Theroux,*
 169 B.R. 498, 499 and n.3 (Bankr.D.R.I.1994) ................................................ 32

*Jefferson Radio v. FCC,*
 340 F. 2d 781 (D.C. Cir. 1964); 47 U.S.C. § 310(d) ....................................... 19

*Nat'l Bank of Commerce v. McMullan (In re McMullan),*
 196 B.R. 818. 835 (Bankr. W.D. Ark. 1996) .................................................... 31

*New Castle County, Delaware v. National Union Fire Ins. Co. of Pittsburgh, PA,*
 174 F.3d 338 (3d. Cir. 1999) ............................................................................ 34

*Next Wave Personal Communications, Inc.,*
 12 FCC Rcd 2030, 2049-51 (WTB 1997) ......................................................... 22

*Pepper v. Litton,*
 308 U.S. 295, 310-11 (1939) .............................................................................. 5

*Phoenix Broadcasting Co.,*
 44 FCC 2d 838 (1973) ....................................................................................... 28

*RKO General, Inc. v. FCC,*
 670 F2d 215, 232 (D.C. Cir. 1981) ................................................................... 20

*Weston Properties XVIII Limited Partnership,*
 8 FCC Rcd 1783, 1783-84 (MMB 1993)............................................................ 28

*WHDH, Inc.,*
 17 FCC 2d 856 (1969) ....................................................................................... 21

**Statutes**
11 U.S.C. § 363(b)(1) ............................................................................................. 16

11 U.S.C. § 363(k) ....................................................................................... 31, 32, 33

11 U.S.C. § 363(m) ................................................................................................. 37

47 U.S.C. § 310(d) .................................................................................................. 30

**Rules**
FCC Rules, 47 C.F.R. § 73.3540(a) ....................................................................... 19

DOCS_NY:25860.5 58984-001

MTB Equity LLC and Multicultural Television Broadcasting LLC (collectively, "MTBL"), by and through their undersigned counsel, hereby object to the above-captioned Sale Motion on the following grounds, and in support thereof, respectfully represent as follows:

## PRELIMINARY STATEMENT

MTBL respectfully submits that the Sale Motion, and indeed the Debtors' bankruptcy filing, is a contrivance to turn over ownership of the Debtors' valuable FCC licenses and operating assets to NRJ TV LLC ("NRJ") and Fortress Investment Group ("Fortress), in exchange for a credit bid from NRJ that is expressly forbidden under the operative governing documents of Multicultural Capital Trust (the "Trust Agreement"), which owns all of the equity in, and thus has the power to appoint the manager of, the Debtors. Lee Shubert d/b/a Lee Shubert, PC is the Trustee under the Trust Agreement and the sole manager of the Debtors. Despite the prohibition on accepting credit bids in the Trust Agreement, Mr. Shubert accepted the credit bid of NRJ and filed this chapter 11 case together with the Sale Motion. As MTBL will show at the hearing on the Sale Motion, Mr. Shubert filed these chapter 11 cases solely because he perceived a threat of action from MTBL on account of his pre-petition misconduct, which it will be shown includes "freezing out" MTBL from all involvement in the Debtors' affairs — even though MTBL is an express beneficiary of the Trust and entitled under its terms to regular updates on the operations and efforts to sell the Bridgeport TV station assets and license owned by the Debtors – and impermissibly accepting the NRJ credit bid. Now that MTBL has had the benefit of discovery, it has also come to light that Mr. Shubert was deferential to a fault to NRJ, the stalking horse bidder, in that he paid remarkably little attention to the sale

process and otherwise conducted himself as if it was a foregone conclusion that ownership of the Debtors' assets would be transferred to NRJ. Remarkably, Mr. Shubert was not even aware of the restriction against accepting a credit bid in the Trust Agreement, gave no thought to the needs of potential buyers in the bankruptcy sale process, took instructions from NRJ as to how to communicate with potential bidders, and deferred to his counsel to select the stalking horse bidder.

Discovery also confirmed the existence of numerous interconnections between NRJ and its principals and Fortress. Ted Bartley, one of NRJ's members, was until December 2010, the Managing Director of Fortress supervising the portfolios that included the secured debt issued by the Debtors. In his deposition, Mr. Bartley admitted to the existence of a previously undisclosed agreement between himself and Fortress dated in December 2010 that included provisions expressly relating to the Debtors' assets and contemplating some sort of arrangement between the parties regarding a future acquisition of the Debtors' assets by NRJ.

Upon information and belief, beginning in early 2010, Fortress, Bartley and NRJ embarked on a course of acquiring TV stations, including those owned by MTBL, to exploit the perceived value of the TV spectrum licenses, hoping to profit on the anticipated auction of such licenses in the future for purposes of expanding broadband signals. As will be shown at the hearing, in furtherance of this plan, Bartley formed NRJ while still employed by Fortress, and NRJ was provided with a $100 million warehouse line of credit from Fortress that NRJ has already drawn on to purchase two TV stations from the Trust. Documentary evidence submitted herewith shows that under the unique financing provided by Fortress, Fortress is given much, if

DOCS_NY:25860.5 58984-001

not all, of the equity upside in the investment.[1] Among other things, under the financing documents, Fortress is given the right to purchase a controlling interest in NRJ by means of a call option and warrants, such that Fortress is the true economic owner of NRJ, a fact not disclosed in the Sale Motion. MTBL has not yet had the opportunity to conduct deposition discovery of Fortress,[2] but if history is any indicator, Fortress has a significant, undisclosed role in the proposed acquisition of the Debtors' assets, including their FCC licenses.

Because the Sale Motion fails to provide a full and accurate context for the sale transaction that is proposed, including Fortress' role as the real purchaser, the Sale Motion should be denied. Moreover, insofar as the Asset Purchase Agreement contains, as a condition to closing, a requirement that the FCC approve the license transfer to NRJ, satisfaction of that condition may not be possible in light of its prior applications which, as discussed below, did not adequately disclose Fortress' involvement in NRJ's prior acquisitions. The same nondisclosure as well as other facts set forth herein warrant denial of the good faith finding under section 363(m) of the Bankruptcy Code requested by the Debtors and NRJ.

Furthermore, discovery conducted by MTBL revealed that the sale process undertaken by the Debtors is fundamentally flawed, warranting denial of the Sale Motion, as NRJ was given extraordinary influence over the formation and conduct of the sale process. As will be shown at the hearing, the Debtors' manager, Mr. Shubert, delegated virtually all managerial responsibility

---

[1] *See Declaration of Howard Topel in Support of Objection* filed concurrently herewith, dated November 8, 2011 and the exhibits annexed thereto submitted herewith.

[2] Thus far, in connection with the Sale Motion, MTBL has conducted document and deposition discovery of Lee Shubert, NRJ and the Debtor's investment banker, Kalil & Co. ("Kalil"). The deposition of a Fortress witness is scheduled to the date this objection is due, and therefore MTBL will supplement this Objection as needed based on that testimony, and otherwise reserves its rights to supplement this Objection based on additional facts uncovered prior to the hearing on the Sale Motion.

-3-

for the Debtors' business to one of NRJ's members (Titan) many months ago, and in the run-up

to the bankruptcy petition and the filing of the Sale Motion, paid little attention to important

details of the sale process. For example, Mr. Shubert admitted in his deposition that even though

he is a lawyer, the Trustee of the Trust, and the sole manager of the Debtors, he read only parts

the Asset Purchase Agreement with NRJ, and did not know whether it provided for payment of

the purchase price in cash or by means of a credit bid. He testified as well that in setting the time

line for the sale process – a truncated 45-day process that makes it extremely difficult if not

impossible for any other potential bidder to formulate a fully-financed, unconditional bid (as the

Sale Motion requires to compete with NRJ's impermissible credit bid) – he gave no thought to

how much time potential buyers would need to accomplish that, stating "[t]hat's not my

problem." Shubert Depo.[3] at 173-83:4-5. Nor did he manage perhaps the most important

decision in the process, the selection of a stalking horse bidder, testifying that the Debtors'

counsel picked the stalking horse, not him.

MTBL respectfully submits that the Sale Motion must be denied for several independent

reasons.

First, the Sale Motion does not represent the sound exercise of business judgment by the

estate's lone fiduciary, Mr. Shubert. It is readily apparent that in connection with conducting the

sale process, Mr. Shubert fell short in multiple ways of fulfilling his obligations to act as a

fiduciary in an informed, diligent and independent manner, thereby tainting the sale process. He

claimed to be totally unaware of the restriction in the Trust Agreement that limited his power to

---

[3] *See* Deposition of Lee W. Shubert ("Shubert Depo") as Exhibit A to *Declaration of Robert Feinstein in Support of Objection* filed concurrently herewith ("Feinstein Decl.").

sell the Debtors' assets for cash only; in accepting a credit bid, he exceeded his authority as Trustee, rendering his action voidable if not void. Also, he acceded to a credit bid from NRJ even though NRJ does not hold a lien on the Debtors' FCC licenses, the most valuable assets to be sold. Mr. Shubert also admitted that he did not read the entire APA, and deferred frequently to NRJ in the bankruptcy process, from the selection of counsel to getting instruction from NRJ's principal on how to communicate with other potential bidders. Mr. Shubert exercised no real independent thought or judgment on behalf of the Debtors' estates in this process, and appears to be nothing more than a mere puppet for NRJ and Fortress. The resulting sale process was not intended to maximize recovery for the estates or even to facilitate competitive bidding, but was simply an exercise in going through the motions of a sale on the way to handing over ownership of the Debtors' assets to NRJ and Fortress. Moreover, Mr. Shubert overlooked the troubling lack of transparency in NRJ's prior disclosures to the FCC in connection with earlier acquisition of TV station assets from the Trust, nondisclosures which render it doubtful that NRJ will be able to qualify as a transferee of the Debtors' FCC licenses and consummate the APA. Under all of the circumstances presented, MTBL respectfully submits that the Sale Motion does not constitute a sound exercise of business judgment by the Debtors and therefore should be denied.[4]

Second, the Sale Motion must be denied because the Debtors seek approval of a sale to NRJ in exchange for an impermissible credit bid. MTBL contends that pursuant to section 363(k) of the Bankruptcy Code, "cause" exists to prohibit NRJ from credit-bidding in this case.

---

[4] Shubert candidly admitted in his deposition that the only reason he caused the Debtors to file for bankruptcy relief was to have the sale process conducted under court supervision so that at the end of the process there would be a court order protecting him from any claims of misconduct. Shubert Depo. at 79. He is not entitled to the comfort of such an order where, as here, his performance fell so patently short of what is required of a fiduciary. *See Pepper v. Litton*, 308 U.S. 295, 310-11 (1939).

As noted above, the Trust Agreement circumscribes Shubert's authority to sell assets owned by the Debtors. Thus, Shubert's acceptance of a credit bid is *ultra vires*. Moreover, NRJ should not be allowed to credit bid a valuable asset, the Debtors' FCC licenses, against which it does not hold a lien. As Mr. Shubert, an experienced FCC lawyer, acknowledged in his deposition, under applicable non-bankruptcy law, a security interest cannot attach to FCC licenses. Thus, pursuant to the Sale Motion, the Debtors will receive no consideration for their most valuable assets, which are unencumbered. Particularly where, as here, the parties contemplated in the Trust Agreement governing the sale of the Debtors that only cash bids would be accepted, allowing NRJ to credit bid for the Debtors' FCC licenses would be wholly inappropriate.

Credit bidding also should be denied for "cause" because NRJ is using its secured creditor status to chill bidding, as the structure of the sale process – over which it exerted great influence – is fundamentally flawed and unfairly advantages NRJ.

Third, the Sale Motion should be denied because Debtors cannot, on the facts presented, obtain an order containing a finding under section 363(m) of the Bankruptcy Code that NRJ purchased the Debtors' assets in "good faith," a requirement under the APA with NRJ. Given Shubert's dereliction of duty in running a fair and open sale process, the inappropriate influence of NRJ over the conduct of the sale process, and the lack of disclosure of the full extent of the inter-relationships between NRJ and Fortress, the inescapable conclusion here is that the deck has been stacked from the outset against any party except NRJ prevailing in the auction process.

Accordingly, MTBL respectfully requests that the Sale Motion be denied.

DOCS_NY:25860.5 58984-001

## FACTUAL BACKGROUND

### A.    Prepetition History and Formation of Trust

1.    In 2006, Arthur Liu and his wife formed Multicultural Television Broadcasting LLC ("MTBL") to acquire five television stations, one of which is the subject of these chapter 11 cases –WSAH, licensed to Bridgeport, CT ("Bridgeport Station").  The other four stations acquired by MTBL, which were sold by Shubert prior to the filing of these bankruptcy cases are: (i) KCNS, licensed to San Francisco, CA ("KCNS"); (ii) WMFP, licensed to Lawrence, MA ("WMFP"); (iii) WOAC in the Cleveland, OH DMA ("WOAC"); and (iv) WRAY in the Raleigh-Durham, NC DMA ("WRAY").  KCNS, WMFP, WOAC and WRAY are hereinafter collectively referred to as the "Non-Bridgeport Stations" and with the Bridgeport Station, they are referred to below as the "Stations."

2.    The primary purpose and goal of the Bridgeport Station was to broadcast television and programming in the Chinese language to the underrepresented Chinese-American community in the New York area.

3.    MTBL purchased the Stations in December 2006 and April 2007 for $170 million.  The purchase was financed by an approximately $70 million capital contribution from the Lius, a senior loan of approximately $70 million (the "Senior Loan"), and a subordinated loan of approximately $30 million (the "Subordinated Loan").  The combined loan facility for the purchase of these stations are referred to as the "Multicultural Loans."  Originally, the largest senior lenders were Wells Fargo Foothill, Inc. ('WFF"), which was Agent for the senior lenders, and several funds managed by Fortress Investment Group (collectively "Fortress").

-7-

4.      During the national economic crisis in 2008, a sharp decline in actual station revenues from those projected when the Multicultural Loans were made caused MTBL and the Stations to default on the Multicultural Loans.

5.      Subsequent to the default, MTBL commenced negotiations with its lenders regarding the potential sale or other disposition of the Stations. On September 29, 2008, the lenders commenced an action in the New York Supreme Court against MTBL and its relevant subsidiaries seeking to have a receiver appointed for the Non-Bridgeport Stations. To avoid a sale of the Stations at "fire sale" prices, MTBL negotiated forbearance agreements with its lenders (the "Forbearance Agreements").

6.      Under the Forbearance Agreements, MTBL agreed to transfer its interests in the Debtors and other affiliates to the Trust, to be governed by the Trust Agreement, so that the Debtors could be sold in an orderly manner for the beneficiaries of the Trust, being (i) the Senior Lenders; (ii) the Subordinated Lenders; and (iii) MTBL. In consideration for entering into the Forbearance Agreements and under the Trust Agreements, the lenders agreed that MTBL would have the right to be kept apprised of all sale activity, including among other provisions:

·  weekly updates regarding potential purchasers and status of the sale of the Stations (Topel Decl. Ex. A, Trust Agreement. at Sec. 3.1(i)); and

·  monthly reports regarding the sale status of the Stations (*Id.* at Sec. 5.5);

7.      In material breach of the Forbearance Agreements and Trust Agreement, MTBL was not kept informed at all of sale activity, and in many respects, was treated worse than other bidders for the Trust's assets.

-8-

## B. Fortress/NRJ Connections

8. As set forth above, Fortress was one of the lenders under the Senior Loan. The Fortress executive handling the Fortress interests in the MTBL Senior Loan was Ted Bartley. Bartley was a Managing Director of Fortress before leaving to form NRJ. Bartley Depo.[5] at 16.

9. NRJ was formed in October 2010 by Bartley (while still employed by Fortress) for the purpose of acquiring the Stations (or a majority of the Stations). Topel Decl. Ex. D (NRJ LLC Agrmt., Recitals "Ted B. Bartley entered into that certain Limited Liability Company Agreement of NRJ TV LLC, dated as of October 8, 2010 (the "Original Agreement"). Bartley left Fortress in December 2010, at which time he entered into an agreement with Fortress relating to acquisition of the Debtors. Bartley Depo. at 16, 79. The agreement produced to MTBL's counsel is heavily redacted.

10. NRJ is financed with a $100 million line of credit extended to it by one or more Fortress affiliates, including DBO Media Finance ("DBO"). Bartley Depo. at 11-13; Higney Depo. at 15; Shubert Depo. at 171.

11. Under the Senior Loan Credit Agreement with MTBL, there is an "Eligible Transferee" requirement that required that any transferee of the Multicultural loans have eligible assets of $250 million or more. With only $100 million from DBO, NRJ would not have been an Eligible Transferee under the Senior Loan Credit Agreement.

12. Nonetheless, NRJ, flush with Fortress funds, then acquired 100% of the Senior Loan debt, which debt was purchased for an undisclosed amount, effective May 26, 2011. *Id.* at

---

[5] See Deposition of Ted Bartley ("Bartley Depo.") attached as Exhibit B to Feinstein Decl.

¶ 8. NRJ also acquired two of the stations already-- KCNS and WMFP in San Francisco and Boston. Shubert First Day Decl. at ¶ 27 [Docket No. 4].

13.　　　Ostensibly, NRJ is owned 33.3% by NRJ Holdings LLC (which in turn is owned by Bartley and his family); 33.3% by 5 Star Spectrum, LLC (which in turn is owned by Titan); and 33.3% by Drumcree LLC.[6]　However, as shown below, Fortress and its affiliates have a substantial, undisclosed interest in NRJ.　Although several of the key documents that have been produced have been heavily redacted, it is evident that:

　　　a.　　　None of the three members of NRJ were required to make any capital contributions to NRJ; Topel Decl. Ex. D (NRJ LLC Agreement at § 4.03);

　　　b.　　　The members only begin to participate in the sharing of proceeds for the liquidation of KCNS and WMFP if the sale of those two Stations were greater than a threshold purchase price. *Id.* Ex. F (Proceeds Sharing Agreement (redacted)).

　　　c.　　　NRJ granted DBO a Warrant for the right to purchase Class A (voting) and Class B (non-voting) ownership units in NRJ. *Id.* Ex. G (Warrant Agreement, § 3.1).

　　　d.　　　NRJ granted to DBO a Call Option to acquire the sole Class A voting unit of NRJ. *Id.* Ex. H (Call Option Agreement, § 2).

　　　e.　　　NRJ pledged to DBO all of its ownership in the subsidiaries that operate and hold the license for KCNS and WMFP should NRJ default on the

---

[6] See Exhibits B and C to the *Declaration of Howard A. Topel in Support of Objection* ("Topel Decl.") filed concurrently herewith.

Fortress line of credit. *Id.* Ex. I (Pledge and Security Agreement at Sec. 2).

 f. Before acting on major matters, NRJ is obligated to "consider the interests" not only of NRJ's LLC members, but also the interests of "DBO, the Lenders and Holders of Warrants." *Id.* Ex. D (NRJ LLC Agreement at § 3.01(c)).

 g. Whenever NRJ is "permitted or required to make a decision in its 'discretion' or under grant of similar authority or latitude," NRJ must similarly consider the interests of "DBO, the Lenders, and the holders of Warrants." *Id.* Ex. D (NRJ LLC Agreement at § 3.01(c)).

 h. NRJ waives claims against DBO and also prohibits NRJ from taking actions inconsistent with that of DBO's. Ex. D (NRJ LLC Agreement at § 8.01(c)(ii)).

14. Fortress installed Titan as the manager of the KCNS and WMFP stations prior to their sale to NRJ. Shubert Depo. at 95-99; Higney Depo. at 30-31; Feinstein Decl. Ex. E. In May 2011, the Trust sold KCNS and WMFP to affiliates of NRJ for cash. *See* Shubert First Day Decl. ¶ 27. However, Shubert could not recollect whether funds were transferred to any lender in connection with either purchase. Shubert Depo. at 84-85.

15. Similarly, here, Shubert installed Titan as the "manager" or "back office support" provider of the Debtors in June 2011 in deference to the lenders' "preference" shortly after the Debtors' assets were transferred into the Trust. Shubert Depo. at 98. Specifically, Shubert's

broker reported: "He [Shubert] also told me that Fortress had yet to decide whether or not Titan will take over the operations of WSAH-TV, but it is included in their agreement as originally signed." Higney Depo. at 30; Feinstein Decl. Ex. E.

### C.     Shubert's Actions/Inactions

16.     The Trust Agreement entered into between MTBL, the Senior Lenders, Subordinated Lenders, and Shubert named Shubert as the Trustee. Under the Trust Agreement, Shubert agreed to accept and perform his duties in compliance with the terms thereof. Topel Decl. Ex. A (Trust Agreement at Sec. 2.7). Shubert's powers and duties to act with respect to the Debtors' assets are circumscribed by the terms of the Irrevocable Trust Agreement. "The Trustee will only have the rights, powers, and privileges to act on behalf of the Trust to the extent expressly provided in this Trust Agreement." *Id.* at Sec. 3.1(a). The Trust Agreement required Mr. Shubert to provide certain reporting to the beneficiaries under the Trust regarding the sale process, which insofar as MTBL is concerned he has failed to do. *Id.* at Sec. 3.1(i) and 5.5. The Trust Agreement also provides that Shubert was only to receive cash or cash equivalent bids for the sale of the Stations. *Id.* at Sec. 5.1. Further, Mr. Shubert was obligated to maximize the value of the Trust's assets for the benefit of all beneficiaries, including MTBL. *Id.* at 3.1(a).

17.     Despite Shubert's duties and obligations under the Trust Agreement:

a.     Shubert received the name of the Debtors' bankruptcy counsel from Bartley of NRJ. Shubert Depo. at 80: 22-25. The negotiations regarding the Debtors' bankruptcy counsel's rates were conducted by NRJ through Bartley. Bartley Depo. at 165.

-12-

b. Titan was installed as the manager at two of the Debtors' other two previous Stations that were sold to NRJ. Bartley Depo. at 29.

c. Shubert did nothing to wall off NRJ from the confidential information that Titan, as the manager for those stations, received because the sale of those stations "wasn't a competitive bidding process", although the Trust Agreement required that Shubert conduct a full and fair open bidding process in connection with the sale of each MTBL station. Shubert Depo. at 160:5-6.

d. Shubert could not recall the form of consideration for the prior two sales of KCNS and WMFP (Boston and San Francisco) to NRJ – whether they were for cash or a credit bit. Shubert Depo. at 84-85.

e. Shubert deferred to the lenders' preference in ousting MTBL management in favor of lender-controlled Titan. *Id.* at 97-98.

f. Shubert acknowledged that in 2009, there was an agreement with Fortress, who was the lender party to the Forbearance Agreement, to install Titan as the Debtors' manager if and when the Debtors' assets were transferred into the Trust. *Id.* at 95: 11-13 ("Q: Who selected Titan? . . THE WITNESS: The lenders.").

g. Shubert did not concern himself with the finances of the Bridgeport Station of whether the Debtors were operating in the red or the black. Rather, he left that to Titan's CFO (Sandry) to figure out. *Id.* at 92-94.

DOCS_NY:25860.5 58984-001

h.  Shubert's bankruptcy counsel chose NRJ to act as the stalking horse purchaser. Shubert Depo. at 101: 20-23 ("Q: Now, who chose NRJ as the stalking horse? .. THE WITNESS: I would have to say it was counsel, bankruptcy counsel."). Shubert later tried to revise his answer to say "Exactly who or how or when the stalking horse was determined, I honestly can't say." *Id.* at 103: 7-9.

i.  Shubert "did not focus on the credit bid" restriction in the Trust Agreement "until it was raised by Multicultural. It was totally out of my head. I just hadn't even thought about it." *Id.* at 121: 19-22.

j.  Shubert only reviewed select portions of the asset purchase agreement (representations/warranties and purchase price), but not the entire document. *Id.* at 125-26.

k.  Shubert knows that under FCC law, a secured party's liens cannot attach to FCC licenses. *Id.* at 89: 24-25.

l.  In creating the sale timeline, Shubert did not consider the amount of time it would take for prospective bidders to obtain financing. Shubert replied: "That's not my problem." *Id.* at 173: 4-5.

m.  Shubert deferred to NRJ on how to communicate with third party bidders. Bartley Depo. at 147-49.

18.  Shubert showed a propensity to defer to NRJ as early as December 2010 when he sent an email to Fortress representatives as follows: "Alternatively, if Bridgeport definitively is

-14-

going to be acquired by NRJ TV, then we ought to establish that as well so as to avoid frivolous discussions with prospective purchasers." Higney Depo. at 16-18; Feinstein Decl. Ex. D.

### D. Asset Purchase Agreement

19.     On August 26, 2011, the Debtors filed their chapter 11 petitions and the Sale Motion. [Docket No. 13]. Shubert's stated motivation for filing these cases was to insulate himself in light of what he perceived to be pre-petition threats by MTBL against Shubert for Shubert's conduct in connection with the Trust. Shubert Depo. at 79.

20.     NRJ is the proposed stalking horse purchaser under the Asset Purchase Agreement (APA) as set forth in the Sale Motion. [Docket No. 13] The Sale Motion seeks authority for the Debtors to sell their Station assets to affiliates of NRJ for a $12 million credit bid, but no cash or other equivalent consideration. *See* Motion, Ex. B (Bidding Procedures), at p. 7; Ex. D (Asset Purchase Agreement), at Sec. 2.2(a) ("Buyer shall deduct the Purchase Price from the amounts owed to Buyer by Seller pursuant to the First Lien Credit Documents. . . .").

21.     Under the Bidding Procedures Order, the Debtors sought and received an expedited sale timeline that allowed for bids to be due by November 7, 2011, which is less than 60 days after the Petition Date and a sale hearing to be held on November 16, 2011. [Docket No. 96]

22.     In the First Day Declaration of Shubert, Shubert states that the FCC Licenses for the Bridgeport station is held by Debtor MTB Bridgeport-NY Licensee LLC ("MTB Licensee"). *See* Shubert First Day Decl., ¶ 7. Shubert states erroneously that the NRJ debt is "collateralized by substantially all, if not all, of the assets of the borrowers and guarantors thereunder, including,

but not limited to substantially all, if not all, of the Debtors' assets." *Id.* at ¶ 11. However, as discussed below, under the federal communications rules and regulations, and as admitted to by Shubert in deposition, NRJ does not and cannot have a lien on the FCC Licenses.

23. The APA is structured as an asset sale under which the Debtors propose to sell to NRJ the "Acquired Assets," which include the "FCC Licenses." Sale Motion (Ex. D).

24. Under the Bidding Procedures, the Debtors propose to allow NRJ to credit bid its secured debt up to $12 million. The bulk of the value of the Debtors' assets is the FCC Licenses, but NRJ does not hold a lien or security interest in the FCC Licenses for which the Debtors are allowing NRJ to credit bid.

## OBJECTION

### A. THE SALE MOTION SHOULD BE DENIED BECAUSE IT DOES NOT CONSTITUTE A SOUND EXERCISE OF BUSINESS JUDGMENT UNDER SECTION 363(B) OF THE BANKRUPTCY CODE

25. Section 363(b)(1) of the Bankruptcy Code permits a debtor to sell property of the estate outside the ordinary course of business "after notice and a hearing." 11 U.S.C. § 363(b)(1). Generally, a debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment. "In determining whether a sale satisfies this standard, the courts in this Circuit require that a sale satisfy four requirements (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Industries, Inc.*, 2002 WL 32332749 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del.1991)).

-16-

26. Here, the Sale Motion cannot be approved as submitted. First, the Debtors have not evidenced a sound business purpose for the sale. Rather, the sale process is merely a pretext to hand over the Debtors' business to its secured lender and the sale as submitted would not be approved by the FCC. Second, and as discussed in the next section below, the sale price as proposed here, a $12 million credit bid, is not fair considering that NRJ's lien does not extend to the Debtors' most valuable assets, the FCC Licenses. Third, the Debtors have also not provided adequate and reasonable notice of the sale. Parties in interest, including the FCC, should be provided notice that the purchaser, NRJ, is really affiliated with Fortress Investment Group. Fourth, as discussed further below, NRJ and the Debtors have not acted in good faith with regard to the sale.

### 1. The Sale Is A Pretext to Hand The Keys Over To NRJ/Fortress

27. Key decisions and aspects of these cases are in the hands of Shubert, who is not functioning in a coherent or customary fashion and in blatant disregard for his obligations as trustee under the Trust Agreement or a fiduciary to these estates. Among other things, Shubert (i) installed Titan, who is the 33.3% owner of the Debtors' secured lender, NRJ, as the manager of the Debtors, (ii) allowed NRJ to choose and negotiate the terms of engagement of the Debtors' bankruptcy counsel; and (iii) deferred to Titan's CFO to determine the financial health of the Debtors such that he did not even know if the Debtors were operating in the black or red when he became Trustee over the Debtors, nor did he apparently care as he viewed the financial health of the Debtors as something that the lenders should concern themselves with, but not him.

-17-

28. Shubert also failed the Debtors' estates with respect to the sale process by: (i) blatantly disregarding his obligations as a Trustee under the Trust Agreement or has pled willful ignorance of such obligations including required structure of bids, notice and reporting requirements to beneficiaries such as MTBL; (ii) deferring to his *counsel* in choosing the stalking horse bid; (iii) failing to review key provisions of the stalking horse purchase agreement before it was filed; and (iv) not considering or espousing a sale timeline that would maximize value to the estate to allow third parties to adequately bid on the estates' assets testifying that it was "not my problem." NRJ also testified that it has given directive to Shubert as to how to communicate with bidders for the Debtors' assets, including MTBL's principal.[7]

29. The only thing Shubert does care about is immunizing himself from liability, which appears to be the main driving factor in filing for chapter 11. Here, where as far as MTBL can tell, Shubert just does not care enough to choose the stalking horse bidder or even review the asset purchase agreement, MTBL submits that cause exists to deny the Sale Motion at a minimum.

### 2. The Identity Of The Purchaser is Uncertain, And As Such, The NRJ Bid Is Not The Best Bid

30. MTBL has ascertained through discovery that Fortress is the financial backer to NRJ. Fortress also has elevated rights to participate in NRJ's key decision making and through

---

[7] Mr. Shubert's failure to perform as a diligent fiduciary draws into question whether he was there as anything more than a figure head who in actuality is beholden to the secured lenders, much like the "independent director" who was roundly criticized by the court in *In re Kingston Square Associates, et al.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997). There, the court disregarded the "bankruptcy remote" status of the debtor entities based on a requirement that no bankruptcy could be filed without the consent of an "independent director" who in fact was a former employee of the secured lender, utterly failed to exercise his fiduciary duty or duty of loyalty to the debtor, and was beholden to DLJ by taking actions such as delaying ratification of the bankruptcy filing. *Id.* at 716-17; 720-23; 730, 735-36. The bankruptcy court *sua sponte* appointed a chapter 11 trustee in that case.

options and warrants, the right to purchase a controlling interest in NRJ such that Fortress's role

is more than is typical of a lender/ borrower relationship. For example, among other things, NRJ

must "consider the interests of" Fortress/DBO, has granted Fortress through DBO grant of Class

A voting shares of NRJ, grants rights to purchase both Class A (voting) and Class B (non-voting)

shares to Fortress through warrants. In effect, if NRJ is deemed the winning bidder, Fortress will

be the winning bidder.

### 3. The Stalking Horse Bidder Cannot Meet FCC Qualifications Requirements to Acquire the WSAH License

31.      Obtaining "FCC Consent" to the transfer of the FCC Licenses from the Debtor to

NRJ is a condition precedent to the closing of the sale. *See* APA at § 7.9. In addition, approval

of the transfer of the FCC Licenses from the Debtor to a third party purchaser is required as a

matter of federal law. 47 U.S.C. § 310(d) (the "Act"); *see also* § 73.3540(a) of the FCC Rules,

47 C.F.R. § 73.3540(a) (providing that "[p]rior consent of the FCC must be obtained for a

voluntary assignment or transfer of control."); *Jefferson Radio v. FCC*, 340 F.2d 781 (D.C. Cir.

1964) (FCC must find that both the proposed buyer and the proposed seller meet its

qualifications criteria in order to approve the proposed transaction). Here, however, the FCC

will be unable to approve the proposed assignment of WSAH from the Debtors to NRJ because

neither the proposed buyer nor the proposed seller possesses the basic qualifications that the FCC

requires for approving the proposed transaction.

32.      NRJ is not qualified to obtain FCC approval because, in two previous applications

and other filings to the FCC, it has concealed the real parties in interest to its applications, made

false and misleading representations to the FCC, and lacked candor regarding its true structure.

-19-

The Debtors, in consort with NRJ, have effectuated an unlawful unauthorized transfer of control of WSAH from the Trust to undisclosed third parties. Due to these defects, the FCC cannot find the proposed transaction to meet its qualifications criteria.

### 4. Relevant FCC Law

33. The FCC requires that, when a party files for FCC consent to acquire a broadcast license, the party's application disclose all of the real parties in interest. The FCC's established test for determining who is the real party in interest is whether an entity who is not identified as a party in an application has an ownership interest or will be in a position to actually or potentially exercise control. *See, e.g., Astroline Communications Co. Ltd Partnership v. FCC*, 857 F2d 1556, 1564 (D.C. Cir. 1988) ("Astroline"); *KOWL, Inc.*, 49 FCC2d, 962, 964 (Rev. Bd. 1974). The FCC further requires that applicants meet a high standard of candor and forthrightness in their disclosures with the FCC. *Astroline, supra*, 857 F2d at 1564. *See also RKO General, Inc. v. FCC*, 670 F2d 215, 232 (D.C. Cir. 1981) ("RKO") ("[T]he Commission must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate. This duty of candor is basic, and well known"). As shown below, the real-parties-in-interest in NRJ, who were not disclosed in NRJ's previous FCC assignment applications, are the Fortress Investment Group and its Managing Director, Constantine Dakolias.

34. The FCC also will reject a party's qualifications where the party has abdicated control or perpetrated an unauthorized transfer of control. *See, e.g., Hicks Broadcasting of Indiana, LLC, Hearing Designation Order*, 13 FCC Rcd 10662 (1998) ("Hicks"). In assessing

-20-

unauthorized transfer of control situations, the FCC looks "to whether a new entity has obtained

the right to determine the basic operating policies of the station, that is, to affect decisions

concerning the personnel, programming or finances of the station." *Id.* at 10676, citing *WHDH,*

*Inc.*, 17 FCC 2d 856 (1969), *aff'd sub nom. Greater Boston Television Corp. v. FCC*, 444 F2d

841 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971). Although transferring "[c]ontrol over

any one of the areas of personnel, programming and finances would be sufficient for a finding of

de facto control," *Hicks, supra* at 10677, in this case the Trustee has abdicated his control over

all three areas and transferred it to Fortress's fronts under egregious and unprecedented

circumstances.

### 5. The Disqualifying FCC Misconduct of NRJ and Fortress

35. On January 31, 2011, the Debtors and NRJ filed applications with the FCC

seeking consent for the assignment of the licenses and assets of television stations KCNS in San

Francisco and WMFP in the Boston market. In both applications, NRJ asserted that it is a

limited liability company owned by three members and held out its equity and control structure

to the FCC as follows:

| | | |
|---|---|---|
| NRJ Holdings LLC | 100% votes | 33.3% equity |
| 5 Star Spectrum, LLC | 0% votes | 33.3% equity |
| Drumcree, LLC | 0% votes | 33.3% equity |

*See* Topel Decl., Ex. B (excerpts from KCNS FCC application) and Ex. C (excerpts from WMFP

FCC application). On its face, this seems to be an innocuous structure, in which the members

made equal capital contributions for equity and thereby owned a third of NRJ's gains and losses,

and in which NRJ Holdings LLC exercised complete control. The reality, however, is vastly different.

36.    Under NRJ's limited liability company operating agreement as produced to MTBL in discovery, none of the three alleged "members" of NRJ are required to make any capital contribution. *See* Topel Decl. Ex. D (NRJ LLC Agreement at § 4.03). Rather, NRJ obtains its capital from a Financing Agreement in which DBO Media Finance ("DBO") is Administrative Agent for the lenders. *See id.* Ex. E (NRJ/DBO Financing Agreement). And NRJ's line of credit with DBO or Fortress is over $100,000,000. *See* Higney Depo.[8] at 15; Shubert Depo. at 171. Accordingly, with no member capital contributions, the scoreboard on NRJ's debt/equity ratio is Debt, $100,000,000 +; Capital, 0. In other words, NRJ's debt/equity ratio is virtually infinity.

37.    The FCC is well aware and wary of structures that create facades of loans to conceal what in reality are equity stakes. *See, e.g., Fox Television Stations, Inc.*, 11 FCC Rcd 5714, 5720 (1995) ("Fox II") ("[W]e conclude that the intercompany loan should be considered a capital contribution and not as bona fide debt."); *Next Wave Personal Communications, Inc.*, 12 FCC Rcd 2030, 2049-51 (WTB 1997) ("Based on our analysis of NTI's capital structure applying the Fox II factors, we find that two classes of debt instruments . . . are more properly characterized as equity."). Even without further evidence, NRJ's debt/equity ratio plainly establishes that this is not a bona fide loan, but equity dressed up as a loan.

---

[8] *See* Deposition of Frank Higney ("Higney Depo.") attached as Exhibit C to Feinstein Decl.

38.     NRJ's representations to the FCC that NRJ Holdings, 5 Star Spectrum, and Drumcree hold 33 1/3% equity interests are also belied by a Proceeds Sharing Agreement those parties entered into with DBO, an agreement also not disclosed to the FCC when it was considering NRJ's applications. *See* Ex. F (excerpts from Proceeds Sharing Agreement). Pursuant to that agreement, NRJ Holdings, 5 Star Spectrum, and Drumcree agree that they will only participate in the proceeds of the liquidation of NRJ's ownership of KCNS and WMFP if those proceeds "are greater than ███████" Ex. F at 3 (numbers redacted in document produced to MTBL). If, and only if, that concealed threshold is achieved, will NRJ Holdings, 5 Star Spectrum, and Drumcreee receive ███████ of the so-called excess. *Id.* (same).

39.     Although NRJ has concealed both the threshold and the sharing percentages of the excess, NRJ Holdings, 5 Star Spectrum, and Drumcree do not have the simple 33 1/3% equity interests that NRJ held out to the FCC in its applications. What interests they do hold, in the excess above what amount, are unknown. NRJ's depiction of its equity interests in its application is false and misleading. Moreover, its ongoing concealment of material relevant facts from the FCC is the epitome of RKO-type lack of candor that precludes acquisition and continued ownership of FCC licenses.

40.     There remain a number of agreements described in which NRJ has not disclosed to the FCC that contain pertinent information. Of particular interest is "the letter agreement, dated as of the date hereof, by and among the Company, the Members, DBO, and the Holders regarding illustrative calculations of proceeds allocations." *See* Topel Decl. Ex. D (NRJ LLC

-23-

Agreement § 9.16)). If the simple 1/3, 1/3, 1/3 equity distribution described in NRJ's FCC applications were bona fide, an additional letter agreement like this would not be necessary.

41. It is undisputed that Fortress is the money behind NRJ. This was the widely held consensus by both Shubert and the Debtors' broker, Kalil. *See* Shubert Depo. at 171; Higney Depo. at 15. Fortress is also listed as the lender signatory on the Finance Agreement through President Constantine Dakolias. *See* Ex. E. Dakolias is listed on Fortress's website as the Co-Chief Investment Officer of the Credit Funds at Fortress Investment Group LLC, a member of the Management Committee of Fortress, as well as a Managing Director.

42. The relationship between Fortress/NRJ is beyond a typical lender/ borrower relationship based on NRJ's governance documents because, among other things:

  a. Under the Warrant, NRJ grants DBO/Fortress the right to purchase – for an unknown, (i.e., redacted) price – both Class A (voting) and Class B (non-voting) ownership units in NRJ "equal, in the aggregate, to the Initial Warrant Quantity." Topel Decl. Ex. G. The quantity varies among similarly redacted numbers of Units based on redacted levels of Total Earnings on Advanced Amounts and Total Payments received by Lenders and Holders. *Id.* (redactions NRJ's).

  b. Pursuant to the Call Option Agreement, NRJ Holdings LLC grants to DBO/ Fortress, "from and after the date hereof," an option to acquire the sole Class A voting unit of NRJ by which NRJ Holdings LLC purportedly

wields 100% control of NRJ. *Id.* Ex. H at § 2. The price for DBO/Fortress' purchase of this voting power is not disclosed. *Id.*

c.  When "acting or otherwise voting" on NRJ matters as Managing Member, Bartley must "consider the interests" not only of the Company and its Members, but also the interests of "DBO, the Lenders and Holders of Warrants." *Id.* Ex. D at § 3.01(c).

d.  Wherever the Managing Member of NRJ "is permitted or required to make a decision in its 'discretion' or under grant of similar authority or latitude, such Person shall be required to consider the interest of and factors affecting" not only the Company and its Members, but also "DBO, the Lenders and the holders of Warrants." *Id.* Ex. D (NRJ LLC Agreement, § 3.02(c)). This duty to consider the interests of DBO/Fortress et al., and the effects of actions on DBO/Fortress et al., extends to all officers, employees, and agents of NRJ. *Id.* at § 3.02(c) (emphasis added).

e.  Under the Pledge and Security Agreement, NRJ pledges to DBO/Fortress NRJ's alleged ownership in its subsidiaries that operate and hold the licenses for KCNS and WMFP, should NRJ default on the $100,000,000+ line of credit. *Id.* Ex. I at Sec. 2.

f.  NRJ has redacted from the Financing Agreement filed with the FCC numbers key relevant terms including the maturity date, interest, and the

events of default, for example, that will enable DBO/Fortress to foreclose on that ownership. *Id.* Ex. E at 12, 33, 88-93. However, these and other redacted items are directly relevant to the FCC's ability to know whether the pledge is a legitimate commercial transaction or merely a set-up for automatic ownership transfer whenever DBO/Fortress wants.

43. Bartley has close and continuing ties to Fortress. From 2008 to December 2010, he was a Managing Director at Fortress responsible for four Fortress entities' positions in MTBL's senior debt. *See* Bartley Depo. at 16.

44. Bartley, on behalf of NRJ, agreed to the several extraordinary provisions in the LLC agreement outlined above. Additionally, when it comes to making decisions that ordinarily would pit NRJ and Bartley against DBO or its Affiliates, Bartley, as the Managing Member of NRJ, acknowledged and agreed for itself and on behalf of NRJ that:

> (A) in the event of any conflict of interest between the Company and DBO Member or Affiliate thereof that may from time to time arise, each such Person may act in his, her or its best interest and (B) no such Person shall be obligated (1) to reveal to the Company confidential information belonging to or relating to the business of such Person or (2) to recommend or take any action in its capacity as such Member that prefers the interest of the Company or its Subsidiaries over the interest of such Person.

*See* Topel Decl. Ex. D (NRJ LLC Agreement § 8.01(c)(ii)). And, should DBO breach the foregoing section, Bartley, as Managing Member, "waives any claim, action, or cause of action against" such DBO /Fortress parties. *Id.* at § 8.01(c)(iii).

45. Through these unusual provisions, Bartley ceded his allegedly unfettered control of NRJ to DBO/Fortress from the outset. In relinquishing his obligations to represent and

-26-

advance NRJ's interests independently against DBO/Fortress, Bartley has effectively ceded

management "control" of NRJ to DBO/Fortress. In any action he takes, Bartley is subject to

litigation and liability from DBO/Fortress et al. on the grounds that what he has decided is not in

the lenders' or warrant holders' "interests," or did not adequately consider the "factors affecting"

those parties. And, when NRJ's interests call for acting adversely to DBO/Fortress' interests,

Bartley has no such duty. Through these provisions, Bartley can, must, has done, and will do

whatever DBO/Fortress tells him to do.

46. When considering the FCC standard for determining who the real party in interest

in NRJ is, DBO/Fortress effectively has ownership of and is or will be in a position to actually or

potentially exercise control over NRJ. *See Astroline, KOWL, Inc., supra.* It is manifest that

NRJ's depiction of its equity and control structures in its FCC applications was false and

misleading.

### 6. The Trustee, Fortress, and NRJ perpetrated an unauthorized transfer of control

47. The first of the FCC's three independent factors for unauthorized transfer of

control is personnel. Here, the record establishes that Shubert ceded control over the key

personnel operations of WSAH to Titan Broadcast Management, Inc. ("Titan"), eighteen months

before WSAH even became an asset of the Trust within the Trustee's ambit. In November 2009,

Shubert executed a Management Services Agreement ("MSA") with Titan providing for Titan to

perform management services for KCNS and WMFP, which had been transferred to the Trust.

Shubert Depo. at 95. Pursuant to that MSA, Titan became the manager of the Debtors and filled

key positions such as Chief Financial Officer. *Id.* at 93:15-17, 94:23 (Sandry is the CFO of

-27-

Titan). When WSAH was actually transferred into the Trust, Shubert testified that he simply acceded to the lenders' preference to use Titan. *Id.* at 98: 11-12. Shubert's broker testified that Titan was Fortress's pick. Higney at 30-31; Feinstein Decl. Ex. E.

48.     The FCC expects the licensee to control the selection of the personnel who will fill such important executive positions. WSAH did not enter the Trust until May 11, 2011, eighteen months after the Trustee had already ceded the right to select the station's executive personnel to the Manager, Titan. Compounding the gravity of this unauthorized transfer of control is the fact that Titan is a principal of NRJ, the proposed Stalking Horse Bidder here.

49.     The FCC has long discouraged prospective purchasers from day-to-day participation in the station's affairs during the pendency of their applications for FCC consent, to avoid the premature transfer of control. *See Phoenix Broadcasting Co.*, 44 FCC 2d 838 (1973); *Fine Arts Broadcasting, Inc.*, 57 FCC 2d108, 111 (1975) ("Fine Arts"); *Weston Properties XVIII Limited Partnership*, 8 FCC Rcd 1783, 1783-84 (MMB 1993) ("Weston"). As the FCC has declared, we "wish to make it clear that, in the future, prospective purchasers will not be permitted to assume managerial positions at stations they are seeking to acquire unless exceptional and the most compelling circumstances are shown." *Weston, supra, citing Fine Arts, supra.* NRJ has directly violated this precept.

50.     Shubert's abdication of control over financial policy, the second focus of FCC inquiry into unauthorized transfer of control, is conclusively demonstrated by the fact that (i) the Trustee deferred to Titan's CFO to determine the financial health of the Debtors and (ii) the Trustee executed a stalking horse contract with NRJ completely ignorant of the fact that he was

-28-

approving a credit bid process. WSAH is the last asset of the Trust, and the Trustee's principal financial duty is to maximize the value of the station sale. *See* Ex. A (Trust Agrmt. at Sec. 3.1(a)). As the Debtors' broker has acknowledged, the use of a credit bid has a dampening effect on prospective bidders and reduces participation in a sale auction. Higney Depo. at 88, 95. And, since the Trustee himself was ignorant that he was taking that approach, one has to assume it was NRJ and Fortress who were controlling that decision.

51.     In sum, the FCC will not put its imprimatur of approval on this pervasively tainted proposed sale. For the foregoing reasons, the sale is not in the best interest of all parties here because (i) the assignment of the FCC Licenses to NRJ will not be approved and, therefore a necessary condition precedent to the sale fails; and (ii) parties in interest, including the FCC, were not provided with notice that the purchaser, NRJ, is really affiliated with Fortress Investment Group.

    **B.**     **THE SALE MOTION, TO THE EXTENT IT SEEKS AUTHORIZATION FOR THE DEBTORS TO SELL SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO NRJ FOR NO CASH, SHOULD BE DENIED BECAUSE (A) NRJ DOES NOT HAVE A LIEN ON THE DEBTORS' FCC LICENSES, AND THEREFORE CANNOT CREDIT BID AGAINST THEM, AND (B) CAUSE EXISTS FOR PRECLUSION OF NRJ'S CREDIT BID UNDER SECTION 363(k) OF THE BANKRUPTCY CODE**

    **1.**     **NRJ Does Not Hold A Lien On The Debtors' FCC Licenses**

52.     The proposed purchase price for the Debtors' assets consists of a $12 million credit bid by NRJ for the "Acquired Assets." That term is defined in the APA to include, among other things, the Debtors' FCC Licenses, acknowledged by all parties to be by far and away the Debtors' most valuable asset. It is also beyond dispute that neither NRJ nor any other creditor

holds a lien upon or security interest in the FCC Licenses, as under applicable non-bankruptcy law, no such lien or security interest may be granted.

53.     An FCC license does not confer a property right, but is a privilege granted by the FCC. *See* 47 U.S.C. § 310(d). As the FCC has stated, "[t]he extraordinary notion that a station license issued by this Commission is a mortgageable chattel in the ordinary commercial sense is untenable." *In re Application of Radio KDAN, Inc.*, 1968 SL 13765, at *2 n.1 (Feb. 21, 1968). The FCC's repeated position is that a "license, as distinguished from a station's physical assets, is not subject to a mortgage, security interest, or lien, pledge, attachment, seizure, or similar property right." *In re Applications of Kirk Merkley, Receiver*, 1983 WL 182883, at *2 (June 29, 1983). Consistent with this rule, the Debtors did not grant any creditor a lien on its FCC licenses.

54.     As Shubert has acknowledged in his deposition, no liens can attach to FCC licenses as a matter of FCC policy. Shubert Depo. at 89. It is axiomatic that to the extent a secured creditor is permitted to credit bid, it may do so only for assets that are subject to that creditor's valid liens. *See Beal Bank, S.S.B. v. Waters Edge Ltd. P'shp*, 248 13.R. 668, 679-80 (D. Mass. 2000) (finding that credit bid provision of bankruptcy code did not apply to sale of property not subject to that secured creditor's lien): *In re Hickey Props.*, 181 B.R. 171, 173 (Bankr. D. Vt. 1995) (secured creditor was not entitled to credit bid its claim at an auction for the sale of assets not subject to its lien); *In re Pine Coast Enters., Ltd.*, 147 B.R. 30, 31 (Bankr. N.D. Ill. 1992) ("Of course, [the secured creditor] could only bid in its claim to acquire property against which it had a lien. *See* § 363(k)."). No doubt the Debtors will argue that because NRJ

-30-

holds a lien on the **_proceeds_** of the FCC Licenses, that it should be entitled to credit bid for the value of the FCC Licenses. The law is flatly to the contrary. NRJ simply cannot credit bid on something for which it does not hold a lien.

55. If NRJ is allowed to credit bid on the FCC Licenses, the value of which is unknown, but constitutes the largest portion of the Debtors' assets, then the estates would receive no consideration for the sale of its "crown jewel" asset. The Sale Motion must be denied because the acceptance of a credit bid, or no consideration, for the Debtors' valuable FCC license, is improper.

### 2. Cause Exists to Deny NRJ Credit Bidding Rights

56. The Bankruptcy Code does not provide an inalienable right to credit bid. Pursuant to section 363(k) of the Bankruptcy Code, a secured creditor holding an "allowed claim" may be permitted to credit bid its liens on a debtor's assets in a section 363(k) sale, unless a court "for cause" orders otherwise. 11 U.S.C. § 363(k). "Cause" may exist where a secured party's liens are subject to a "bona fide dispute," such as where the creditor's lien is contested or in dispute. *See, e.g., In re Daufuskie Island Props.*, LLC, 441 13.R. 60, 63-64 (Bankr. D.S.C. 2010) (finding where trustee and parties-in-interest filed adversary proceedings to invalidate or subordinate mortgage and claim, mortgage and claim were disputed and secured creditor was not entitled to credit bid asserted mortgage); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, [the secured creditor] shall not be entitled to offset bid any of its claimed liens or security interest under 11 U.S.C. § 363(k) (1994) because the validity of its liens and security interests are unresolved."),

-31-

gird, 162 F.3d 1164 (8th Cir. 1998). For the reasons set forth above, this Court should deny

entry of any sale order based on a credit bid by NRJ for the FCC Licenses due to the fact that

NRJ does not have a lien against the FCC Licenses.

57. In addition, the Court may "for cause" order that credit bidding is not appropriate

against the Debtors' other assets in which NRJ does hold a lien. The Third Circuit has held that:

"A court may deny a lender the right to credit bid in the interest of any policy advanced by the

Code, such as to ensure the success of the reorganization or to foster a competitive bidding

environment." *See, e.g.*, 3 <u>Collier on Bankruptcy</u> 363.09[1] ("The Court might [deny credit

bidding] if permitting the lienholder to bid would chill the bidding process.")." *Philadelphia*

*Newspapers,* 599 F.3d at 316 n.14. As admitted by the Debtors' broker, the NRJ credit bid is

chilling bidding. Higney Depo. at 88, 95. In addition, MTBL is aware of at least one bidder that

did not submit a bid because the sale of the Debtors' assets was proposed to be structured as a

credit bid. Thus, allowing NRJ to credit bid will chill and has chilled the bidding process, which

constitutes grounds in and of itself to deny credit bidding.

58. Courts have also denied credit bidding where there has been an obfuscation of the

true intention of the purchaser. *See, e.g., In re Aloha Airlines*, 2009 WL 1371950, at *8 (Bankr.

D. Hawaii May 14, 2009) (determining that "cause exists to deny the credit bid" under § 363(k)

where purchaser did not disclose a licensing agreement to be given to a competitor); *In re*

*Theroux*, 169 B.R. 498, 499 and n.3 (Bankr. D.R.I. 1994) (noting that "there is no absolute

entitlement to credit bid" even though creditor was oversecured because entire process was

designed to benefit only the secured creditor). Similarly, here, NRJ has not disclosed the nature

-32-

and extent of Fortress's interest in NRJ or their profit sharing agreement, which also constitutes independent cause to deny credit bidding.

59.     Finally, the parties, including NRJ's predecessor, Fortress, specifically negotiated and agreed in the prepetition Trust Agreement that any bid for the Debtors should be a cash bid or a cash-equivalent bid.  *See* Trust Agrmt. at Sec. 5.1.  Shubert was granted the express power to "sell, convey, transfer, or assign the Trust Asset," but such power was made expressly "subject to Section 5.1" of the Irrevocable Trust Agreement.  *Id.* at Sec. 3.1(a)(v).  And Section 5.1 specifically provides that any sale of the Trust Assets must be for cash or other immediately available funds:

> The Trustee shall take such steps as the Trustee deems necessary to sell, convey, transfer, or assign the Subsidiaries, or any part or asset thereof or any interest therein, on such terms and for such consideration as the Trustee deems desirable or appropriate; **provided, however, that the Trustee shall not, and shall not be authorized to, sell, convey, transfer or assign the Subsidiaries (or any part or asset thereof or interest therein) for any consideration other than cash or other immediately available funds**.  The Trustee's actions with respect to the disposition of the Subsidiaries shall in all events be taken in a manner so as to maximize the Sale Proceeds.

Ex. A, at Sec. 5.1 (emphasis supplied).

60.     The Debtors argue in response that (i) they are not a party to the Trust Agreement and (ii) a credit bid is the equivalent of a cash bid.  *See* Reply to Bidding Procedures [Docket No. 71].  The first argument is a red herring.  The Debtors' equity is owned by the Trust.  Shubert is a party to the Trust Agreement and was charged, as the Trustee under the Trust, to liquidate the Stations pursuant to the Trust Agreement.   The Debtors' primary responsible person, Shubert,

agreed that with respect to the Debtors, he would take only cash and cash equivalent bids. The Debtors' secured lenders, including Fortress, were also a party to the Trust Agreement, so there is no excuse that NRJ can provide that it did not understand or is not bound by the Trust Agreement.

61.     Second, the Debtors argue that a credit bid is the equivalent of a cash bid. The law in the Third Circuit is to the contrary. *In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3rd Cir. 2010). In *Philadelphia Newspapers*, the Third Circuit expressly rejected the secured lenders' argument that a credit bid right must be granted in order to allow the secured lender the "indubitable equivalent" of its claim. Specifically, the Third Circuit held that a credit bid was not synonymous with a the "indubitable equivalent", but rather that "[l[ogically, this can include not only the cash value generated by the public auction, but other forms of compensation or security such as substituted collateral or, as here real property." *Id.* at 312.

62.     In the context of the parties' discussions, which was the transfer of these Stations into the Trust to maximize the value of the Trust assets for the purpose of avoiding foreclosure and providing for an orderly liquidation, the parties' intention was for a cash bid. If the intention of the parties was simply to allow NRJ to foreclose on its interest by means of a credit bid, there would have been no necessity for the Forbearance Agreements in the first instance and adding the express provision in Section 5.1 of the Trust Agreement requiring a cash bid in the second instance. Courts interpret contracts to give logical meaning to all parts of a contract rather than favoring an interpretation that renders a provision moot. *New Castle County, Delaware v. National Union Fire Ins. Co. of Pittsburgh, PA*, 174 F.3d 338 (3d. Cir. 1999) ("an interpretation

-34-

which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect" quoting Restatement (Second) of Contracts § 203(a) (1979)"). Here, where the secured creditor and all parties in interest, including Shubert, agreed that only cash bids would be accepted, it would be inequitable to allow NRJ to now credit bid.

### C. THE SALE MOTION SHOULD BE DENIED INSOFAR AS IT SEEKS A FINDING THAT NRJ HAS ACTED IN GOOD FAITH WITHIN THE MEANING OF SECTION 363(m) OF THE BANKRUPTCY CODE

63. The APA with NRJ provides as a condition to closing that the Court enter an order approving the sale in form and substance satisfactory to NRJ finding, inter alia, that NRJ has purchased the Debtors' assets "in good faith" within the meaning of Section 363(m) of the Bankruptcy Code. MTBL respectfully submits that the Debtors' cannot satisfy that condition, in that based upon the facts and circumstances presented, this Court should not find that NRJ acted in good faith in connection with the proposed purchase of the Debtors' assets and the sale process generally.

64. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

-35-

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," in remanding a

Bankruptcy Court approval of a section 363 sale that did not make a good faith finding the Third

Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, held:

> [t]he requirement that a purchaser act in good faith . . . speaks to
> the integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); *see also In re Cable One CATV*, 169 B.R.

488, 493 (Bankr. D.N.1-1. 1994) (noting that "under-the-table negotiations" and "selective

information dissemination between [purchaser] and the trustee" is evidence of bad faith). Courts

have found bad faith sufficient to rebut the protections of 363(m) where there is collusion

between the purchaser and other bidders or the trustee. *See In re Stroud Ford. Inc.*, 163 B.R.

730, 733 (Bankr. M.D. Pa. 1993) (finding purchaser acted in bad faith where it agreed to pay

$18,000 to objecting potential bidder in exchange for withdrawal of bidder's objection); *id.*

("[A]s innocent and business-like as this 'understanding' was to the parties involved, ... it smacks

of inappropriateness and could have only stilled the bankruptcy mechanism designed to ensure

that the estate was fairly compensated for its assets."). Moreover, the Third Circuit in *Abbotts*

*Dairies*, noted that allegations, if proven, that the justification for the immediate sale was

contrived by the Company's CEO and proposed purchaser would, as a matter of law, be

sufficient to destroy the purchaser's good faith status. *In re Abbotts Diaries*, 788 F.2d at 148.

Specifically, the alleged collusion was effectuated through an exchange of a "lucrative

employment agreement" for the CEO for the ability to manipulate the timing of the sale process

-36-

so that the bankruptcy court had "no choice" but to approve the agreement, "the terms of which were designed to preclude any truly competitive bidding for the assets." *Id.*

65.     Here, the entire chapter 11 case and expedited sale process has been planned and devised by Shubert and NRJ for the benefit of NRJ/ Fortress. For example, Shubert proposed an expedited time frame for the sale of these assets, regardless of the prejudice to potential bidders. Shubert represented to the Court in the First Day Declaration that NRJ was secured by liens on substantially all of the assets of the Debtors—a representation that clearly omitted to mention that NRJ's lien does not extend to the FCC Licenses. The proposed credit bid here features an aggressive play by NRJ to credit bid for the FCC Licenses, the most significant asset of the Debtors' estates, on which it does not even have a lien. NRJ's 33.3% owner, Titan, has been installed as the Debtor's manager. The Debtors' independent fiduciary, Shubert, has deferred to Titan and NRJ on all manner of governance from the health of the Debtors' finances, to selection of bankruptcy counsel. And, apparently, NRJ and Fortress have a secret agreement regarding the Debtors.

66.     Finally, Shubert has breached his obligations under the Trust Agreement to which MTBL is an express named beneficiary in at least the following ways: (i) failing to provide weekly updates regarding potential purchasers and status of sale of the Stations to MTBL (Trust Agrmt., at Sec. 3.1(i)); (ii) failing to provide monthly reports regarding sale status of the Stations (*Id.* at Sec. 5.5); and (iii) accepting a credit bid (*Id.* at Sec. 5.1). Instead, Shubert chose to negotiate and enter into the APA in a vacuum.

67.     In light of all of the foregoing facts, acquisition of any collateral by a credit bid from NRJ will not be an acquisition "in good faith" under section 363(m) of the Bankruptcy Code.  Accordingly, the proposed Sale Order should be modified to remove such a finding and paragraph 7 should be deleted, to the extent NRJ is awarded the prevailing bid.

DOCS_NY:25860.5 58984-001

**CONCLUSION**

For the foregoing reasons, MTBL requests that the Sale Motion be denied.

DATED: November 9, 2011

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Peter J. Keane*
Laura Davis Jones (Bar No. 2436)
Robert Feinstein (*Admitted pro hac vice*)
Bruce Grohsgal (Bar No. 3583)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:        ljones@pszjlaw.com
                   rfeinstein@pszjlaw.com
                   bgrohsgal@pszjlaw.com
                   pkeane@pszjlaw.com

Counsel to MTB Equity LLC and Multicultural Television Broadcasting LLC

DOCS_NY:25860.5 58984-001

<u>SERVICE LIST</u>

*[Proposed] Counsel to Debtors and Debtors in Possession*
William E. Chipman, Jr.
Mark D. Olivere
J. Landon Ellis
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801


MTB Bridgeport-NY Operating LLC
Attn: Lee W. Shubert, LC, Trustee
c/o 11077 Swansfield Rd.
Columbia, MD 21044-2724

*Counsel for NRJ TV LLC*
Scott D. Cousins
Dennis A. Meloro
Greenberg Traurig, LLP
The Nemours Bldg.
1007 N. Orange St., Ste. 1200
Wilmington, DE 19801


Juliet M. Sarkessian
Office of the United States Trustee
844 N. King St., Ste. 2207
Wilmington, DE 19801


Charles M. Oberly, III
Offices of the United States Attorney
1007 N. Orange St., Ste. 700
Wilmington, DE 19801

<u>Top 8 Creditors</u>
Lerman Senter P.L.L.C.
Attn: Howard A. Topet
2000 K St., NW, Ste. 600
Washington, DC 20006


Seymour Tax Collector
Attn: Account Manager
1 First Street
Seymour, CT 06483-2896

Bernard National Loan Investors Ltd. And Fortress Value Recovery Fund I LLC
c/o Peter Leibman
1345 Avenue of the Americas, 46th Fl.
New York, NY 10105

28:30, LLC
Attn: Terry Crosby
3330 Ocean Park Blvd., Ste. 201
Santa Monica, CA 90405

Hartford Fire Insurance Company
Attn: Account Manager
One Hartford Plaza
Hartford, CT 06115

AT&T
Attn: Account Manager
250 South Clinton, 4th Fl.
Syracuse, NY 13202

WorldLink Ventures, Inc.
Attn: Dan Casey
6100 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90048

Federal Communications Commission
Attn: William Lake
445 12th St., SW
Washington, DC 20554

Eric H. Holder, Jr.
Office of the Attorney General
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

*Counsel for NRJ TV LLC*
David B. Kurzweil
Jon J. Dyer
Green Traurig, LLP
The Forum
3290 Northside Pkwy, Ste. 400
Atlanta, GA 30327

DOCS_NY:25860.5 58984-001

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
Attn: Insolvency
1352 Marrows Rd., 2nd Fl.
Newark, DE 19711-5445

Internal Revenue Service
Attn: Insolvency
31 Hopkins Plaza, Rm. 1150
Baltimore, MD 21201

Matthew Berry
Office of General Counsel
Federal Communications Commission
445 12th St., SW
Washington, DC 20554

Securities & Exchange Commission
New York Regional Office
Attn: George S. Canellos, Regional Director
3 World Financial Center, Ste. 400
New York, NY 10281-1022

Securities & Exchange Commission
Secretary of the Treasury
100 F St., NE
Washington, DC 20549

Secretary of Treasury
PO Box 7040
Dover, DE 19903
Office of the General Counsel

Pension Benefit Guaranty Corp.
1200 K St., NW
Washington, DC 20005-4026

Wachovia Bank – Columbia Mall Financial Center
10 Corporate Center
10400 Little Patuxent Parkway
Columbia, MD 21044

Free Business Checking Account
Secretary of State
Division of Corporations – Franchise Tax
PO Box 898
Dover, DE  19903

Secretary of Treasury
15th & Pennsylvania Ave., NW
Washington, DC  20220

DOCS_NY:25860.5 58984-001