IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MTB BRIDGEPORT-NY OPERATING LLC, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-12707 (KJC)<br><br>Ref. No. 4, 13, 143 and 151 |

## DECLARATION OF LEE W. SHUBERT IN SUPPORT OF SALE MOTION

I, Lee W. Shubert, declare as follows:

1. I am the managing member of MTB Bridgeport-NY Operating LLC ("MTB Operating") and MTB Bridgeport-NY Licensee LLC ("MTB Licensee" and together with MTB Operating, the "Debtors" or the "Company"), debtors and debtors-in-possession in the above-referenced chapter 11 cases (the "Chapter 11 Cases"). I have been employed in such capacity since May 11, 2011, and am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2. On August 26, 2011, through counsel to the Debtors, I filed the *Declaration of Lee W. Shubert in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[2]. I hereby submit this declaration (the "Declaration") in support of the *Motion of the Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the*

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) MTB Bridgeport-NY Operating LLC (0459); and (ii) MTB Bridgeport-NY Licensee LLC (4381).
[2] Capitalized Terms not otherwise defined herein shall have the same meanings as ascribed to them in the Declaration.

{895.002-W0017730.3}

*Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 13] (the "Sale Motion").

3. As set forth in the First Day Declaration, on October 30, 2008, pursuant to the Forbearance Agreements, MTB Equity LLC ("Old Equity"), Multicultural Television Broadcasting LLC ("Multicultural" and together with Old Equity, "MTBL"), myself, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders and the Successor Second Lien Agent entered into that certain Irrevocable Trust Agreement forming that certain Multicultural Capital Trust.

4. Prior to the station being transferred to the Trust, NRJ made an offer to acquire the Assets for $10 million that was rejected in favor of running a fair and open sale process whereby any party could submit higher and better bids.

5. The disposition of the Debtors' assets (the "Assets") has always been contemplated by the parties involved with the creation of the Trust.

6. The purpose for which the Trust was created in the Forbearance Agreements and one of my duties is to liquidate the assets transferred into the Trust's control.

7. Consistent with the stated purpose of the Trust and my duties, I determined, with the full support of NRJ, the Debtors' prepetition secured lender, that a sale of the Debtors' Assets would provide the best and most efficient means for the Debtors to maximize the value of their Assets.

8. NRJ is owed in excess of $76 million and the second lien lender, Fortress Value Recovery Fund I LLC, is owed in excess of $44 million.

9. Pursuant to the terms of the Trust and the Forbearance Agreement, MTBL acknowledged, admitted and agreed that this secured debt is to be repaid in full before MTBL would have any rights to the proceeds of such sale.

10. To effectuate the sale of the Debtors' Assets, prior to the Petition Date, I engaged in numerous discussions with NRJ, during which time NRJ agreed to provide the Debtors with debtor-in-possession financing, as well as act as a stalking horse bidder for the sale of substantially all of the Debtors assets (the "Acquired Assets"), subject to Court Approval and higher and better offers.

11. I reviewed the asset purchase agreement ("APA") for the purchase of the Acquired Assets.

12. In doing so, I focused on the representations and warranties to ensure the Debtors could comply with those provisions and relied upon Debtors' counsel and Kalil to review the APA for sale and bankruptcy related issues.

13. The APA was in a form very similar to the form that was used for the sale of the Trust's San Francisco and Boston stations so I was already intimately familiar with it.

14. Because I was already familiar with the form of APA, which had been successfully used in similar prior transactions, and to save the Debtors the cost of creating a completely new form, I agreed that the initial draft of the APA was to be drafted by Greenberg Traurig (counsel to the Stalking Horse).

15. Counsel for the Debtors, Landis Rath & Cobb LLP ("LRC"), and Kalil, thoroughly reviewed and commented on the initial draft APA, in an effort to ensure that it was appropriate for the Debtors and this transaction.

16. Several provisions of the APA were removed or revised during this process, including the removal of NRJ's request for a breakup fee and expense reimbursement provisions that the Debtors' believed could have a potential chilling effect on the bidding.

17. In the Trust's prior transactions pursuant to the Forbearance Agreement, no cash was physically received by the Trust and all cash went directly to the lenders at closing.

18. The instant transaction was set up in essentially the same way as prior sales to NRJ.

19. When reviewing the APA, I focused on the purchase price and deferred to Kalil and LRC on the bankruptcy issues, including the credit bid aspect contained therein.

20. It is my understanding that where there is an undisputed perfected first lien secured lender with uncontested priority in payment from the proceed of the sale, and those proceeds do not even come close to satisfying the secured debt, the economic reality is that a credit bid is effectively the same as a cash bid.

21. Once it was determined that the best way to maximize the value of the Debtors Assets was through a section 363 sale, NRJ and I agreed, prior to the Debtors engagement of bankruptcy counsel, that it was in everyone's best interest that NRJ, as the Debtors' first lien lender, to set a floor for bidding and provide debtor-in-possession financing to expedite the sale of the Assets.

22. The Debtors have proposed the sale of the Acquired Assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by a number of sound business reasons.

23. Most importantly, the Debtors cannot sustain a stand-alone operational reorganization based on, among other things, the level of the Debtors' secured debt ($120 million), a lack of long term financing and the fact that the Debtors' operations are currently losing approximately $50,000 per month.

24. Absent a sale of their Assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as they become due.

25. The Agreement between the Debtors and the Stalking Horse Bidder is the product of good faith, arm's-length negotiations between independent parties represented by their own separate counsel.

26. NRJ and the Debtors also negotiated the Bidding Procedures that were approved by this Court on October 4.

27. The Bidding Procedures were designed to encourage bidding and notably, did not contain any break-up fee or expense reimbursement provisions at the Debtors' request.

28. Titan Broadcast Management, LLC ("Titan") was installed in 2009 as the administrator of the Trust stations. Titan replaced MTBL as the administrator because the lenders wished to limit MTBL's responsibility respecting the operations of the stations, including the marshalling of the stations' financial reports. Titan was a consensus choice of the lenders and me as MTBL's replacement, and was selected because it was experienced in television stations operations and had accounting, programming and operational people in place. From an operational standpoint, Titan fundamentally mirrored the operational and personnel capabilities of MTBL.

29. The Management Services Agreement with Titan was principally negotiated by the attorneys for Wells Fargo Foothill, Inc.

30. I am familiar with Titan as they are well known in the television industry as a capable asset manager.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of November, 2011.

_____
Lee W. Shubert

{895.002-W0017730.3}