# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MTB BRIDGEPORT-NY OPERATING LLC, *et al.*,[1] | Case No. 11-12707 (KJC) |
| | (Jointly Administered) |
| Debtors. | |

## RESPONSE OF NRJ TV LLC TO OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF [RE DOCKET NO. 143]

NRJ TV LLC ("**NRJ**") hereby responds (the "**Response**") to the *Objection to Debtors' Motion for Entry of Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* (the "**Objection**") [Docket No. 143]. In support of this Response, NRJ respectfully states as follows:

## PRELIMINARY STATEMENT

1. While on its face the Objection trumpets fairness and condemns the actions undertaken by the above-captioned Debtors in connection with the sale of the Debtors' assets, the Objection, at its core is nothing more than an attempt by disgruntled former owners to regain ownership to which they are not otherwise entitled. MTB Equity LLC and Multicultural

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are MTB Bridgeport-NY Operating LLC (0459) and MTB Bridgeport-NY License LLC (4381).

Television Broadcasting LLC (collectively, the "**Old Equity**") are an out of the money constituency that is attempting to interfere with the proposed sale while providing no viable alternative for the Debtors. When viewed in that light, it is clear that the Objection should be overruled.

2. Despite the length of the Objection, Old Equity does not take issue with the fact that the Debtors cannot pay back their current debt, are operating at a loss, have no unencumbered cash, and have no options other than the proposed sale. Instead, the Objection relies on irrelevant facts and meritless legal arguments in an attempt to avoid the reality that the proposed sale is the Debtors' only alternative.

3. At its core, the Objection contains three fundamental arguments: (i) the credit bid by NRJ is defective, (ii) NRJ did not act in good faith, and (iii) NRJ is not a valid FCC licensee. These three arguments are incorrect for the reasons set forth herein.

**FACTUAL BACKGROUND**

**A. Relationship with Old Equity**

4. MTB Equity LLC and Multicultural Television Broadcasting LLC were each formed in 2006 to acquire five television stations, one of which is the subject of these chapter 11 cases – WSAH in Bridgeport, Connecticut (the "**Bridgeport Station**").[2] The Old Equity also acquired (i) KCNS in San Francisco, California ("**KCNS**"); (ii) WMFP in Lawrence, Massachusetts ("**WMFP**"); (iii) WOAC in Cleveland, Ohio ("**WOAC**"); and (iv) WRAY in Raleigh-Durham, North Carolina ("**WRAY**" and collectively with KCNS, WMFP and WOAC the "**Non-Bridgeport Stations**"). The Old Equity is solely owned by Arthur Liu and his wife (the "**Lius**").[3]

---

[2] Deposition of Arthur Liu ("**Liu Deposition**"), pg. 15, lns. 13-14, 23-25.
[3] Liu Deposition, pg. 15, lns. 9-12, 21-22.

5. Old Equity purchased the Bridgeport Station and the Non-Bridgeport Stations (collectively, the "**Stations**") in December 2006 and April 2007 for $170 million. The purchase was financed by approximately $70 million in capital contributions from the Lius, a senior loan of approximately $70 million (the "**Senior Loan**") and a subordinated loan of approximately $30 million (the "**Subordinated Loan**" and with the Senior Loan, the "**Secured Loans**"). Wells Fargo Foothill, Inc. acted as agent under the Senior Loan for the benefit of the lenders thereunder (the "**Senior Lenders**"). Through several of its managed funds, Fortress Investment Group (collectively, "**Fortress**") were lenders under both the Senior Loan and the Subordinated Loan (the "**Subordinated Lenders**" and collectively with the Senior Lenders, the "**Secured Lenders**").

6. The Old Equity defaulted on the Secured Loans in 2008. On September 29, 2008, the Secured Lenders commenced an action in the New York Supreme Court seeking to appoint a receiver for the Non-Bridgeport Stations. Subsequently, the Secured Lenders and the Old Equity negotiated forbearance agreements (the "**Forbearance Agreements**"), which avoided the need for a receiver to be appointed.

7. Pursuant to the Forbearance Agreements, Old Equity was to transfer their interests in the Debtors and other affiliates into the Multicultural Capital Trust (the "**Trust**"), which was governed by the Trust Agreement, and which was intended to allow the orderly sale of the Stations for the benefit of first the Senior Lenders, second for the benefit of the Subordinated Lenders and third for the benefit of Old Equity. The Old Equity transferred the Non-Bridgeport Stations into the Trust in accordance with the terms of the Forbearance Agreements.

8. The Secured Lenders extended the timeframe set forth in the Forbearance Agreement by which Old Equity was to have transferred the Bridgeport Station into the Trust on

three separate occasions to allow Old Equity additional time to attempt to gain the Federal Communications Commission's ("**FCC**") consent to transfer the Bridgeport Station's transmitter from a tower site in Connecticut to the Empire State Building.[4] However, on November 5, 2009, the FCC issued a letter denying the Old Equity's request (the "**FCC Letter**"). A copy of the FCC Letter is attached hereto as **Exhibit A**.

9. In addition to extending the time periods in the Forbearance Agreement and had the Old Equity's request to relocate the transmitter to the Empire State Building been successful, the Secured Lenders offered the Lius the opportunity to share in the proceeds from the sale of the relocated station. Despite being owed over $100 million, the Secured Lenders proposed a deal where if the relocated station sold for $100 million or more, the Old Equity would receive $16 million in cash plus 25% of any amounts over $100 million.[5] Old Equity refused this offer from the Secured Lenders and instead demanded that they be paid the first $20 million resulting from any sale of the Bridgeport Station.[6]

10. The Bridgeport Station was ultimately transferred into the Trust on May 11, 2011.

**B. The Identity of the Lenders**

11. NRJ is a Delaware limited liability company. NRJ currently owns KCNS and WMFP. One hundred percent of the voting interests in NRJ are owned by NRJ TV Holdings, LLC ("**NRJ Holdings**"). The economic interests in NRJ, which are represented by Class B units, are owned one-third by each of NRJ Holdings, 5 Star Spectrum, LLC and Drumcree, LLC.

12. 5 Star Spectrum, LLC ("**5 Star Spectrum**") is owned by Titan Broadcasting Management LLC ("**Titan Broadcasting**"). Prior to the formation of NRJ, on November 16, 2009, the Trust entered into a Management Services Agreement ("**MSA**") with Titan

---

[4] Deposition of Mari Subburathinam ("**Subburathinam Deposition**"), pgs. 91-92.
[5] Subburathinam Deposition, pgs. 79-83.
[6] Subburathinam Deposition, pgs. 79-83.

Broadcasting to manage the Non-Bridgeport Stations. This MSA also contained a provision that Titan Broadcasting would have the right to manage the Bridgeport Station should it ever be transferred to the Trust. As previously disclosed to the Court, Titan Broadcasting, though its ownership of 5 Star Spectrum is a part owner in NRJ and presently manages the Bridgeport Station on behalf of the Trust. The engagement and utilization of a manager in the broadcast industry is common practice and Titan Broadcasting provides broadcast television management services to various other stations for unrelated third parties not involved in these chapter 11 cases.

13. NRJ was formed in October 2010 to, among other things, acquire, own and operate broadcast television stations in the United States and to acquire publicly or privately issued securities. Subsequently, NRJ purchased two of the Non-Bridgeport Stations via the sale of assets of the respective operating and licensing holding companies to affiliates of NRJ. At the time of these purchases, NRJ was not a secured creditor of any of the Debtors, or any of the non-debtor affiliates. The other two Non-Bridgeport Stations were sold via the sale of assets of the respective operating and licensing holding companies to unrelated third parties.

14. As of May 26, 2011, NRJ acquired 100% of the Senior Loan, purchased in separate transactions from Canpartners Investments IV, LLC, Citicorp USA, Inc., Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund Ltd., Fortress Credit Funding III LP, and Fortress Credit Funding IV LP. Contrary to the claims contained in the Objection, NRJ was an "Eligible Transferee" under the Senior Loan Credit Agreement, as subsection 7(f) of the Senior Loan Credit Agreement provides that any person approved by the Agent is an Eligible Transferee upon an event of Default.

15. Prior to NRJ's acquisition of 100% of the Senior Loan, Una Vez Mas ("**UVM**") unsuccessfully attempted to acquire 100% of the Senior Loan. Mr. Liu testified that he had reached an agreement with UVM that had they successfully acquired the Bridgeport Station, Mr. Liu would have received $12 million in cash and 22% equity in the new venture.[7]

16. Despite the mischaracterizations in the Objection, NRJ is not controlled by Fortress. DBO Media Finance LLC ("**DBO**"), a fund managed by Fortress, is the lender to NRJ and pursuant to various terms of those loans, DBO possesses a conditional ability to participate in any upside or return, either monetarily or through ownership of a majority of the interest in NRJ. The nature of this relationship is hardly unique. It is also irrelevant and inconsequential to the proposed sale process and has been thoroughly disclosed during the proceedings of these chapter 11 cases.

### C. The Asset Purchase Agreement and Auction

17. On August 26, 2011, the Debtors filed their chapter 11 petitions and the *Motion of the Debtors for Entry of Orders (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "**Sale Motion**") [Docket No. 13].

---

[7] Liu Deposition, pg. 24, lns. 20-25, pg. 25, lns. 1-5, pg. 26, lns. 14-23, pg. 27, lns. 2-25, pg. 28, ln. 1.

18. NRJ agreed to act as the stalking horse bidder in the sale of the Debtors' assets, which provided a baseline bid against which the Debtors could run the sale process. To facilitate the sale process, NRJ and the Debtors entered into an asset purchase agreement (the "**APA**") whereby the Debtors would sell the Bridgeport Station to affiliates of NRJ in exchange for a $12 million credit bid plus the assumption of certain liabilities of the Debtors. Under the APA, NRJ is purchasing substantially all of the Debtors' assets, including direct or indirect, right, title and interests of the Debtors in and to all the tangible and intangible assets, properties, rents, claims, and contracts of the Debtors, to the extent transferable.

19. The Debtors conducted a full, fair and complete marketing and sale process which resulted in offers to purchase the assets from two additional bidders, including a bid from a disinterested third party that is in an amount in excess of the initial bid submitted by NRJ. In effect, the Bridgeport Station has been effectively marketed since July 2011, when the Trust began to market the Bridgeport Station.

20. Obtaining consent to the transfer of the FCC Licenses (as defined in the APA) from the Debtor to NRJ is a condition precedent to the closing of the sale. While the issue of whether NRJ is qualified to hold the FCC License for the Bridgeport Station is not at issue before this Court, the Objection asserts that NRJ's bid cannot be the highest and/or best bid because the FCC will be unable to approve the proposed assignment of the Bridgeport Station from the Debtors to NRJ. This assertion is unsupported, speculative and is inconsistent with the fact that the FCC has already considered and evaluated NRJ's qualifications to hold television station licenses in connection with acquisition of both KCNS and WMFP.[8] If NRJ's bid proves to be the highest and/or best bid after the auction process, based on previous experience, NRJ is

---

[8] Copies of the FCC approvals are attached hereto as **Exhibit B**.

certain it will be able to obtain the FCC's consent in accordance with the conditions contained in the APA.[9]

## RESPONSE

### A. The Objection is Merely an Attempt by Disgruntled Former Owners to Regain Value to Which they are Otherwise Not Entitled.

21. The Objection is the Old Equity's most recent attempt to complicate the sale of the Debtors' assets in order to obtain value to which they are not entitled. Old Equity has not provided value sufficient to repay the Secured Loans in full. In fact, the Trust was set up to allow for an orderly sale of the Debtors' property after the initial default by Old Equity, and the value of the assets of the Debtors is substantially less than the outstanding amount of the Secured Loans. Further, the Debtors are operating at a net loss of approximately $50,000 per month.

22. The Debtors are encumbered with more than $100 million of secured debt and have initiated these chapter 11 cases to effectuate a sale of their assets. As set forth in the Sale Motion, the Debtors' bid procedures were designed to ensure that the Debtors' assets will be sold for the highest or otherwise best possible purchase price. As set forth above, the process has resulted in bids other than the stalking horse bid. The sale of the Debtors' assets will be done through a competitive, fair and open auction, thus, if Old Equity believes the Bridgeport Station's value exceeds that of the Secured Loans, they may submit a bid in excess of the secured debt and own the Bridgeport Station. Absent providing the highest and/or best bid at the auction, Old Equity should not be allowed to interfere with the sale process.

---

[9] The Objection's assertion that lenders and warrant holders should have been disclosed in NRJ's prior FCC applications is incorrect. The FCC's application form for assignment of television station licenses, FCC Form 314, does not call for this information. The FCC requires the disclosure of parties that have "attributable" interest in the proposed buyer. and neither holders of debt or warrant holders are deemed to have an attributable interest. *See* 47 C.F.R. § 73.3555, Note 2e, 2i; FCC Form 314, instructions to Section III, Item 4.

DEL 86,388,967v4 11-14-11                                           8

## B. NRJ is Entitled to Credit Bid

### 1. NRJ May Credit Bid the Full Amount of its Secured Claim.

23. NRJ holds a valid, first-priority lien in substantially all of the Debtors assets pursuant to the Senior Loan. As such, NRJ should be permitted to "credit bid" the amount of its claim in a sale. Bankruptcy Code §363(k) provides, in relevant part, that in a sale under Bankruptcy Code §363, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. §363(k).

24. Credit bidding permits secured creditors to "prop up" the value of their collateral during the auction process and set a floor for other bidders. A secured creditor can credit bid its secured claim in excess of any amount a third-party bidder would be willing to pay, in effect, purchasing its collateral in exchange for the debt it held against the debtor. *See, e.g., Beal Bank S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668 (D. Mass 2000) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1129.05[2][b], at 1129-34 (15th ed. rev. 1998) (Bankruptcy Code §363(k) "gives the secured creditor protections against attempts to sell the collateral too cheaply; if the secured party thinks the collateral is worth more than the debtor is selling it for, it may effectively bid its debt and take title to the property."). *See also In re Requilman*, No. 08-32240, 2009 WL 4929397 (Bankr. N.D. Cal. Dec. 11, 2009) ("The purpose of section 363(k) is to ... permit[] the secured the secured creditor to take the collateral if the proposed sale price would not pay the secured claim in full and the creditor believes it could do better."). In this case, NRJ's valid, perfected lien provides it the right to credit bid under Section 363(k) even if that bid is in excess of that which any third-party would pay.

25. A credit bid is the functional equivalent of a cash bid. A credit bid is effectively a cash bid because a credit bid of the debt to purchase collateral simply avoids the meaningless step of a secured creditor paying itself in cash and then applying the cash to its debt; either way, the result is the same - the secured creditor's debt is reduced by the amount of the bid. *See In re Finova Capital Corp.*, 365 B.R. 609 (Bankr. D. Del. 2006).

### 2. There is No Basis to Deny NRJ The Right to Credit Bid

26. A court may deny the ability of a secured creditor to credit bid "for cause." The term "cause" is not defined in Section 363, but it is intended to be a flexible concept enabling a court to fashion a remedy on a case by case basis. *In re NJ Affordable Homes Corp.*, 2006 WL 2128624 (Bankr. D. N.J. 2006). In this case, the Objection asserts that NRJ should not be allowed to credit because (i) it does not have a lien on the FCC Licenses and (ii) of NRJ's alleged misconduct in the sale process. Neither of these assertions has merit and NRJ should be permitted the right to credit bid its debt in an amount it deems appropriate.

### I. NRJ May Acquire the Interest in the FCC License Through Credit Bidding.

27. Congress has granted the FCC the authority to regulate the use of the public airwaves in the United States, which includes the exclusive right to grant a license to use the airwaves and to approve any transfer of a license by a licensee. *See 47 U.S.C.* §§ 301, [*17] 310(d); *see also* 47 C.F.R. § 731150(a). In order to grant a license or approve its transfer, the FCC must determine that the transfer will serve the public interest, thus, the right to use the airwaves is a public right granted by the FCC to a licensee that may not be assigned without the express permission of the FCC. *See* 47 U.S.C. §310(d). However, it is well settled that a creditor may perfect a lien in the licensee's "general intangible," which in this instance includes the private economic value of an FCC license to the extent that such lien does not violate the

FCC's public right to regulate license transfers. *See Sprint Nextel Corp. v. U.S. Bank National Assoc. (In re TerreStar Networks Inc.)*, Case No. 10-15446 (SHL) (Bankr. S.D.N.Y. Aug. 19, 2011) ("noteholders have a valid lien on the economic value associated with TerreStar's S-Band License, even if they cannot hold a lien on the FCC license itself."); *MLQ Investors, L.P. v. Pacific Quadracasting*, 146 F.3d 746, 748 (9th Cir. 1998); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 334-35 (S.D.N.Y. 2008); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009) ("FCC Licenses... are subject to an enforceable dedication of their economic value ...."; *In re Beach Television Partners*, 38 F.3d 535, 537 (11th Cir. 1994) (holding that "[a] security interest in the proceeds of an FCC-approved sale of a broadcast license in no manner interferes with the FCC's authority and mandate under the Act to regulate the use of broadcast frequencies."); *Wells Fargo Foothill, Inc. v. Kepler (In re Media Props.)*, 311 B.R. 244, 249-250 (Bankr. W.D. Wis. 2004) ("After those prerogatives exclusive to the FCC are carved out, there remains an interest which would continue in proceeds of those interests by operation of law.")(citation omitted). NJR has a perfected lien on the economic value of the FCC Licenses and is therefore entitled to credit bid against its collateral. 11 U.S.C. §363(k).

28. MTB Bridgeport-NY Licensee LLC ("**NY Licensee**") holds the FCC license. In addition to a security interest in the economic value of the FCC License, NRJ also has a security interest in the membership interest of NY Licensee. Thus whether NRJ credit bids against the economic value of the FCC License or for their security interest in NY Licensee, the result is the same.

## II. No Cause Exists for Denial of Credit Bid based on NRJ's Conduct

29. Despite the assertions contained in the Objection, there is no cause to deny NRJ the right to credit bid their interests in the auction and as discussed more fully below, NRJ has acted in good faith throughout these chapter 11 proceedings. NRJ's ability to credit bid at the auction is not affected by their agreements with DBO, and any assertions to the contrary in the Objection misinterpret applicable law.

### C. NRJ Acted in Good Faith and is Entitled to the Protections Contained in Section 363(m) of the Bankruptcy Code

30. As a condition to closing, the APA requires that the Court enter an order approving the sale in a form and substance satisfactory to NRJ, finding that NRJ has purchased the Debtors' assets "in good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

31. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. §363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit has held:

> [t]he requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.

788 F. 2nd 143, 147 (3d Cir. 1985) (citations omitted). Generally, a "good faith purchaser" is one who buys property ... for value, without knowledge of adverse claims." 3 COLLIER ON BANKRUPTCY ¶ 363.11.

32. Before an asset sale has taken place, it is impossible to determine whether the proponent of good faith has satisfied the burden of establishing good faith; nevertheless, a streamlined procedure that includes a good faith finding by the Court is still possible if, before or immediately after the sale closes, a declaration or other competent evidence is submitted to the Court. *See In re Boarders Group, Inc.* 453 B.R. 477 (Bankr. S.D.N.Y., 2011).

33. While a finding of good faith for purposes of section 363(m) is premature at this stage of these chapter 11 cases, NRJ submits that it has conducted itself in accordance with the principles of good faith. The Debtors have conducted an open solicitation process which exposed the opportunity presented by the Bridgeport Station to the marketplace and resulted in numerous offers to purchase the Bridgeport Station. After arm's-length negotiations, NRJ agreed to serve as the stalking horse bid; however, as a result of the Debtors' solicitation, the Debtors received a bid which trumped NRJ's stalking horse bid.

34. The Debtors, along with their broker, conducted an exhaustive marketing process designed to solicit bids from any and all interested potential purchasers. As the market for television broadcasting stations is a relatively small close knit community the market was well aware that the Bridgeport Station was available for purchase. In addition, the Bridgeport Station has been marketed and available for sale well before the commencement of these chapter 11 proceedings, as the Old Equity solicited potentially interested parties to submit offers well before the commencement of these chapter 11 cases. Finally, as the Trust had already solicited and disposed of the Non-Bridgeport Stations through the Debtors' broker, the Debtors' broker was

familiar with the market and was able to run an efficient and comprehensive search for interested purchasers.

35. Conjecture and unfounded allegations are insufficient to establish a lack of good faith. Neither NRJ, nor any of its members, colluded, improperly influenced, exerted pressure or control or engaged in any other impermissible conduct relating to the Debtors' execution of these chapter 11 cases. *See In re Abbotts Dairies of Pennsylvania, Inc.* 788 F.2d 143, 147 (3d Cir. 1986). Further, NRJ has not had any impermissible contact with either of the other bidders interested in acquiring the Debtors' assets, and have not attempted to control the sale through any agreements with other potential bidders. *See In re Stroud Ford, Inc.*, 163 B.R. 730 (Bankr. M.D. Pa. 1993). If, after a competitive, fair, transparent auction, NRJ is indeed the bidder with the highest or best bid, NRJ will demonstrate that the sale was negotiated at arm's-length and in good faith.

## RESERVATION OF RIGHTS

36. This response represents NRJ's attempt to respond to the most germane issues raised in the Objection and as such omits resuscitation of many of the legal standards and resulting analysis commonly addressed in pleadings related to the sale of a debtor's assets. NRJ respectfully reserves its rights to more fully respond to issues addressed in the Objection at any hearing addressing the terms of the Objection.

## CONCLUSION

37. For the foregoing reasons, NRJ requests this Court allow the auction to proceed unencumbered as contemplated in the Sale Motion.

Dated: November 14, 2011					GREENBERG TRAURIG, LLP

*[signature]*

Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Matthew L. Hinker (DE Bar No 5348)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hinkerm@gtlaw.com

-and-

David B. Kurzweil
James S. Altenbach
3290 Northside Parkway, Suite 400
Atlanta, GA 30327
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
Email: kurzweild@gtlaw.com
    dyerj@gtlaw.com

*Counsel to NRJ TV, LLC*